The Honorable Tana Lin

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BUNGIE, INC.,

               Plaintiff,

      v.

ELITE BOSS TECH INCORPORATED,
11020781 CANADA INC., DANIEL
FAGERBERG LARSEN, ROBERT JAMES
DUTHIE NELSON, SEBASTIAAN JUAN
THEODOOR CRUDEN A/K/A
"LUZYPHER," JOHN DOE NO. 4 A/K/A
"GOODMAN," YUNXUAN DENG A/K/A
"YIMOSECAI," ANTHONY ROBINSON
A/K/A "RULEZZGAME," EDDIE TRAN
A/K/A "SENTIENT", CHENZHIJIE CHEN
A/K/A "CHENZHIJIE402, DSOFT, CVR
37454303, MARTA MAGALHAES A/K/A
MINDBENDER A/K/A BLUEGIRL, AND
JOHN DOES NO. 9-20,

               Defendants.

Case No. 2:21-cv-01112-TL

MOTION FOR DEFAULT

**NOTE ON MOTION CALENDAR:
January 20, 2023**

## PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

# TABLE OF CONTENTS

2

I. INTRODUCTION ................................................................................................................ 1

3

II. FACTUAL BACKGROUND ............................................................................................. 2

4

   A.  BUNGIE AND THE LSLA ......................................................................................... 2

   B.  LARSEN & THE WALLHAX ENTERPRISE ........................................................... 3

5

III. ARGUMENT ................................................................................................................... 7

6

   A.  The Court Has Personal Jurisdiction Over Larsen and Subject Matter Jurisdiction Over the Dispute ................................................................................................................................... 7

7

   B.  The First, Sixth, and Seventh *Eitel* Factors Favor Default Judgment Because Larsen Has Consciously Decided Not to Appear ...................................................................................... 8

8

   C.  The Second and Third *Eitel* Factors Favor Bungie Because Bungie's Well-Pled Complaint and Supporting Evidence Establish Larsen's Liability. ........................................................... 9

9

      1.  Copyright Infringement .................................................................................. 10

10

      2.  Civil RICO under 18 U.S.C. § 1962(a), (b), & (c) ........................................ 14

11

      3.  Circumvention of Technological Measures under 17 U.S.C. § 1201(a) ......... 21

12

      4.  Violation of the Computer Fraud and Abuse Act .......................................... 23

      5.  Breach of Contract and Interference with Contractual Relations .................. 25

13

      6.  Violation of the Washington Consumer Protection Act................................. 26

14

      7.  Civil Conspiracy ............................................................................................ 28

   D.  The Fourth *Eitel* Factor Weighs in Bungie's Favor Because Larsen's Conduct Warrants the Damages Bungie seeks .................................................................................................... 28

15

   E.  The Fifth *Eitel* Factor Favors Bungie Because the Facts are Undisputed. ........................ 28

16

   F.  The Court Should Award Bungie $3,400,154.71 in Compensatory Damages, $13,500,000.00 in Statutory Damages, and $338,113.52 in Attorney Fees and Costs, Plus Fees Incurred After Submission of this Motion ...................................................................................... 29

17

18

      1.  On Bungie's Anti-Circumvention Claim, the Court Should Award Bungie $13,500,000.00 in Statutory Damages .................................................................. 29

19

      2.  On Bungie's Copyright Claim, the Court Should Award Bungie $1,400,156.71 in Damages, Plus Costs and Attorneys' Fees. ...................................................... 31

20

      3.  Plaintiff is Entitled to Compensation for Its Significant Mitigation Expenses ............. 34

21

      4.  Plaintiff is Entitled to Recover its Attorney's Fees and Costs ....................... 35

22

   G.  Plaintiff is Entitled to Permanent Injunctive Relief. ............................................... 35

23

      1.  Plaintiff Suffered Irreparable Harm .............................................................. 36

      2.  Monetary Damages Alone Are Inadequate ................................................... 37

24

      3.  The Balance of Equities Favors a Permanent Injunction ............................... 37

25

      4.  The Public Interest Would Be Served by a Permanent Injunction................. 38

   IV. Conclusion .................................................................................................................. 38

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

# Table of Authorities

**Page(s)**

**Cases**

*Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995) .................................................. 19

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633 (9th Cir. 2013) ......................... 38

*Amazon Content Servs. LLC v. Kiss Libr.*, No. C20-1048 MJP, 2021 WL 5998412
(W.D. Wash. Dec. 17, 2021) ........................................................................................ 9

*Apulent, Ltd. v. Jewel Hosp., Inc.*, C14-637RSL, 2015 WL 630953
(W.D. Wash. Feb. 12, 2015) ......................................................................................... 34

*Bangkok Broad. & T.V. Co., Ltd. v. IPTV Corp.*, 549 Fed. Appx. 647 (9th Cir. 2013) ............... 30

*Blizzard Entm't, Inc. v. Bossland GmbH*, 16-cv-1236-DOC, 2017 WL 7806600
(C.D. Cal. Mar. 31, 2017) ...................................................................................... 11, 12

*Blue Nile, Inc. v Ideal Diamond Solutions, Inc.*, No. C10-380Z, 2011 WL 3360664
(W.D. Wash. Aug 3, 2011) .......................................................................................... 11

*Boyle v. U.S.*, 556 U.S. 938 (2009) ..................................................................................... 15

*Cisco Sys. Inc. v. Arista Networks, Inc.*, 14-CV-05344-BLF, 2016 WL 11752975
(N.D. Cal. Nov. 16, 2016) .......................................................................................... 33

*Crim. Prods., Inc. v. Evans*, No. 16-CV-1647RAJ, 2018 WL 2397439
(W.D. Wash. Apr. 4, 2018) ......................................................................................... 14

*Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 1200, 1211 (W.D. Wash. 2014) ...................... 10

*CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051 (E.D. Cal. 2009),
*aff'd*, 348 F. App'x 288 (9th Cir. 2009) ....................................................................... 37

*DeFelice v. State, Emp't Sec. Dep't*, 187 Wash. App. 779, 351 P.3d 1971 (2015) ..................... 11

*Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696  (9th Cir. 2008) ............................... 14

*Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017) ................................ 10, 38

*eBay, Inc. v. Bidder's Edge*, 100 F. Supp. 2d 1058 (N.D. Cal. 2000) ...................................... 37

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ......................................................... 37

*Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 538 F. Supp. 3d 1132
(D. Or. 2021) ............................................................................................................... 38

*Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986) ...................................................................... 7

*Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918 (E.D. Va. 2017) ................. 24

*Facebook, Inc. v. ILikeAd Media Int'l Co. Ltd.*, 19-CV-07971-SK, 2022 WL 2289064
(N.D. Cal. Feb. 1, 2022), *report and recommendation adopted as modified*,
19-CV-07971-JST, 2022 WL 2289058 (N.D. Cal. Mar. 15, 2022) ................................... 8

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) ................................... 25

*Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) .................................................. 7

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

*Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016 (9th Cir. 2001) ...................... 20

2

*Getty Images I v. Virtual Clinic*s, No. C13-0626JLR, 2014 WL 1116775
  (W.D. Wash. Mar. 20, 2014) ................................................... 37, 39

3

*Gossen v. JPMorgan Chase Bank*, 819 F. Supp. 2d 1162 (W.D. Wash. 2011) ............ 29

4

*Griffo v. Oculus VR, Inc.*, SACV151228DOCMRWX, 2018 WL 6265067
  (C.D. Cal. Sept. 18, 2018) ..................................................... 33

5

*Hangman Ridge*, 105 Wash.2d 778 719 P.2d 531 ....................................... 28

6

*Hill v. Lynn*, No. 17 C 06318, 2018 WL 2933636 (N.D. Ill. June 12, 2018) ......... 24, 26

7

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) ................... 25

8

*Holland Am. Line Inc. v. Wartsila N. Am. Inc.*, 485 F.3d 450 (9th Cir. 2007) ............... 8

9

*In re Tuli,* 172 F.3d 707 (9th Cir. 1999) .......................................... 7

10

*Internet Specialties W., Inc. v. Milon- DiGiorgio Enters., Inc.*, 559 F.3d 985
  (9th Cir. 2009) ................................................................ 39

11

*Inteum Co., LLC v. Natl. U. of Singapore*, C17-1252-JCC, 2018 WL 2317606
  (W.D. Wash. May 22, 2018) ...................................................... 28

12

*Jackson v. Sturkie*, 255 F. Supp. 2d 1096 (N.D. Cal 2003) .......................... 38

13

*Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979 (2016) ...................... 36

14

*Klem v. Wash. Mut. Bank,* 176 Wn.2d 771 295 P.3d 1179 (2013) ....................... 27

15

*Landstar Ranger, Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 2d 916 (C.D. Cal. 2010)........... 29

16

*Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 930 P.2d 288 (1997)............. 26, 27

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F. 2d 965 (9th Cir. 1992) ................ 13

17

*Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353 (9th Cir. 2005) .............. 15

18

*Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002)..................................... 32

19

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993)................ 24, 36

20

*Malnar v. Carlson*, 128 Wash. 2d 521, 910 P.2d 455 (1996).......................... 11

21

*Maplebear Inc. v. Doe*, No. 121CV474AJTIDD, 2021 WL 2767296,
  (E.D. Va. May 10, 2021) ........................................................ 25

22

*MDY Industries LLC v. Blizzard Entertainment Inc.*, 629 F. 3d 928 (9th Cir. 2010)................... 22

23

*Neurovision Medical Products, Inc. v. NuVasive, Inc.*, 2014 WL 12554861
  (C.D. Cal. Aug. 5, 2014)........................................................ 38

24

*Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007 (9th Cir. 1994)................. 30

25

*Nugget Hydroelectric, L.P. v. P. Gas and Elec. Co.*, 981 F.2d 429 (9th Cir. 1992)................... 21

26

*Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 899 P.2d 6 (1995)........ 26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  *On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001)............................................................ 33

2  *Padded Spaces LLC v. Weiss*, C21-0751JLR, 2022 WL 2905887
   (W.D. Wash. July 22, 2022) ......................................................................................... 7, 9, 10

3  *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 204 P.3d 885 (2009............................ 27

4  *PepsiCo Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172 (C.D. Cal. 2002) ............................ 10, 29

5  *Philips N. Am. LLC v. Glob. Med. Imaging, LLC*, No. 21-CV-3615, 2022 WL 3106971
   (N.D. Ill. Aug. 4, 2022).................................................................................................... 26

6  *Philips N. Am. LLC v. KPI Healthcare, Inc.*, SACV191765JVSJDEX,
7  2021 WL 6103527 (C.D. Cal. Sept. 1, 2021) ................................................................ 31

8  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004),
   *as amended on denial of reh'g and reh'g en banc* (Oct. 25, 2004), *opinion amended*
9  *on denial of reh'g*, 03-35188, 2004 WL 2376507 (9th Cir. Oct. 25, 2004) ......................... 33

   *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531
10 (N.D. Tex. 2003)............................................................................................................... 13

11 *Principal Life Ins. Co. v. Hill*, C21-1716 MJP, 2022 WL 2718087
   (W.D. Wash. July 13, 2022) ............................................................................................. 7

12 *Rearden LLC v. Walt Disney Co.*, 17-CV-04006-JST, 2021 WL 4099622
13 (N.D. Cal. Aug. 17, 2021).................................................................................................. 32

   *Reves v. Ernst & Young*, 507 U.S. 170 (1993)............................................................... 16

14 *Rimini St., Inc. v. Oracle Int'l Corp.*, 473 F. Supp. 3d 1158 (D. Nev. 2020) ...................... 14

15 *Seattle Pac. Indus., Inc. v. S3 Holding LLC*, 831 Fed. Appx. 814 (9th Cir. 2020)................. 30

16 *Shute v. Carnival Cruise Lines*, 783 P.2d 78 (Wash. 1989) ............................................. 8

17 *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068 (N.D. Cal. 2005)............ 31

18 *State v. Reader's Digest Ass'n*, 81 Wash.2d 259, 501 P.2d 290.......................................... 28

   *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) .................. 37
19
   *Take-Two Interactive Software, Inc. v. Zipperer*, 18 CIV. 2608 (LLS),
20 2018 WL 4347796 (S.D.N.Y. Aug. 16, 2018)................................................................ 12

21 *Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004)....................................................... 25

22 *TracFone Wireless, Inc. v. SND Cellular, Inc.*, 715 F. Supp. 2d 1246 (S.D. Fla. 2010)............. 32

   *Tu v. TAD Sys. Tech. Inc.*, 2009 WL 2905780, (E.D.N.Y. 2009)......................................... 39
23
   *U.S. v. Middleton*, 231 F.3d 1207 (9th Cir. 2000) .......................................................... 35
24
   *Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980 (9th Cir. 2017)....................................... 14
25
   *United States v. Liu*, 731 F.3d 982 (9th Cir. 2013)....................................................... 15
26
   *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) .................................................. 17

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

*United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) .................................................. 24

*United States v. Shipsey*, 363 F.3d 962 (9th Cir. 2004) ................................................ 17

*Urban Accessories, Inc. v. Iron Age Design & Imp., LLC,* C14-1529JLR,
2015 WL 1510027 (W.D. Wash. Apr. 1, 2015) ........................................................ 11

*Van Buren v. United States*, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021)......................... 25

*Warner Bros. Home Entm't Inc. v. Jimenez*, 2013 WL 3397672 (C.D. Cal. 2013)..................... 38

*Wecosign, Inc. v. IFG Holdings, Inc.*, 845 (C.D. Cal. 2012) ........................................ 38

*Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995 n.12 (Fed. Cir. 1986)....................... 38

*Woody v. Stapp*, 146 Wn. App. 16 (Wash. Ct. App. 2008) ........................................ 28

**Statutes**

17 U.S. Code § 504 .................................................................................................. 35

17 U.S.C. § 1201 ........................................................................................ 8, 21, 22, 23

17 U.S.C. § 502(a) .................................................................................................. 36

17 U.S.C. § 504(b) .................................................................................................. 32

17 U.S.C. § 506(a) .................................................................................................. 18

18 U.S.C. § 1030 ........................................................................................ 8, 23, 24, 36

18 U.S.C. § 1343 .................................................................................................... 17

18 U.S.C. § 1956 ........................................................................................ 17, 18, 19

18 U.S.C. § 1957 ............................................................................................ 17, 19

18 U.S.C. § 1961 ........................................................................................ 15, 17, 19

18 U.S.C. § 1962 ........................................................................................ 8, 15, 16, 21

18 U.S.C. § 1962 *et seq.* ..................................................................................... 15

18 U.S.C. § 1964 ........................................................................................ 32, 35, 36

28 U.S.C. § 1331 ...................................................................................................... 8

28 U.S.C. § 1367 ...................................................................................................... 8

RCW 19.138.280 ...................................................................................................... 35

RCW 19.86.090 ................................................................................................ 32, 35

RCW 19.86.920 ...................................................................................................... 27

**Rules**

Fed. R. Civ. P. 55 .................................................................................................... 7

Fed. R. Civ. P. 41 .................................................................................................... 8

LCR 55 .................................................................................................................. 7

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

# I. <u>INTRODUCTION</u>

2       As alleged in the Complaint – and as Defendants Elite Boss Tech Incorporated ("EBT"),

3 11020781 Canada Inc. ("1102 Canada"), and Robert James Duthie Nelson ("Nelson") conceded

4 in their stipulated judgment – the Wallhax enterprise develops cheat software that violates both

5 federal law and the rights of Plaintiff Bungie, Inc. ("Bungie") in its successful live-service game,

6 *Destiny 2*. Defaulting Defendant Daniel Fagerberg Larsen ("Larsen") played a critical role in

7 those violations, designing the cheat software ("Cheats") and helping to coordinate the Wallhax

8 enterprise. As shown herein, the evidence establishes Larsen's personal liability on each of

9 Bungie's claims in this action: for (1) copyright infringement, (2) civil RICO, (3) circumvention

10 of technological protection measures, (4) violations of the Computer Fraud and Abuse Act, (5)

11 breach of contract, (6) intentional interference with contractual relations, (7) violations of the

12 Washington Consumer Protection Act, and (8) civil conspiracy. Given Larsen's default, Bungie

13 is thus entitled to a default judgment on its claims.

14       As further shown herein, that judgment should issue in the amount of $17,238,268.23.

15 Bungie is entitled to an award of statutory damages in the amount of $13,500,000.00, consisting

16 of $2,000 per circumvention device. It is entitled to an award of its actual damages under the

17 copyright act and the CFAA, which, after a trebling of their damages under the Racketeering

18 Influence and Corrupt Organizations Act, is $3,400,154.71. And Bungie is entitled to an award

19 of attorneys' fees and costs of $338,113.52. All told, Bungie's damages total $17,238,268.23.

20       Finally, the Court should issue a permanent injunction barring Larsen from continuing to

21 develop, sell, distribute, or otherwise profit from Cheats targeting *Destiny 2* or other Bungie

22 games. Cheat software allows unskilled, unethical, and antisocial players to gain an unfair

23 advantage against other players in Bungie's shared-world, massively multiplayer online games,

24 in which millions of users across the globe play with and compete against each other for fun,

25 bragging rights, in-game loot, and accolades. Cheats destroy the appeal of Destiny 2's

26 competitive PvP activities, attract the parasitic activities of black-market "boosting" services,

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  and devalue the in-game and real-world rewards that Bungie offers for exceptional end-game

2  achievement. Cheats thus negatively impact the gaming experience of Bungie's large community

3  of honest players who enjoy playing and winning fairly through skill and practice rather than

4  shortcuts, and thereby negatively affect Bungie's business. That, in turn, threatens Bungie in

5  ways that cannot be reduced to a damages number. As the provider of a continuing live-service

6  game, Bungie is uniquely vulnerable to attacks on the long-tail engagement of its community of

7  players. When Bungie's player community is dissatisfied, Bungie loses players and the

8  opportunity for continued growth, and therefore revenue (Bungie's revenue from *Destiny 2* is

9  derived entirely from players' in-game cosmetic purchases, optional purchases of additional

10  game content ("DLCs"), and memorabilia – all of which suffer when players are less attached to

11  the game). Larsen's Cheat activity thus irreparably harms Bungie, and should be enjoined.

## II. FACTUAL BACKGROUND

### A.  BUNGIE AND THE LSLA

14         Bungie, Inc. is the developer and publisher of the critically acclaimed video game

15  *Destiny 2*, a shared world massively multiplayer online shooter. Declaration of James Barker

16  ("Barker Dec"), ¶ 2. *Destiny 2* operates on a free-to-play model; the base game and experience is

17  completely free, and any console or PC owner with the hardware and the inclination can

18  download and play. *Id.*, ¶ 7. The player can then elect to become a customer: Bungie offers for

19  sale various expansions and packs of content that add story missions and campaigns, new

20  weapons and items, and any manner of cosmetic and aesthetic enhancements that can be

21  obtained using an in-game currency, Silver, that a player may purchase. *Id.* As such, Bungie's

22  business depends entirely upon community good will and the high quality of their player

23  experience. *Id.*, ¶ 8.  The better the game is, and the more fun it is to play, the more players

24  become paying customers. *Id.*

25         The bet Bungie made on itself and its game is substantial. Bungie expends significant

26  resources on the development of new content, both free and commercial. Barker Dec, ¶ 9.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   Bungie released a massive new expansion, *The Witch Queen*, in early 2022, and will release

2   another, *Lightfall*, in February 2023. *Id.* As such, it is vital that Bungie protect the quality of the

3   *Destiny 2* experience, and it therefore spares no expense in doing so. In order to play *Destiny 2*,

4   players must first agree to the Limited Software License Agreement (the "LSLA"); it is

5   impossible to play the game without agreeing to the LSLA's terms. *Id.*, ¶ 17. The LSLA contains

6   provisions against hacking and modifying the game, protects Bungie's intellectual property

7   rights, and forbids cheating. *Id.*, Ex. 3.

8           Cheat software imperils Bungie's live-service business model, which is especially

9   vulnerable because the base game is free to play. Barker Dec, ¶¶ 13-14. When the game is unfair,

10  and when its competitive modes are so saturated with cheaters as to become broken, players stop

11  having fun. *Id.* Between major expansions, Bungie maintains a rigorous publishing schedule of

12  seasonal content and in-game events, which expand the game in substantial ways on a quarterly

13  basis and drive a central story with narrative content week-by-week. When players stop having

14  fun, they stop spending money, stop participating in the game's community, stop promoting the

15  game in their own capacity and fans, influencers, and creators, and sometimes, stop playing

16  altogether. *Id.* Additionally, the perception of cheating leads to bad press and scorn from the

17  wider industry. *Id.*, ¶ 14 and Ex. 2. As such, Bungie devotes considerable resources to anti-cheat

18  mitigation measures, and to identifying and banning offenders. Barker Dec, ¶¶ 16-23.  The more

19  complex and novel the cheat, the more expensive it is to combat, both in money and man hours.

20  *Id.*, ¶ 25. Larsen's cheat has demanded substantial investments of time, resources, effort, and

21  legal expenses to combat. *Id.*, ¶ 26. *See also* Declaration of Steven Guris ("Guris Dec"), ¶ 5.

22  **B.  LARSEN & THE WALLHAX ENTERPRISE**

23          Daniel Fagerberg Larsen ("Larsen") is a cheater who makes a living developing and

24  selling illegal cheat software, and a resident of Denmark.  Declaration of Robert James Duthie

25  Nelson ("Nelson Dec"), ¶ 3; Declaration of Patrick Schaufuss ("Schaufuss Dec"), ¶¶ 1-2, 13, 17.

26  Larsen and his partners worked together to develop and sell Cheats.  Schaufuss Dec, ¶ 5; Nelson

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Dec, ¶¶ 2-11.  Larsen and his co-Defendants, Nelson and Patrick Schaufuss (a/k/a "Badger")

2    were partners in the cheat software business, and developed and sold subscriptions to cheat

3    software to multiple games, including *Destiny 2*, from the Wallhax.com website and other

4    websites. Schaufuss Dec, ¶¶ 1, 3; Nelson Dec, ¶¶ 16-21. Wallhax sold subscriptions to cheat

5    software on terms of various lengths, usually between three days and three months. Nelson Dec,

6    ¶ 16; Declaration of Akiva M. Cohen ("Cohen Dec") Ex. 1. Users paid for these subscriptions

7    via crypto or credit card, Nelson Dec, ¶ 20; if a user left a positive review, Nelson would extend

8    their subscription by a few days as a thank you. Cohen Dec Ex. 2. After a customer subscribed to

9    their software, Wallhax continued to update the cheat as needed to ensure that it remained

10   functional and undetectable, and provided customer service and support. Nelson Dec, ¶¶ 23, 31.

11   In addition to selling the cheats at their own websites at Wallhax.com, Cheatautomation.com,

12   and ArtificialSensei.com, Wallhax also operated a reseller program. Nelson Dec, ¶ 19. Resellers

13   would purchase the cheat in bulk at a discount and resell it, both on the Wallhax sites and their

14   own, enabling them to provide additional payment processing options while sharing in the

15   Wallhax profits. *Id.* Nelson, Larsen, Badger, their relevant corporate entities, and the Wallhax

16   resellers are collectively referred to herein as the "Wallhax Enterprise."

17           Nelson brought several years of experience in the cheat business to the table, having

18   previously been a successful affiliate marketer for DamnCheaters.com. Nelson Dec, ¶ 12. Badger

19   and Larsen were the technical team, with Larsen responsible for the design of the Wallhax client

20   software, also known as the "cheat loader." Schaufuss Dec, ¶ 5. Larsen was also the architect and

21   developer ███████████████████████████████████████████████

22   ████████████████████████████████ *Id.*, ¶¶ 5-6. *See also* Cohen Dec Ex. 3. ███████

23   ████████████████████████████████████████████████████

24   ████████████████████ Schaufuss Dec, ¶ 6. ██████████████████

25   ████████████████████████████████████████████████

26   ██████████████████████████████████████████████ *Id.*;

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Guris Dec, ¶¶ 22-25. ████████████████████████████████

2    ████████████████████████████████████████████████████████

3    ███████████████████████████████████████. Schaufuss Dec, ¶ 6. ████████

4    ████████████████████████████████████████████████████████

5    ██████████████████████████ Schaufuss Dec, ¶ 6, as well as the development of game-

6    specific cheats for various games, including *Destiny 2*. Cohen Dec Ex. 4[1] at 295-297; Schaufuss

7    Dec, ¶ 6. Larsen, Nelson, and Badger split profits from the Wallhax Enterprise amongst

8    themselves in equal thirds. Cohen Dec Ex. 6; Nelson Dec, ¶ 8; Schaufuss Dec, ¶ 5. Nelson

9    participated in the enterprise through his corporate entities, EBT and 1102 Canada Inc., which

10    collected the payments for Wallhax's cheat software, Cohen Dec. 4 at 2146-49, and Ex. 3;

11    Nelson Dec, ¶ 4; Schaufuss Dec, ¶ 5, while Larsen participated through his own Danish business

12    entity, DSoft, CVR 37454303.[2] Cohen Dec Ex.7; Nelson Dec., ¶ 4.

13      Nelson, Larsen, and Badger operated the Wallhax Enterprise as a general partnership,

14    with Larsen and his fellow defendants equally sharing its profits and expenses. Nelson Dec, ¶8.,

15    Cohen Dec Ex. 6**.** The Wallhax Enterprise invested considerable time and effort in attempting to

16    evade the measures Bungie uses to combat cheaters. Schaufuss Dec, ¶ 9; Guris Dec, ¶ 6. Indeed,

17    the Wallhax Enterprise exists for the sole purpose of developing and selling cheats. Nelson Dec,

18    ¶ 16; Schaufuss Dec, ¶ 3. In order to effectively develop and test cheats, Larsen and his partners

19    played *Destiny 2* extensively, going through dozens of accounts as each one in turn got banned

20    for cheating. Nelson Dec, ¶¶ 33-34; Cohen Dec Ex. 4 at 1428-1430.

21      At a high level, the Wallhax Cheat's components primarily work in three different ways.

22    First, some components – such as the ESP hack that shows cheaters targets that would otherwise

23    be hidden, the "teamcheck" that provides color-coded highlighting to identify targets as friendly,

24

25    [1] Nelson's affidavit authenticating the documents produced by Wallhax is submitted concurrently herewith as Exhibit 5 to the Cohen Dec.

26    [2] Danish companies are registered by CVR number assigned by Denmark's Central Business Register.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  neutral, or enemies, and a warning feature that tells players when they are being targeted –

2  primarily obtain game information not normally available to players and make that game

3  information visible. Schaufuss Dec, ¶¶ 6-7. That information can be displayed to the cheater

4  either via a user-configurable Cheat-provided overlay or as a secondary display on a different

5  screen. *Id.*, ¶ 7. Second, other components – such as the aimbot and triggerbot - █████

6  ███████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████████

8  ████████████████████████████. Schaufuss Dec, ¶¶ 8; Cohen Dec Ex. 4 at 1476-79.

9  And third, some components – such as the hardware ID spoofer – primarily work to avoid

10  detection by Bungie's technology protective measures (its anti-cheat systems) by c███████████

11  ███████████████████████████████████[3] Schaufuss Dec, ¶ 9. *C.f.*

12  Barker Dec, ¶¶ 20-23. When Bungie introduced measures to defend against cheat software, the

13  Wallhax Enterprise reverse-engineered their mitigation efforts to prevent Bungie from blocking

14  the Wallhax Cheat and rendering it useless. Cohen Dec Ex. 4 at lines 1192-95, 1205-07. That

15  allowed them to continue to market and sell their cheat as effective. *Id.* at lines 74-77.

16      Larsen and his colleagues became aware that Bungie was beginning to take legal action

17  against other cheating enterprises like theirs. Cohen Dec Ex. 4 at lines 541-542. Eventually, they

18  learned that their enterprise had come to Bungie's attention, and that they were being sued. *Id.* at

19  line 1949. They did not cease their unlawful activities. Instead, they responded by taking

20  additional measures to hide their tracks, including – with the knowledge that they were being

21  sued – measures to destroy evidence relevant to this litigation. *Id.* at lines 2162-2166 and 1994.

22      At all relevant times, Larsen and the Wallhax Enterprise knew their actions were

23  wrongful, and continued them anyway. Schaufuss Dec, ¶ 13. In fact, Larsen sought and obtained

24  ————————————

25  [3] Because most of Destiny 2's anticheat systems are proprietary, Wallhax does not name or advertise specific features that it circumvents, instead trumpeting that its cheats are or will be "undetected." However, Wallhax

26  prominently advertises technology to circumvent BattlEye, a commercial anticheat package that has been added to Bungie's protective measures after this lawsuit began.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1 legal advice when Wallhax was threatened by Activision Blizzard with a lawsuit over similar

2 conduct, and that advice reassured him that as a resident of Denmark he could thumb his nose at

3 any judgment an American court might issue, even if his conduct put his partners, Nelson and

4 Badger, at risk. Schaufuss Dec, ¶¶ 14, 16-17.

5 ### III. <u>ARGUMENT</u>

6       The Court unquestionably has the authority to enter a default judgment against Larsen,

7 based on the Court's Order of Default and the Federal and Local Rules. Fed. R. Civ. P. 55; LCR

8 55. Once the Clerk entered default, Larsen's liability was established, and the well-pled factual

9 allegations of the Complaint accepted as true. *See Principal Life Ins. Co. v. Hill*, C21-1716 MJP,

10 2022 WL 2718087, at *1 (W.D. Wash. July 13, 2022) (*quoting Fair Hous. of Marin v. Combs*,

11 285 F.3d 899, 906 (9th Cir. 2002). Prior to entering judgment, the Court must assure itself that it

12 has both personal and subject matter jurisdiction. *See Padded Spaces LLC v. Weiss*, C21-

13 0751JLR, 2022 WL 2905887, at *2 (W.D. Wash. July 22, 2022) (*citing In re Tuli*, 172 F.3d 707,

14 712 (9th Cir. 1999)). And in considering whether to enter a default judgment, the Court must

15 assess the seven *Eitel* factors: (1) the prejudice to Bungie from denial of a default judgment; (2)

16 the merits of Bungie's claims; (3) the sufficiency of the Complaint; (4) the amount at issue; (5)

17 the possibility of a factual dispute; (6) whether the default was due to excusable neglect; and (7)

18 the preference for decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir.

19 1986). As shown below, application of these rules requires grant of the motion. The Court has

20 subject matter jurisdiction over this dispute and personal jurisdiction over Larsen, and the *Eitel*

21 factors weigh heavily in favor of entering a default judgment. The motion should be granted.

22 ### A.  THE COURT HAS PERSONAL JURISDICTION OVER LARSEN AND SUBJECT
23     MATTER JURISDICTION OVER THE DISPUTE

24       The Court's subject matter jurisdiction over this action is straightforward; the Court has

25 federal question jurisdiction over civil actions arising under the laws of the United States, 28

26 U.S.C. § 1331, and Bungie asserted claims against Larsen under 18 U.S.C. § 1962(a), (b), & (c),

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    17 U.S.C. § 1201(a), and 18 U.S.C. § 1030(a)(5)(B). Dkt. No. 1 at ¶¶ 157-265. And the Court

2    therefore has pendant jurisdiction over Bungie's state law claims against Larsen, which arise out

3    of the same operative nucleus of fact as Bungie's copyright, DMCA, and RICO claims. 28

4    U.S.C. § 1367(a). *See id.* at ¶¶ 266-306.

5        The Court also has personal jurisdiction over Larsen. Larsen agreed to the LSLA,[4] which

6    contains a forum selection clause that provides that those who accept the agreement "agree to

7    submit to the personal jurisdiction of any federal or state court in King County, Washington."

8    Compl. at ¶ 40. That is sufficient to support personal jurisdiction. *See Facebook, Inc. v. ILikeAd*

9    *Media Int'l Co. Ltd.*, 19-CV-07971-SK, 2022 WL 2289064, at *2 (N.D. Cal. Feb. 1, 2022),

10   *report and recommendation adopted as modified*, 19-CV-07971-JST, 2022 WL 2289058 (N.D.

11   Cal. Mar. 15, 2022) (citing *Holland Am. Line Inc. v. Wartsila N. Am. Inc.*, 485 F.3d 450, 458 (9th

12   Cir. 2007). And, were it necessary, the Court would also have jurisdiction over Larsen under

13   Washington's long arm statute. *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 80 (Wash. 1989).

14       As established by Plaintiff's affidavit of service, Dkt. No. 31, Larsen was properly served

15   with the Complaint. Fed. R. Civ. P. 41(f)(1) (service under Hague Convention is sufficient). As

16   such, Larsen is subject to the jurisdiction of the Court, and the Court may grant a default

17   judgment against him so long as the *Eitel* factors warrant it. They do.

18   **B.  THE FIRST, SIXTH, AND SEVENTH *EITEL* FACTORS FAVOR DEFAULT
     JUDGMENT BECAUSE LARSEN HAS CONSCIOUSLY DECIDED NOT TO
19   APPEAR.**

20       The evidence submitted in connection with this motion makes clear that Larsen has been

21   on actual notice of this litigation and has consciously chosen not to appear, and, as such, each of

22   the first (prejudice from denial), sixth (excusable neglect), and seventh (preference for merits

23   decisions) *Eitel* factors weigh heavily in Bungie's favor. As to the sixth factor, Larsen discussed

24   the litigation extensively with Nelson over Telegram chat, beginning the day the litigation was

25   _____

26   [4] The evidence establishes that Larsen himself played *Destiny* 2. Cohen Dec Ex. 4 at lines 1428-1430. As explained
     by Mr. Barker, he could only have done so after accepting the LSLA. Barker Dec, ¶ 17.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   filed. Cohen Dec. Ex. 4 at lines 1967-1968, 1985-1990, and 2000-2110. By August 20, 2021,

2   Larsen had and was discussing a copy of the complaint. *Id.* at line 2172.  As settlement

3   discussions between Bungie and Nelson progressed, Larsen offered opinions on settlement terms

4   and opposed the release to Bungie of the full Wallhax software. *Id.* at lines 2202-05 and 2433-

5   40**.** His refusal to appear before the Court is thus active and intentional, not excusable neglect.

6       Absent a default judgment, Bungie has no legal remedy against Larsen and no means to

7   prevent him from inflicting further harm, and would therefore be prejudiced by denial of the

8   motion. *See Amazon Content Servs. LLC v. Kiss Libr.,* No. C20-1048 MJP, 2021 WL 5998412,

9   at *3 (W.D. Wash. Dec. 17, 2021) ("Defendants have failed to appear or participate in this

10  litigation. Plaintiffs face prejudice by not being able to obtain complete relief on their

11  claims…"). As to the preference for decisions on the merits, as discussed below, Bungie's

12  submission here is no mere form request for default judgment – it is supported by expert

13  testimony, the testimony of Larsen's partners and co-defendants, and documents obtained from

14  Larsen's partners in discovery. *See* Cohen Dec Exs. 1-15; Nelson Dec; Schaufuss Dec; Guris

15  Dec. Even were that not so, because there can be no decision on the merits after adversarial

16  testing unless Larsen participates, and Larsen has refused to do so, the policy preference for

17  contested litigation rather than default is irrelevant. *See Padded Spaces LLC v. Weiss*, C21-

18  0751JLR, 2022 WL 2905887, at *5 (W.D. Wash. July 22, 2022) (Seventh *Eitel* factor favors

19  default judgment when failure to answer precludes the possibility of resolution on the merits).

20  **C.   THE SECOND AND THIRD *EITEL* FACTORS FAVOR BUNGIE BECAUSE**
    **BUNGIE'S WELL-PLED COMPLAINT AND SUPPORTING EVIDENCE**
21  **ESTABLISH LARSEN'S LIABILITY.**

22      The second and third factors – "often analyzed together," *Padded Spaces LLC v. Weiss*,

23  C21-0751JLR, 2022 WL 2905887, at *3 (W.D. Wash. July 22, 2022), *quoting Curtis v.*

24  *Illumination Arts, Inc.,* 33 F. Supp. 3d 1200, 1211 (W.D. Wash. 2014) – likewise favor grant of

25  the motion. In assessing these factors, the Court must examine whether Bungie pled facts

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  sufficient to establish and succeed on the asserted claims. *Id.*; *PepsiCo Inc. v. Cal. Sec. Cans*,

2  238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002).

3       Here, in addition to the well-pled allegations in the Complaint, Bungie's motion for a

4  default judgment is supported by declarations from Bungie's investigator-expert Stephen Guris,

5  from Bungie's in-house counsel James Barker, and from other former defendants themselves,

6  alongside voluminous chat records and logs from the Defendants directly discussing the relevant

7  events. Taken together, the Complaint and other evidence strongly support grant of this motion.

8       **1.   Copyright Infringement**

9       Bungie has clearly established its "ownership of the allegedly infringed material" and

10  "that the alleged infringers violate at least one exclusive right granted to copyright holders."

11  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (cleaned up). Bungie

12  has copyright registrations for *Destiny 2* both as an audiovisual work and as software,

13  establishing its ownership. Barker Dec, ¶ 3 and Ex. 1.

14       Larsen's infringement of Bungie's rights in *Destiny 2* is equally clear. Larsen was the

15  lead developer of the Cheats and engaged in the infringing acts at issue in this case. Schaufuss

16  Dec, ¶¶ 5, 10-12. Larsen was also a partner in the Wallhax Enterprise, along with "Badger" and

17  Nelson (both individually and through his companies, EBT and 1102 Canada).[5] Nelson Dec, ¶¶

18  2-6. Larsen may be held individually liable for the infringements as personal participant in the

19  infringing activity; the corporate veil provides no protection. *See Urban Accessories, Inc. v. Iron*

20  *Age Design & Imp., LLC*, C14-1529JLR, 2015 WL 1510027, at *4 (W.D. Wash. Apr. 1, 2015)

21  *quoting Blue Nile, Inc. v Ideal Diamond Solutions, Inc.*, No. C10-380Z, 2011 WL 3360664, at *2

22

23  [5] Under Washington law, "[T]he association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." RCW 25.05.055. "A partnership is

24  formed by agreement to place money, effects, labor and skill ... in a lawful business and to divide the profits and bear the losses in certain proportions." *DeFelice v. State, Emp't Sec. Dep't*, 187 Wash. App. 779, 789, 351 P.3d 197,

25  201 (2015). "Where, from all the competent evidence, it appears the parties have entered into a business relation combining their property, labor, skill and experience, or some of these elements on the one side and some on the

26  other, for the purpose of joint profits, a partnership will be deemed established." *Malnar v. Carlson*, 128 Wash. 2d 521, 535, 910 P.2d 455, 461 (1996).

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   (W.D. Wash. Aug 3, 2011) ("copyright is a strict liability tort; therefore, there is no corporate

2   veil and all individuals who participate are jointly and severally liable").

3         The Wallhax Enterprise infringed Bungie's copyrights in several ways. During the

4   process of developing the cheat, Larsen repeatedly downloaded and played *Destiny 2* to enable

5   the development of the cheat, invalidating his license and rendering that usage unlicensed. *See*

6   *Blizzard Entm't, Inc. v. Bossland GmbH*, 16-cv-1236-DOC, 2017 WL 7806600, at *4 (C.D. Cal.

7   Mar. 31, 2017) (fraudulently obtaining access to software by falsely indicating agreement to a

8   license agreement renders the license void and the download unlicensed and infringing). Each

9   download and play was therefore an infringement. *Blizzard*, 2017 WL 7806600 at *4.

10        The cheat software also infringes by altering the underlying game software as it is

11  executed, creating an unauthorized derivative work. Nelson Dec, ¶¶ 28-30. The Cheats' code

12  contains instructions that actively modify the game displays seen by cheaters during gameplay,

13  Schaufuss Dec ¶ 7, creating an unauthorized derivative work by annotating Bungie's copyrighted

14  display. The various components of the Cheats provide cheaters with visuals that are not part of

15  the audiovisual work that Bungie presents to players. Player characters that are behind objects

16  and out of the view of honest players are "colorfully highlighted" for cheaters using Larsen's

17  products. Schaufuss Dec ¶ 7.[6] These colors not only show the cheater that there are other players

18  or enemies hidden from view; the precise color used informs the cheater at a glance whether a

19  character is an enemy or an ally - a feature that is certainly not available to honest players or part

20  of the game's graphics. Nelson Dec, ¶¶ 29-30. The Cheats also produce text alerts that inform

21  cheaters if another player is aiming at them, even allowing the cheater to specify what color the

22  cheat should use when it generates warning text in the overlay. Schaufuss Dec, ¶ 7. And the

23  cheat will even draw lines of dots, or "bread crumbs," showing where another player has been,

24  allowing cheaters to effortlessly track their opponents through the game. *Id.* All these features

25  _____

26  [6] Not only are the precise colors used not part of the game, the cheat software allows the cheater to customize the
    colors to their own preference. Schaufuss Dec, ¶ 7.

MOTION FOR DEFAULT -11
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   were drawn on the cheaters' screens as game overlays. However, the Cheats did not stop there.

2   They also contained a 'webdar' mode that presented all the key information needed by cheaters

3   on secondary devices including phones and tablets, allowing players to stream their gameplay

4   without revealing that they were cheating. Schaufuss Dec, ¶ 7.

5       These features create unauthorized and infringing derivative works. The creation of

6   dynamic screen overlays creates a new, unauthorized derivative work consisting of the

7   combination of Bungie's protected *Destiny 2* audiovisual work and the new display elements

8   added by the Cheats, which annotate it. See *Blizzard Entm't, Inc. v. Bossland GmbH*, 2017 WL

9   7806600, at *5 (C.D. Cal. Mar. 31, 2017) (holding that a dynamic screen overlay created as a

10  video game cheat constitutes a derivative work). *See also Take-Two Interactive Software, Inc. v.*

11  *Zipperer*, 18 CIV. 2608 (LLS), 2018 WL 4347796, at *8 (S.D.N.Y. Aug. 16, 2018) (cheat

12  software that created "alternative version" of video game "with added elements" sufficient for

13  likelihood of success on the merits of copyright claim on preliminary injunction). Exhibit B to

14  the Guris Declaration shows what that derivative work looks like:



15

16

17

18

19

20

21

22

23

24

25

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   (Note the red text indicating the presence of an enemy behind the wall).

2        The secondary display created by the Cheats' 'webdar' mode – a feature absolutely not

3   provided by the game software – is also a derivative work, for similar reasons, and, to the extent

4   that it incorporates the games' own graphics, an infringing reproduction. *See* 17 U.S.C. § 106.

5   All of these modifications to the game are created by instructions fixed within the cheat

6   software's code. Schaufuss Dec, ¶ 10. These visual changes are not produced in any way by the

7   *Destiny 2* software but are instead created by the Cheats. *C.f. Lewis Galoob Toys, Inc. v.*

8   *Nintendo of America, Inc.*, 964 F. 2d 965, 968 (9th Cir. 1992) (finding that a mechanical device

9   that sat between a game cartridge and a console did not create a derivative work where the

10  display came entirely from the original game).

11       But the infringement continued. Data structures are copyrightable, *see Positive Software*

12  *Sols., Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531, 535 (N.D. Tex. 2003), and

13  copying data structures from *Destiny 2* into the cheat software also infringes Bungie's copyright.

14  *See Bungie, Inc. v. Aimjunkies.com*, C21-811 TSZ, 2022 WL 2391705, at *2 (W.D. Wash. July

15  1, 2022) (cheat software that "necessarily copied" code corresponding to data structures likely

16  infringed). Here, the cheats operate by copying *Destiny 2*'s data structures and data and then

17  ███████████████████████████████████. Schaufuss Dec, ¶ 6. And, because the

18  Cheats themselves exist in a concrete and permanent form that substantially incorporates

19  protected content without Bungie's consent, the Cheats were an unauthorized derivative work in

20  violation of Bungie's rights under 17 USC 106(2). *See Rimini St., Inc. v. Oracle Int'l Corp.*, 473

21  F. Supp. 3d 1158, 1210 (D. Nev. 2020).

22       Finally, Larsen's copying was willful, for purposes of both civil and criminal copyright

23  infringement. Bungie alleged willfulness, Dkt. No. 1 at ¶¶ 139-56, 177, and factual allegations of

24  willfulness are deemed admitted on default. *See*, *e.g.*, *Crim. Prods., Inc. v. Evans*, No. 16-CV-

25  1647RAJ, 2018 WL 2397439, at *1 (W.D. Wash. Apr. 4, 2018) (deeming allegation of

26  willfulness admitted on default*); FameFlynet, Inc. v. Feel the Piece, LLC*, No.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    CV175406FMOGJSX, 2018 WL 4850383, at *3 (C.D. Cal. Feb. 21, 2018) ("court may infer

2    willfulness even where a defendant defaults"); *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528

3    F.3d 696, 702 (9th Cir. 2008) ("all factual allegations in the complaint are deemed true,

4    including the allegation of Poof's willful infringement"). And, were it necessary, the record is

5    replete with facts[7] from which Larsen's willfulness can be inferred under the Ninth Circuit

6    standard applicable to civil criminal infringement cases. *See Unicolors, Inc. v. Urb. Outfitters,*

7    *Inc.,* 853 F.3d 980, 991 (9th Cir. 2017) ("the plaintiff must show (1) that the defendant was

8    actually aware of the infringing activity, or (2) that the defendant's actions were the result of

9    reckless disregard for, or willful blindness to, the copyright holder's rights"); *United States v.*

10   *Liu*, 731 F.3d 982, 990 (9th Cir. 2013) ("willfully" as used in 17 U.S.C. § 506(a) connotes a

11   voluntary, intentional violation of a known legal duty") (cleaned up).

12   **2.   Civil RICO under 18 U.S.C. § 1962(a), (b), & (c)**

13   Bungie's well-pled complaint and supporting evidence establish Larsen's liability under

14   the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.* ("RICO").

15   RICO forbids "any person employed by or associated with any enterprise engaged in, or the

16   activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

17   indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or

18   collection of unlawful debt." 18 U.S.C. § 1962(c). To prevail on its RICO claim, Bungie must

19   show: 1) a violation of 18 U.S.C. § 1962; (2) injury to its business or property; and (3) causation

20

21   ---

[7] The messages between the Wallhax Enterprise's principals reveal that Larsen and his co-conspirators were
22   concerned when they learned of Bungie's suits against other cheat developers. Cohen Dec. Ex. 4 at 1220-1224.
     Despite this notice, they neither ceased their unlawful infringement nor acted as though they believed what they
23   were doing was lawful; instead, they took measures intended to evade detection and continue profiting from the
     infringement. Defendants set the profanity filter on their forum to remove mentions of *Destiny 2* so that it would not
24   come up in searches, Cohen Dec. Ex. 4 at 1856 hid the subforums dedicated to discussions of their *Destiny 2* cheat,
     *id.* at 2162-2166, and, once they had actual knowledge of this suit, they actively attempted to spoliate evidence by
25   moving their communications to Keybase and setting the messages to disappear after three days, Schaufuss Dec, ¶
     16. Larsen went further and deleted all the posts he had made on CheatAutomation.com. Cohen Dec, ¶ 8. Larsen
26   was the instigator of some of these efforts, and a participant in all of them. His knowledge of the unlawfulness of his
     actions is thus not only deemed admitted by default, but also clearly apparent from his actions.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   of the injury by the violation. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 451 (2006).

2   Bungie has established these elements.

3              a.   **Violation of 18 U.S.C. § 1962(c)**

4        To recover under § 1962(c), Bungie must prove (1) conduct, (2) of an enterprise, (3)

5   through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to

6   the plaintiff's "business or property" by the conduct constituting the violation. *Living Designs,*

7   *Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).

8              (1) The Wallhax Enterprise is a RICO enterprise

9        An "enterprise" "includes any individual, partnership, corporation, association, or other

10  legal entity, and any union or group of individuals associated in fact although not a legal entity."

11  18 U.S.C. § 1961(4). A RICO Enterprise must have a "structure" that has at least three features:

12  a purpose, relationships among the associates, and longevity sufficient to permit the associates to

13  pursue the enterprise's purpose. *Boyle v. U.S.*, 556 U.S. 938 (2009). "[A]n association-in-fact

14  enterprise is simply a continuing unit that functions with a common purpose." *Id*. There should

15  be no question that the Wallhax Enterprise satisfies this element of RICO.

16        The Wallhax Enterprise consisted of multiple distinct legal entities and individuals

17  working together over a period of years for a common illegal purpose: selling cheat software.

18  The Wallhax website was owned and operated by EBT. Cohen Dec Ex. 8. Payments were

19  funneled through 1102 Canada. *Id.*, Exs. 9, 10. Nelson, Schaufuss, and Larsen operated the

20  Wallhax business as partners, with Larsen contributing his technical skills via yet another legal

21  entity, DSoft. It began operations in 2012 and continues to operate, selling cheats for other video

22  games, to this day. Nelson Dec, ¶ 16. Were that not enough, Wallhax also employed a "reseller"

23  program, by which third parties could purchase the cheat at a bulk discount, sell it themselves,

24  and share in the profit with the Wallhax Enterprise while also providing a valuable safety net

25  against the inevitable if unpredictable loss of payment processors. Nelson Dec, ¶ 19, Cohen Dec

26  Ex. 4 at lines 1488-1490. And, as shown herein, its purpose was illegal: sale of cheat software

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   that violated copyright law, the DMCA's anticircumvention provisions, and the Computer Fraud

2   and Abuse Act. The Wallhax Enterprise thus more than satisfies the criteria for a RICO

3   enterprise: it had associates, a structure (in which Nelson, Larsen, and Schaufuss controlled the

4   business and shared the profits), longevity, and an illegal purpose.

5                    (2)  Larsen conducted the enterprise

6        Persons who "conduct[ed] or participate[d], directly or indirectly, in the conduct of such

7   enterprise's affairs," are liable for RICO. 18 U.S.C. § 1962(c). "RICO liability is not limited to

8   those with primary responsibility for the enterprise's affairs," but "some part in directing the

9   enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Larsen was

10  not an incidental participant in the Wallhax Enterprise's activities, merely taking direction and

11  being tertiarily useful. He was an active manager who directed the Wallhax Enterprise's affairs.

12  Cohen Dec Ex. 4 at lines 117-19, 129-30; Nelson Dec, ¶ 9. He developed the *Destiny 2* cheat

13  software the enterprise sold, shared in the profits, and had input on the response to this legal

14  action. Nelson Dec, ¶¶ 2-10, 35-37; Schaufuss Dec, ¶¶ 5, 16. He was an essential component of

15  the enterprise, and his conduct both steered and furthered its purpose.

16                   (3)  The Wallhax Enterprise engaged in a pattern of racketeering activity

17       Racketeering activity is "any act which is indictable" under specified provisions of Title

18  18. 18 U.S.C. § 1961(1)(B). Bungie pled the following predicate acts: 1) wire fraud (18 U.S.C. §

19  1343) in Defendants' use of the interstate wires to further their fraudulent cheat sales; 2) criminal

20  copyright infringement in the illegal and intentional sale of Bungie's copyrighted intellectual

21  property for profit; and 3) money laundering (18 U.S.C. § 1956 & 1957) in violation of 18

22  U.S.C. § 1956(a)(1) and 18 U.S.C. § 1957.

23                   (A)  Wire Fraud

24       The elements of wire fraud are (1) a scheme to defraud; (2) use of the wires in

25  furtherance of the scheme; and (3) a specific intent to deceive or defraud. *United States v.*

26  *Shipsey*, 363 F.3d 962, 971 (9th Cir. 2004). A scheme to defraud involves "the intent not only to

MOTION FOR DEFAULT -16
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    make false statements or utilize other forms of deception, but also to deprive a victim of money

2    or property by means of those deceptions." *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th

3    Cir. 2020). The record makes clear that the conduct of the Wallhax Enterprise satisfies each of

4    these elements.

5        First, developing the cheat software that was the Wallhax Enterprise's core product

6    required Defendants to use the interstate wires to obtain a copy of the *Destiny 2* software through

7    fraud. As discussed above, Larsen had to fraudulently indicate his intent to abide by the terms of

8    the LSLA – which prohibited the cheat development and sale that was his purpose in

9    downloading the game – in order to obtain and access the *Destiny 2* software. *Supra* at 6, 12.

10   Because the *Destiny 2* software is property, and it was downloaded over the internet through

11   fraud, the Wallhax Enterprise's initial download of the *Destiny 2* software is sufficient, in and of

12   itself, to violate the wire fraud statute.

13       Second, Defendants' subsequent distribution of Cheats over the internet also involved the

14   use of the interstate wires as part of a scheme to obtain property from Bungie by means of false

15   or fraudulent pretenses. Bungie offers its players various rewards and items of value for certain

16   participation and accomplishment in the course of *Destiny 2* gameplay. Barker Dec, ¶ 11. For

17   instance, players who complete *Destiny 2*'s highest-level endgame content ("raids") within a

18   designated period of time from release qualify to purchase a "raid jacket." *Id.* Because players

19   who utilize Larsen's cheat software have all executed the LSLA and represented to Bungie that

20   they are gaming honestly, using cheat software to obtain such rewards is a fraud.

21       Moreover, Defendants routinely used interstate wires in connection with this scheme.

22   Larsen is located in Denmark, Badger in Germany, and Nelson in Canada. Nelson Dec, ¶¶ 3.

23   Each used email, telephone, and chat communications extensively to coordinate and operate the

24   Wallhax Enterprise. *See, e.g.*, Cohen Dec Ex. 4 at lines 350-364 and 2358-2364; Nelson Dec,

25   ¶¶10-11. These actions establish the predicate act of wire fraud.

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1            (B)   Criminal Copyright Infringement

2            The elements of criminal copyright infringement are (1) that a valid copyright; (2) was

3    infringed by the defendant; (3) willfully; and (4) for purposes of commercial advantage or

4    private financial gain. 17 U.S.C. § 506(a). As shown above, the Wallhax Enterprise infringes

5    Bungie's copyrights, and it does so specifically for commercial advantage and private financial

6    gain. *Supra*, at 11-15. And Larsen's willfulness must both be presumed given his default and has

7    been actively demonstrated on the evidence. *Supra*, at 14-15.

8            (C)   Money Laundering

9            A defendant engages in money laundering under 18 U.S.C. § 1956(a)(1)(A)(i)[8] when

10   they (1) conduct (or attempt to conduct) (2) a financial transaction, (3) knowing that the property

11   involved in the financial transaction represents the proceeds of some unlawful activity, (4) with

12   the intent to promote the carrying on of specified unlawful activity, and (5) the property was in

13   fact be derived from a specified unlawful activity. 18 U.S.C. § 1956(a)(1). The proceeds of

14   Wallhax's cheat software sales are proceeds of criminal copyright infringement and wire fraud,

15   which is a specified unlawful activity under §1956(a)(1). The Wallhax principals were aware that

16   their activity was unlawful, *see* Nelson Dec, ¶ 24 (testifying to awareness that content had been

17   taken down as infringing), *id.*, ¶ 22 (payment processors would decline their business given its

18   nature); Schaufuss Dec, ¶ 13 (awareness that conduct violated the DMCA); Cohen Dec Ex. 4 at

19   lines 1219-24, 1863, 1868, & 1855-56. And Wallhax reinvested those proceeds in its business,

20   using them to pay staff, invest in tools and equipment, and promote the business. Schaufuss Dec

21   Ex. 1; Nelson Dec, ¶ 8. Each time it reinvested those proceeds, the Wallhax Enterprise

22   committed money laundering under 18 U.S.C. §1956(a)(1)(A)(i).

23           The Wallhax Enterprise also engaged in money laundering under 18 U.S.C. § 1957,

24   which prohibits engaging in transactions involving more than $10,000 of property derived from

25   _____

26   [8] Due to a typo, the Complaint mistakenly identified §1956(a)(1)(A)(*ii*) as the section applicable to money
laundering by use of proceeds to promote specified unlawful activity.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  specified unlawful activity. Cohen Dec Ex. 10 at pp. 9-15 (showing regular transfers in excess of

2  $10,000 from PayPro to 1102 Canada's WiseBusiness Ltd. account, among others). Thus, Larsen

3  engaged in money laundering under both § 1956(a) and § 1957.

4  (D)   Pattern of Predicate Acts

5    Nor were these isolated predicate acts. To establish a pattern of racketeering activity,

6  Bungie need only show at least two acts of racketeering activity. 18 U.S.C. § 1961(5). "To

7  prevail under RICO, plaintiffs must establish that the predicate acts were continuous … by

8  pleading 'closed-ended continuity' or by pleading 'open-ended continuity.'" *Allwaste, Inc. v.*

9  *Hecht*, 65 F.3d 1523, 1526 (9th Cir. 1995) Closed-ended continuity is "a closed period of

10  repeated conduct … established by showing that the predicate acts occurred over a substantial

11  period of time." *Id.* Open-ended continuity, on the other hand, involves "past conduct that by its

12  nature indicates a threat of future criminal conduct. It is established by showing either that the

13  predicate acts specifically threaten repetition or that they were an ongoing entity's regular way of

14  doing business." *Id.*

15    Here, the Wallhax Enterprise has engaged in the conduct at issue over a period of ten

16  years, and began selling the *Destiny 2* cheat in 2019. Nelson Dec, ¶¶ 14, 26. Bungie is not the

17  only victim of the Wallhax Enterprise's conduct; it offers cheat software for more than 20 other

18  games, including DICE's *Star Wars Battlefront 2*, Valve's *Counter-Strike*, Studio Wildcard's

19  *ARK: Survival Evolved*, Rare's *Sea of Thieves*, and Electronic Arts' *Battlefield V*. Cohen Dec Ex.

20  11. Each of those games has a provision in its license agreement or terms of use that bars

21  hacking and cheating, Cohen Dec ¶ 11, meaning that the Wallhax Enterprise committed a similar

22  fraud when it first obtained access to those games to develop the Cheats. Each of those games is

23  the subject of copyright registrations, Cohen Dec Ex. 12 meaning that the Wallhax Enterprise

24  similarly committed criminal copyright infringement when it hacked them. The Wallhax

25  Enterprise routinely reinvested the proceeds of its cheat software into developing, marketing, and

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  distributing new and existing cheats, Nelson Dec, ¶ 8, and apparently continues to do so to this

2  day. That is more than sufficient to establish the necessary pattern.

3                    (4)  Injury to Bungie from the Predicate Acts

4          To establish a RICO injury and causation, Bungie need only show that it suffered some

5  out-of-pocket loss as a result of the predicate acts. *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d

6  1016, 1021 (9th Cir. 2001). The evidence submitted herewith is more than sufficient to do so. As

7  detailed above, the Cheats caused significant injury to Bungie's business. Thousands of players

8  used Larsen's Cheats, Cohen Dec Ex. 13, contributing to the perception that *Destiny 2* had "a

9  cheating problem." Barker Dec, ¶ 14. Bungie has incurred significant expense in order to identify

10 and address Defendants' Cheats in particular, Cohen Dec Ex. 4 at lines 1925-28 (gloating that

11 the Wallhax Cheat impelled Bungie to obtain BattlEye), so that it could strengthen the

12 protections for its copyrighted work and ensure that players could not fraudulently obtain

13 rewards. Barker Dec, ¶ 16; Guris Dec, ¶ 51. Moreover, Wallhax users cost Bungie business and

14 drove existing players from their game. Barker Dec, ¶ 25.

15                    b.   **Violation of 18 U.S.C. § 1962(a)**

16         18 U.S.C. § 1962(a) prohibits people who have received income derived from a pattern of

17 racketeering activity to use those funds to invest in any business or enterprise engaged in or

18 impacting interstate or foreign commerce. 18 U.S.C. § 1962(a).  As laid out above, the Wallhax

19 Enterprise has derived substantial income from their illegal activities, which funds were, in turn,

20 invested directly back into the marketing, development, and growth of the enterprise. Nelson

21 Dec, ¶ 8. This money expanded the reach and market of the *Destiny 2* cheats, contributing to and

22 magnifying the harm suffered by Bungie, an injury under 1962(a). But for the Wallhax

23 Enterprises' continuing investment in their activities, Bungie's damages would have been

24 significantly less over time. *Nugget Hydroelectric, L.P. v. P. Gas and Elec. Co.*, 981 F.2d 429,

25 437 (9th Cir. 1992).

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1        c.   Violation of 18 U.S.C. § 1962(b)

2        Section 1962(b) prohibits people from acquiring or maintaining an interest in or control

3    of an enterprise through a pattern of racketeering activity, if that enterprise engages in or impacts

4    interstate or foreign commerce. 18 U.S.C. § 1962(b). As a partner in Wallhax and developer of

5    the Cheat, Larsen maintained both an interest in the activities of the Wallhax Enterprise and

6    control over the enterprise. Nelson Dec, ¶¶ 6-9. The Wallhax Enterprise engaged in both

7    interstate and foreign commerce, as demonstrated above. As such, Larsen violated 18 U.S.C. §

8    1962(b).

9        **3.   Circumvention of Technological Measures under 17 U.S.C. § 1201(a)**

10       The second and third *Eitel* factors also favor default judgment Bungie's Section 1201(a)

11   claim for two reasons. Larsen violated the statute when he trafficked in an anticircumvention

12   device in violation of 17 U.S.C. § 1201(a)(2). And Larsen's own circumvention of technical

13   protection measures in the course of developing the Cheats, including his evasion of bans,

14   violated 17 U.S.C. § 1201(a)(1).

15       Larsen infringed Bungie's rights under Section 1201 when he: "(1) traffic[ked] in (2) a

16   technology or part thereof (3) that is primarily designed, produced, or marketed for, or has

17   limited commercially significant use other than (4) circumventing a technological measure (5)

18   that effectively controls access (6) to a copyrighted work." *MDY Industries LLC v. Blizzard*

19   *Entertainment Inc.*, 629 F. 3d 928, 953 (9th Cir. 2010). As was the case in *MDY*, *id.* at 953-54,

20   those elements are easily met here. Larsen created and trafficked in the Cheats, Nelson Dec, ¶¶

21   16-23 ; Schaufuss Dec, ¶ 5, which, as software, are a technology, satisfying elements one and

22   two. *See MDY*, 629 F.3d at 953-954. The Cheats contain technology that is has no purpose other

23   than evading Bungie's anti-cheat measures, Schaufuss Dec, ¶ 9; Guris Dec, ¶ 52, meeting

24   elements three and four. *MDY*, 629 F.3d at 953-954. And the dynamic non-literal elements of the

25   *Destiny 2* game and its expansions are a copyright-protected work, thereby fulfilling element six.

26   *Id*.

MOTION FOR DEFAULT -21
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Defendants breached measures that effectively controlled access to the work, and thereby

2    meet the fifth element, in two separate ways. First, the Cheats circumvent anti-cheat software

3    and tools used by Bungie. Schaufuss Dec, ¶ 9; Barker Dec, ¶¶ 19, 23. Second, the Cheats also

4    ████████████████████████████████████████████████████████████████████

5    ████████████████████████████████████. Schaufuss Dec, ¶¶ 8-9; Guris Dec, ¶¶ 34-35. As

6    with the anti-cheat software at issue in *MDY*, the Cheats violate Bungie's Section 1201 rights,

7    and, as discussed below, Bungie is entitled to recompense for its damages. *MDY*, 629 F.3d at

8    954. Larsen has engaged in the same trafficking in anticircumvention devices that his co-

9    conspirators have stipulated to, and should be held accountable alongside them. The evidence

10   shows that users downloaded Wallhax cheat software at least 6,765 times, and statutory damages

11   should be awarded accordingly. Dkt. No. 27 at ¶ 5.

12       Larsen also separately breached 17 U.S.C. § 1201(a)(1) when he repeatedly used new

13   accounts to evade Bungie's bans. Larsen's initial efforts to help cheaters prosper at Bungie's

14   expense were hampered by a significant barrier: Bungie had caught Larsen attempting to cheat,

15   and banned him from gameplay – a fact Larsen was aware of. Nelson Dec, ¶¶ 33-34. Larsen

16   therefore created new accounts to avoid or bypass the measures that Bungie implemented to

17   prevent him from accessing the game. Nelson Dec, ¶¶ 33-34; Barker Dec, ¶ 21 (bans control

18   access to *Destiny 2*). In so doing, Larsen violated the DMCA. 17 U.S.C. § 1201(a)(3)(A)

19   (activities that "avoid" or "bypass" access controls constitute circumvention). Larsen did not

20   merely engage in this conduct once or twice; his accounts were being banned by Bungie as

21   quickly as they could be identified, often within hours. Nelson Dec, ¶ 33. Evidence suggests that

22   Larsen personally engaged in anticircumvention in excess of thirty times. Cohen Dec Ex. 4 at

23   lines 332-37, 563-75, 1287-1321, 1407-21, 1436-54, 1680-95.

24       And the Cheats Larsen created also violate § 1201(b)(1). As discussed above, and unlike

25   the software at issue in *MDY*, Larsen's Cheats create an infringing derivative work whenever

26   they are engaged during *Destiny 2* gameplay. Because Bungie's anti-cheating measures thus

MOTION FOR DEFAULT -22
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   effectively protect their derivative works right from violation during gameplay, Larsen is also

2   liable to Bungie under § 1201(b)(1).

3       **4.  Violation of the Computer Fraud and Abuse Act**

4       Bungie's well-pled complaint and the supporting evidence similarly establishes Larsen's

5   liability under the Computer Fraud and Abuse act because Larsen intentionally accessed a

6   protected computer without authorization, damaging Bungie. 18 U.S.C. § 1030(a)(5)(B).

7       As pled in the complaint and admitted by Larsen's default, the *Destiny 2* servers (the

8   "Server"), the *Destiny 2* client software (the "Client"), and the proprietary, encrypted network

9   protocols which facilitate the transfer of information between them (together with the Server and

10  the Client, the "Protected Computer") collectively constitute a "protected computer." A

11  "protected computer" is any computer affected by or involved in interstate commerce, which

12  includes all computers with Internet access. *United States v. Nosal*, 844 F.3d 1024, 1050 (9th

13  Cir. 2016). The Computer Fraud and Abuse Act defines a "computer" broadly. 18 U.S.C. §

14  1030(e)(1). Cloud-based and internet-based services and information are "computers" under the

15  CFAA, *Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 926–27 (E.D. Va.

16  2017) (an account "connected to—and entirely contained within—the Internet" was a "protected

17  computer" under the CFAA), and the statute also "clearly includes" online data storage facilities

18  "operating in conjunction with what is ordinarily thought of as a computer." *Hill v. Lynn*, No. 17

19  C 06318, 2018 WL 2933636, at *3 (N.D. Ill. June 12, 2018).

20      *Destiny 2* consists of many elements, which all work together under Bungie's ownership

21  and control to create the massively multiplayer gameplay experience. Barker Dec, ¶ 5. The client

22  software is made available by Bungie for one purpose and one purpose only: to enable players to

23  play *Destiny 2. Id.* Bungie is the only party authorized to control the content and functionality of

24  the Client; the Client's sole functionality is to connect to the Server and allow players to play the

25  game. As described in paragraphs 242-251 of the Complaint, the Client is directly related to and

26  operates in conjunction with the Server, both in fact by its design and in law under the LSLA.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    When a computer program is executed from disk and loads into RAM, it creates a legally

2    distinct copy. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993). This

3    memory-resident copy of the Client stores important data such as the character's position, health

4    level, and ammunition level. Barker Dec, ¶ 5. The Client also communicates those values to the

5    server so that the game can respond appropriately. *Id.* When copied into memory, the Client is a

6    data storage and communications facility directly related to and operating in conjunction with the

7    Server, and as a result is part of the *Destiny 2* "computer".

8    Larsen's access to this protected computer was concededly without authorization. Bungie

9    prevents exposure and manipulation of key game data via specific technological measures

10   designed to protect the integrity of the gameplay on the Protected Computer. Barker Dec, ¶ 6.

11   These measures cannot be overridden or disabled by other applications because Windows

12   categorically prevents applications from interfering with each other's operations in this way.

13   Guris Dec, ¶ 9. In order to circumvent these "generally applicable rules regarding access

14   permissions," *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022), Larsen

15   ███████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████

17   and copying them into the cheat software's source code. Schaufuss Dec, ¶11. The Destiny 2

18   cheat ████████████████████████████████████████████

19   ██████████████████████████████. *Id.* █████████████████████████

20   ████████████████████████████████████████████████████████

21   ██████. *Id.* ████████████████████████████████████████

22   Larsen's cheat software is then able to obtain and manipulate "information located in particular

23   areas of the computer … that are off limits to him." *Van Buren v. United States*, 141 S. Ct. 1648,

24   1662, 210 L. Ed. 2d 26 (2021).

25   The cheat software then either reveals that information to the cheater to yield an unfair

26   advantage, such as with the ESP hack, or manipulated through the Cloned System Instructions to

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   convince *Destiny 2* that the cheating player is accomplishing things that he is not skilled enough

2   to accomplish on his own, as with the Aimbot. The *Destiny 2* client sends the resulting cheat-

3   altered values back to the *Destiny 2* server almost instantly, having accepted them as valid. Guris

4   Dec, ¶ 35. Bungie alone has the right to authorize such access to the *Destiny 2* Protected

5   Computer. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016)

6   (permission from the user is insufficient to create authorization); *Theofel v. Farey-Jones*, 359

7   F.3d 1066, 1078 (9th Cir. 2004) (plaintiff is proximately harmed by unauthorized access via a

8   third-party computer). It has not done so.

9          Larsen's unauthorized access to Bungie's protected data and information clearly falls

10   within the conduct prohibited by the CFAA. *Maplebear Inc. v. Doe*, No. 121CV474AJTIDD,

11   2021 WL 2767296, at *1–2 (E.D. Va. May 10, 2021) (granting injunctive relief). *See also*

12   *Philips N. Am. LLC v. Glob. Med. Imaging, LLC*, No. 21-CV-3615, 2022 WL 3106971, at *7

13   (N.D. Ill. Aug. 4, 2022) (allegations of hacking set out CFAA claim even where machines

14   themselves were owned by the defendant); *Villareal v. Saenz*, No. 520CV00571OLGRBF, 2021

15   WL 1986831, at *7 (W.D. Tex. May 18, 2021)(unauthorized access to web-based account

16   violates the CFAA even if access is accomplished on a computer owned by the defendant); *Hill*

17   *v. Lynn*, No. 17 C 06318, 2018 WL 2933636, at *3 (N.D. Ill. June 12, 2018) ("computer"

18   includes web-based accounts). And it has caused extensive damage to Bungie, which has had to

19   take a range of very costly measures to attempt to further block users from employing Larsen's

20   cheat software. Barker Dec, ¶¶ 16-23. Bungie has properly alleged a CFAA claim and default

21   judgment on this claim is warranted.

22          **5.   Breach of Contract and Interference with Contractual Relations**

23          Bungie's well-pled complaint establishes Larsen's liability for both his own breach of

24   contract and for his intentional interference with Bungie's contractual relations. The complaint

25   alleges the existence of the LSLA, the terms of which Larsen accepted when he first played

26   *Destiny 2*. Dkt. No. 1, ¶¶ 267-72; Cohen Dec Ex. 4 at line 987. The LSLA imposes a duty to,

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   inter alia, not reverse engineer, create derivative works of, or hack or modify *Destiny 2*. Dkt. No.

2   1, ¶¶ 276-77; Barker Dec Ex. 3. Larsen is thus plainly liable for breach of contract. *See Nw.*

3   *Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6, 9 (1995)

4   (setting forth elements of breach of contract claim).

5        Larsen also tortiously interfered with Bungie's contractual relations. Bungie's claim for

6   tortious interference only requires it to show that Larsen was aware of a contractual relationship

7   between Bungie and its players, that Larsen's intentional interference induced a breach of that

8   contract, that his interference was through improper means or with an improper purpose, and

9   damaged Bungie. *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d

10  288, 300 (1997). Each of those elements is satisfied: The LSLA is a valid contract between

11  Bungie and *Destiny 2* players, which Larsen, having repeatedly executed the LSLA himself, was

12  well aware of. He intentionally interfered with that relationship by supplying cheat software to

13  players. Cohen Dec Ex. 4 at line 2028 ("And maybe we encourage our users to break their

14  TOS"). As shown above, doing so violated both Federal law and Larsen's own agreement with

15  Bungie. And the breaches damaged Bungie by requiring it to incur costs defending against

16  Larsen's cheats, by costing Bungie continued revenue from players banned for using cheats, and

17  by harming Bungie's reputation and deterring honest players from playing *Destiny 2*. Barker

18  Dec, ¶¶ 13-15, 24-27. Larsen's liability is clear.

19      **6.  Violation of the Washington Consumer Protection Act**

20       The second and third Eitel factors also favor default judgment for Bungie's claim under

21  the Washington Consumer Protection Act ("WCPA"). The WCPA must "be liberally construed

22  that its beneficial purposes may be served." RCW 19.86.920. For a plaintiff to prevail in a

23  private cause of action under the CPA, they must establish "(1) an unfair or deceptive act or

24  practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a

25  person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166

26  Wn.2d 27, 37, 204 P.3d 885 (2009) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title*

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    *Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986)). "[A] claim under the Washington CPA may

2    be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive

3    substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute

4    but in violation of public interest." *Klem v. Wash. Mut. Bank,* 176 Wn.2d 771, 787, 295 P.3d

5    1179 (2013).

6         Larsen's actions were unfair and deceptive. "A plaintiff need not show the act in question

7    was intended to deceive, only that it had the capacity to deceive a substantial portion of the

8    public." *Panag*, 166 Wn.2d at 47 (citing *Leingang*, 131 Wn.2d at 150). Wallhax did not disclose

9    that its cheats were logging and retaining its users' personally identifying information in

10   violation of many laws, including (in the European Union) the GDPR. The Wallhax Enterprise,

11   through its Cheats, assembled a database on its users' activity that included information as varied

12   and deeply personal as the contents of their browser tabs, revealing such minutiae as email

13   logins,  ninth-grade algebra classes, and COVID health information. Guris Dec, ¶¶ 39-50. It was

14   also a potential national security risk: a tool that, in at least some cases, compromised computers

15   used by members of the military or Department of Defense. *Id.*, ¶¶ 48-50.  Wallhax's

16   development and use of cheat software also deceived both Bungie and the public. Bungie expects

17   users to play the game honestly and comply with their agreements in the LSLA, Barker Dec, ¶

18   12, 16, while *Destiny 2*'s tens of millions of players expect an honest, fair experience. *Id.* And

19   even Wallhax's users were deceived – not only by the undisclosed logging software, but by

20   Wallhax's false reassurances that its cheats would evade detection, which led to Wallhax users

21   being banned. Cohen Dec Ex. 14; Barker Dec ¶ 21.

22        Offering the cheats for sale is a commercial act, RCW 19.86.010, and the public's interest

23   is implicated by the Wallhax Enterprise's misconduct. It injures Bungie in its business, damaging

24   customer satisfaction and impacting their player retention, and has the capacity to cause further

25   injury to future players, and thus to Bungie's reputation and community good will. Moreover, as

26   shown above Defendant's conduct is unlawful, and "[w]hat is illegal and against public policy is

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    per se an unfair trade practice*." Hangman Ridge*, 105 Wash.2d at 786, 719 P.2d 531 (alteration

2    in original, quoting *State v. Reader's Digest Ass'n*, 81 Wash.2d at 270, 501 P.2d 290). Bungie is

3    thus entitled to judgment on this claim as well.

4         **7.  Civil Conspiracy**

5         Larsen's liability for civil conspiracy is as clearly established as his liability for the other

6    causes of action on which it depends. To establish a claim for civil conspiracy, a plaintiff must

7    show "(1) two or more people combined to accomplish an unlawful purpose…; and (2) ... an

8    agreement to accomplish the conspiracy." *Inteum Co., LLC v. Natl. U. of Singapore*, C17-1252-

9    JCC, 2018 WL 2317606, at *1 (W.D. Wash. May 22, 2018), citing *Woody v. Stapp*, 146 Wn.

10   App. 16, 22 (Wash. Ct. App. 2008). A claim for civil conspiracy must be predicated on "a

11   cognizable and separate underlying claim." *Gossen v. JPMorgan Chase Bank*, 819 F. Supp. 2d

12   1162, 1171 (W.D. Wash. 2011). Here, Larsen engaged in the relevant conduct in concert with

13   Nelson, Badger, and the other participants in the Wallhax Enterprise, and pursuant to his

14   agreement with his partners to do so. That is all that is required to support this claim.

15   **D.  THE FOURTH *EITEL* FACTOR WEIGHS IN BUNGIE'S FAVOR BECAUSE**
16   **    LARSEN'S CONDUCT WARRANTS THE DAMAGES BUNGIE SEEKS.**

17        The fourth factor favors a default judgment because the damages that Bungie seeks are

18   reasonable in light of Larsen's willful and extensive illegal conduct. Although courts are more

19   cautious when a large damages award is involved, "the court must consider the amount of money

20   at stake in relation to the seriousness of Defendant['s] conduct." *PepsiCo, Inc.,* 238 F. Supp. 2d

21   at 1176. As discussed in Section F, *infra*, Larsen's conduct entitles Bungie to the award it seeks.

22   **E.  THE FIFTH *EITEL* FACTOR FAVORS BUNGIE BECAUSE THE FACTS ARE**
     **    UNDISPUTED.**

23        The fifth factor decidedly favors grant of a default judgment, as Larsen has consciously

24   declined to participate in this litigation. Larsen has thus admitted both the scope and the extent of

25   his participation in the illicit enterprise at the heart of this case. Because default has been entered,

26   "the court must take plaintiff's factual allegations as true." *Curtis v. Illumination Arts, Inc.*, 33 F.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   Supp. 3d 1200, 1212 (W.D. Wash. 2014). In any event, there would be no dispute over the

2   material facts even had Larsen appeared. The evidence submitted for the second and third *Eitel*

3   factors is substantial, including direct testimony from Larsen's co-conspirators and admissions in

4   his Telegram chat logs, and the fifth factor thus favors default judgment. *See Landstar Ranger,*

5   *Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 2d 916, 922 (C.D. Cal. 2010) (no possibility of

6   factual dispute where plaintiff "supported its claims with ample evidence, and defendant has

7   made no attempt to challenge the accuracy of the allegations in the complaint"). Indeed, Larsen's

8   co-defendants and partners in the Wallhax Enterprise have already stipulated to those facts and

9   accepted their liability. This factor thus favors grant of the motion.

10   **F.  THE COURT SHOULD AWARD BUNGIE $3,400,154.71 IN COMPENSATORY**
11   **DAMAGES, $13,500,000.00 IN STATUTORY DAMAGES, AND $338,113.52 IN**
      **ATTORNEY FEES AND COSTS, PLUS FEES INCURRED AFTER SUBMISSION**
12   **OF THIS MOTION**

13        The award Bungie seeks in this case is large because the harm that Bungie has incurred is

14   substantial. These damages stem from the multiple wrongful acts that Larsen committed over the

15   course of his participation in the Wallhax Enterprise, and the different harms those acts caused

16   Bungie. As the Ninth Circuit has repeatedly reaffirmed, one act by a defendant may create

17   multiple legal harms, and when the statutes forbidding those harms are enacted for different

18   purposes and provide for different types of damages, there is no concern for double recovery. *See*

19   *Seattle Pac. Indus., Inc. v. S3 Holding LLC*, 831 Fed. Appx. 814, 818 (9th Cir. 2020); *Bangkok*

20   *Broad. & T.V. Co., Ltd. v. IPTV Corp.*, 549 Fed. Appx. 647 (9th Cir. 2013); *Nintendo of Am.,*

21   *Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994). Here, Bungie seeks to recover

22   damages for the following separate harms:

23        **1.  On Bungie's Anti-Circumvention Claim, the Court Should Award Bungie**
             **$13,500,000.00 in Statutory Damages**

24        Bungie is entitled to an award of $13,500,000.00 in statutory damages for Larsen's

25   anticircumvention violations. Although Bungie is unable to precisely calculate the damages it

26   has sustained as a result of Larsen's Cheats, Bungie has been forced to expend considerable sums

MOTION FOR DEFAULT -29
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    on cheat mitigation – sums which would not be necessary were it not for people like Larsen.

2    Barker Dec, ¶¶ 24-25. Where a plaintiff proves that a defendant violated the DMCA's

3    anticircumvention provisions, the plaintiff may elect to receive statutory damages, which the

4    Court has discretion to award up to $2,500 per circumvention device or act of circumvention in

5    violation of Section 1201. 17 U.S.C. 1203(c)(3). In this case, the settling defendants

6    acknowledged that the Cheat were downloaded a total of 6,765 times, and agreed to a consent

7    judgment of 13,530,000.00, representing statutory damages of $2000 per act of infringement.

8    Bungie respectfully requests that Larsen be held jointly and severally liable for this amount.

9            This figure, which is less than the maximum statutory damages that are available, is

10   warranted under the circumstances of this case.  To determine where in the statutory range

11   damages should fall for a particular defendant, Courts consider factors including "profits reaped

12   by defendant in connection with the infringement; revenues lost to the plaintiff; and the

13   willfulness of the infringement.... The Court can also consider the goal of discouraging wrongful

14   conduct." *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1075 (N.D. Cal.

15   2005).

16           Here, the $2,000-per-unique-download damage figure Bungie seeks is appropriate. As the

17   Central District of California held just over a year ago, statutory damages of $2,000 per

18   anticircumvention device is appropriate where "the acts of circumvention are severe." *Philips N.*

19   *Am. LLC v. KPI Healthcare, Inc.*, SACV191765JVSJDEX, 2021 WL 6103527, at *8 (C.D. Cal.

20   Sept. 1, 2021). There is no question that Larsen's violations of the DMCA were severe. He was

21   fully aware at all times that what he was doing was illegal, yet he continued his conduct based on

22   advice of counsel that, as a citizen of Denmark, he could simply ignore the judgment of any

23   American court. Schaufuss Dec, ¶ 17. Defendants, including Larsen, made substantial profits

24   from their enterprise while making substantial efforts to avoid detection by Bungie in an attempt

25   to avoid suit. Nelson Dec, ¶ 27; Schaufuss Dec, ¶ 16. Moreover, the number of unique

26   downloads *undercounts* Larsen's violations of the DMCA: not only does it ignore his own

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   repeated circumventions of account bans and his own repeated uses of the Cheat software – each

2   of which was an independent act of circumvention – but he (and Wallhax) participated in each

3   act of circumvention conducted by the Cheat's users each and every one of the countless times

4   the Cheat was loaded and used to play *Destiny 2*, validating the user's license to the Cheat and

5   allowing access to the software. Schauffuss Dec, ¶ 5. Under these circumstances, it is appropriate

6   for the Court to award Bungie damages on the high end of the statutory range, particularly where

7   *not* doing so would leave Larsen in a more favorable position than his partners as a result of his

8   refusal to participate in this litigation. Indeed, if *this* conduct and *these* circumstances do not

9   justify an award of $2,000 per trafficked anticircumvention device, it is difficult to imagine what

10  circumstances ever could. *Cf. TracFone Wireless, Inc. v. SND Cellular, Inc.*, 715 F. Supp. 2d

11  1246, 1262 (S.D. Fla. 2010) (awarding $2,500 per circumvention device where defendant

12  "caused damage and substantial irreparable harm" through willful actions). The Court should

13  award Bungie $13,500,000 in statutory damages on its § 1201 claim.

14       **2.   On Bungie's Copyright Claim, the Court Should Award Bungie $1,400,156.71 in**
15            **Damages, Plus Costs and Attorneys' Fees**

16       Bungie is entitled to recover "any profits of the infringer that are attributable to the

17  infringement." 17 U.S.C. §504 (b). To recover the infringer's profits, Bungie "is required to

18  present proof only of the infringer's gross revenue, and the infringer is required to prove his or

19  her deductible expenses and the elements of profit attributable to factors other than the

20  copyrighted work. Bungie requests that this court award it $466,718.90 in actual damages under

21  17 U.S.C. §504, representing an award of $406,649.55 in Wallhax's direct profits and an

22  additional $60,069.35 in indirect profits.[9] Those baseline damages should trebled under RICO,

23

24  ───────────────
    [9] Although Bungie is also entitled to recover its actual damages, 17 U.S.C § 504, it is unable to calculate such
25  damages in this case. It is not possible to fully quantify the income lost as a result of players who have ceased
    purchasing game items from Bungie. In addition, because of the nature of the harm caused by cheating, there is
26  literally no price at which Bungie would license cheating software. Bungie is therefore requesting only
    disgorgement of profits or, in the alternative, statutory damages.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  18 U.S.C. § 1964(c), and, subject to the statutory cap, under the WCPA. RCW 19.86.090, for a

2  total of $1,400,156.71.

3        In awarding the victim of infringement the infringer's profits, courts distinguish between

4  direct and indirect profits. Direct profits are "generated by selling an infringing product," *Mackie*

5  *v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). Indirect profits, which include those generated by

6  the use of infringing content in advertising, have "a more attenuated nexus to the infringement."

7  *Ibid.* To establish an entitlement to either direct or indirect profits, the copyright owner must

8  show a casual nexus between the profits and the infringement. *See Rearden LLC v. Walt Disney*

9  *Co.*, 17-CV-04006-JST, 2021 WL 4099622, at *3 (N.D. Cal. Aug. 17, 2021), on reconsideration

10  in part, 17-CV-04006-JST, 2022 WL 2064976 (N.D. Cal. June 8, 2022). To establish an

11  entitlement to indirect profits, the plaintiff must show that "the infringement at least partially

12  caused the profits that the infringer generated," and not simply that income is "remotely or

13  speculatively attributable to the infringement." *Griffo v. Oculus VR, Inc.*,

14  SACV151228DOCMRWX, 2018 WL 6265067, at *9 (C.D. Cal. Sept. 18, 2018).

15        The requirement that requirement applies to both direct and indirect infringement, and

16  determines what is appropriately considered gross revenue under §504; a plaintiff cannot simply

17  point to all of a publisher's gross profits from all its sales as the gross revenue attributable to the

18  infringing inclusion of a poem in an anthology. *See Cisco Sys. Inc. v. Arista Networks, Inc.*, 14-

19  CV-05344-BLF, 2016 WL 11752975, at *9 (N.D. Cal. Nov. 16, 2016) (*quoting On Davis v. The*

20  *Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001). Once the plaintiff has shown the causal nexus, the

21  burden shifts to the infringer to apportion any profits that were not the result of infringement.

22  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004), *as amended on denial*

23  *of reh'g and reh'g en banc* (Oct. 25, 2004), *opinion amended on denial of reh'g*, 03-35188, 2004

24  WL 2376507 (9th Cir. Oct. 25, 2004).

25        As a result of information acquired from Settling Defendants, Bungie was able to

26  differentiate Defendants' relevant gross revenues into two pools. The first is the $406,649.55 of

MOTION FOR DEFAULT -32
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  revenue that was derived from the sale of the infringing cheat, both as a standalone product and

2  from the sale of subscriptions to Defendants' cheat services, which included but was not limited

3  to the *Destiny 2* cheat. The cheat subscriptions are, in effect, an anthology of video game cheats;

4  the *Destiny 2* cheats are a component of that anthology. This pool of revenue includes direct

5  profits attributable to the sale of the infringing product, and it is Defendants' burden to apportion

6  any profits that are not attributable to the inclusion of the Cheats. *See On Davis v. The Gap, Inc.*,

7  246 F.3d 152, 160 (2d Cir. 2001). Larsen's refusal to participate in this litigation does not shift

8  that burden back to Bungie.

9       Second, there is a pool of gross revenue that consists of Defendants' convoyed sale of

10  other, non-*Destiny 2* cheats during the period of time that it offered the infringing Cheats.

11  Having cheats for high-popularity games in general and *Destiny 2* in particular was important to

12  Defendants' business not merely because of the direct revenues yielded by that product, but also

13  because having popular games allowed them to sell more cheats in total, including some that

14  would not otherwise have sold. *See* Schaufuss Dec, ¶ 3. Indeed, Defendants' business records

15  show substantial drops both in their overall revenue and in their overall cheat utilization when

16  they ceased providing the *Destiny 2* cheats. Cohen Dec, Ex. 15. This is non-speculative evidence

17  that the *Destiny 2* "infringement 'at least partially' contributed to profits." *Apulent, Ltd. v. Jewel*

18  *Hosp., Inc.*, C14-637RSL, 2015 WL 630953, at *5 (W.D. Wash. Feb. 12, 2015) (cleaned up).

19  Applying the percentage by which Defendants' non-*Destiny 2* cheat usage dropped after the

20  *Destiny 2* cheat was no longer available yields $60,069.35 in Wallhax revenue attributable to the

21  availability of *Destiny 2*. To the extent that there is any question about this calculation, here, too,

22  the burden shifts to Defendants to apportion profits attributable to sources other than the

23  infringement, and Larsen has not done so.

24       Placing this burden on Larsen is more than reasonable. Given Larsen's refusal to appear

25  in this case, Bungie is not in possession of the information needed to perfectly apportion those

26  sales that were specifically attributable to the *Destiny 2* cheats, nor can Bungie calculate the

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  portion of this income that represents whatever Larsen might wish to claim as expenses. Neither

2  Bungie nor this Court should engage in speculation as to those amounts; the uncertainty is purely

3  the result of Larsen's failure to appear. Thus, Bungie is entitled to an award of $466,718.90,

4  trebled to a total of $1,400,156.71.

5       In the alternative, and should the court find that Bungie has not adequately demonstrated

6  the link between Larsen's infringement and Larsen's revenues, Bungie respectfully requests that

7  the court award the maximum available statutory damages. Larsen's conduct, as demonstrated

8  above, provides more than ample proof of his willful infringement of Bungie's copyright

9  protected works. As such, Bungie is entitled, at its election, to recover either actual copyright

10  damages, or statutory damages of up to $150,000 per infringed work. 17 U.S. Code § 504. In this

11  case, Bungie has shown that two registered works were infringed, entitling it to receive up to

12  $300,000.

13       **3.  Plaintiff is Entitled to Compensation for Its Significant Mitigation Expenses**

14       Bungie is entitled to recover not only its cost of third-party anti-cheat software, but the

15  salaries it had to pay employees to work on its cheat mitigation efforts. *See U.S. v. Middleton*,

16  231 F.3d 1207 (9th Cir. 2000) (in criminal case, court could compute damages based on hours

17  worked and salaries paid to employees tasked with fixing CFAA problems). Bungie has

18  expended more than $2,000,000.00 on cheat mitigation, including game security staffing and

19  software, since the launch of Wallhax's *Destiny 2* Cheat in 2019. Barker Dec, ¶ 25. During the

20  time that the Wallhax Enterprise offered a *Destiny 2* Cheat, the Cheat market for *Destiny 2* was

21  comprised of three different cheat products: the Wallhax Cheat, the Ring -1 cheat, and the

22  AimJunkies cheat, each of which attempt to hack *Destiny 2* in different ways. Barker Dec, ¶ 26.

23  As a coarse estimate, the Court should fing that roughly one-third of Bungie's cheat mitigation

24  costs are attributable to the Wallhax Cheat, and should therefore award Bungie $666,666.00 as

25  baseline actual damages on its breach of contract, RICO, WCPA, and CFAA claims.  Those

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  baseline damages should trebled under RICO, 18 U.S.C. § 1964(c), and, subject to the statutory

2  cap, under the WCPA. RCW 19.86.090, for a total of $1,999,998.00.

3          **4.  Plaintiff is Entitled to Recover its Attorney's Fees and Costs**

4          Bungie is permitted under multiple statutes to recover its attorney's fees and costs of

5  court. Section 1964(c) expressly allows a party that has been injured by a RICO violation to

6  recover reasonable attorney's fees in a civil RICO case. The Washington Consumer Protection

7  Act states that "a person who is injured by a violation of this chapter may bring an action for

8  recovery of actual damages, including court costs and attorneys' fees." RCW 19.138.280.

9  Additionally, Section 505 of the Copyright Act "grants courts wide latitude to award attorney's

10 fees based on the totality of circumstances in a case." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136

11 S. Ct. 1979, 1985 (2016). Bungie has incurred $257,849.60 in attorney's fees to date. Cohen

12 Dec, ¶ 17;[10] Declaration of Brian Esler, ¶ 3. Bungie's attorney's fees were all reasonably

13 incurred in the process of litigating this action, and they are entitled to recover them by the RICO

14 Act, the Washington Consumer Protection Act, and the Copyright Act. In addition, Bungie has

15 incurred $80,263.92 in costs relating to this action, including expert fees. Barker Dec, ¶ 28.

16 Bungie is entitled to an award of those fees and costs.

17 **G.  PLAINTIFF IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF.**

18         In addition to statutory damages, the Court should permanently enjoin Larsen from

19 further infringing Plaintiff's rights and attacking their business by simply recreating the scheme

20 under a different name or developing new cheat software to sell with a different enterprise. "As a

21 general rule, a permanent injunction will be granted when liability has been established and there

22 is a threat of continuing violations." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520

23 (9th Cir. 1993). The Copyright Act specifically provides that a court may "grant temporary and

24 final injunctions on such terms at it may deem reasonable to prevent or restrain infringement of a

25 _____

26 [10] The Court's order on this motion should allow Bungie to submit any final billings it received relating to this action or this motion after submission of this brief.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   copyright." 17 U.S.C. § 502(a). Additionally, Larsen's liability for violations of the CFAA and

2   the Racketeer Influenced and Corrupt Organizations Act provide this Court ample reason to

3   grant permanent injunctive relief. 18 U.S.C. § 1964(a); 18 U.S.C. § 1030(g).

4          A plaintiff seeking permanent injunctive relief must demonstrate: "(1) that it has suffered

5   an irreparable injury; (2) that remedies available at law, such as monetary damages, are

6   inadequate to compensate for that injury; (3) that, considering the balance of hardships between

7   the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

8   would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, LLC*, 547 U.S.

9   388, 391 (2006). Because all four factors are met, the Court should issue a permanent injunction,

10  as set forth in the accompanying proposed order.

11         **1. Plaintiff Suffered Irreparable Harm**

12         Bungie has suffered, and will continue to suffer, irreparable injury by virtue of Larsen's

13  willful infringements, violations, and criminal conduct. Loss of prospective customers and

14  goodwill is irreparable, because it cannot be easily calculated and compensated for by a money

15  judgment. *See, e.g., Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir.

16  2001); *eBay, Inc. v. Bidder's Edge*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm

17  resulting from lost profits and lost customer goodwill is irreparable because it is neither easily

18  calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief.");

19  *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) (copyright

20  infringement may specifically constitute irreparable harm "in the loss of control of a business's

21  reputation" and in the "loss of trade and … goodwill"), *aff'd,* 348 F. App'x 288 (9th Cir. 2009).

22         Here, as established by the well-plead complaint and supporting evidence, the illegal

23  activity of the Wallhax Enterprise has disrupted Bungie's business relationships, caused them to

24  lose current and prospective customers, and damaged their brand and reputation. Dkt No. 1, ¶¶ 5,

25  222, 287, 297; Barker Dec, ¶¶ 13-14, 25. Accordingly, the Court should find that Plaintiffs

26  suffered, and will continue to suffer, irreparable harm in the absence of permanent injunctive

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    relief. *See Getty Images I v. Virtual Clinic*s, No. C13-0626JLR, 2014 WL 1116775, at *6 (W.D.

2    Wash. Mar. 20, 2014) (finding irreparable harm because Getty faced potential loss of customers,

3    goodwill, and reputation from defendant's unlicensed use of Getty's images).

4        **2.  Monetary Damages Alone Are Inadequate**

5        "For the second factor, the plaintiff must show that 'remedies available at law, such as

6    monetary damages, are inadequate to compensate for the injury.'" *Getty Images II*, 2014 WL

7    1116775, at *6 (quoting *eBay*, 547 U.S. at 391). A defendant's failure to appear suggests their

8    "infringing activities will not cease absent judicial intervention." *Warner Bros. Home Entm't Inc.*

9    *v. Jimenez*, 2013 WL 3397672, at *7 (C.D. Cal. 2013); *see also Jackson v. Sturkie*, 255 F. Supp.

10   2d 1096, 1103 (N.D. Cal 2003) ("[D]efendant's lack of participation in this litigation has given

11   the court no assurance that defendant's infringing activity will cease"). Here, monetary damages

12   are insufficient for the same reason that the harm is irreparable: because Bungie's lost business is

13   impossible to calculate, no award of compensatory damages can make it whole. "Loss of sales is

14   notoriously difficult to calculate, making money damages an inadequate remedy" *Edwards*

15   *Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 538 F. Supp. 3d 1132, 1146 (D. Or.

16   2021) (cleaned up), *quoting Neurovision Medical Products, Inc. v. NuVasive, Inc.*, 2014 WL

17   12554861, at *1 (C.D. Cal. Aug. 5, 2014).

18       **3.  The Balance of Equities Favors a Permanent Injunction**

19       Larsen has no legitimate interest in continuing to profit from his exploitation and abuse of

20   Bungie's work. *Disney*, 869 F.3d at 866-67; *see Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534

21   F. App'x 633, 636 (9th Cir. 2013) (that injunction might drive defendant out of business was

22   irrelevant when defendant's business rests on infringing plaintiff's intellectual property);

23   *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects

24   to build a business on a product found to infringe cannot be heard to complain if an injunction

25   against continuing infringement destroys the business so elected."). And absent an injunction,

26   Bungie will continue to suffer further irreparable harm as a result of Defendants' willful

MOTION FOR DEFAULT -37
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  misconduct. Thus, the balance of harms weighs decidedly in Bungie's favor. *See, e.g., Wecosign,*

2  *Inc. v. IFG Holdings, Inc.*, 845 (C.D. Cal. 2012) ("[W]ithout an injunction, Plaintiff will lose

3  profits and goodwill, while an injunction will only proscribe Defendants' infringing activities.").

4  As Larsen has no right to continue his wanton and damaging misconduct, a permanent injunction

5  against these activities is necessary and prudent.

6      **4.  The Public Interest Would Be Served by a Permanent Injunction**

7      Courts routinely find that 'the public interest is served when the rights of copyright

8  holders are protected against acts likely constituting infringement,'" *Getty Images II*, 2014 WL

9  1116775, at *7 (citation omitted), as the public has a strong interest in not being taken in by

10  fraudulent and infringing conduct. *see Internet Specialties W., Inc. v. Milon- DiGiorgio Enters.,*

11  *Inc.*, 559 F.3d 985, 993 n.5 (9th Cir. 2009). The Wallhax Enterprise has damaged consumer

12  confidence in Bungie's product and "sneer[ed] in the face of copyright owners and copyright

13  laws." *See Tu v. TAD Sys. Tech. Inc.*, 2009 WL 2905780, at *3 (E.D.N.Y. 2009) (citation &

14  internal quotation marks omitted). Even without considering the myriad other laws Larsen's

15  conduct breaks, it is manifestly in the public's interest that he be permanently enjoined from

16  continuing his illegal and tortious conduct.

17                    **IV. <u>CONCLUSION</u>**

18      For the foregoing reasons, Bungie respectfully requests the Court enter a default

19  judgment against Daniel Fagerberg Larsen for $17,238,268.23 and enter the requested injunctive

20  relief.

21      DATED this 20th day of January, 2023.

22

23

24

25

26

MOTION FOR DEFAULT -38
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

By: s/ *Brian W. Esler*
Brian W. Esler, WSBA No. 22168
MILLER NASH LLP
Pier 70
2801 Alaskan Way, Suite 300
Seattle, WA 98121
Telephone: (206) 624-8300
Fax: (206) 340-9599
Email: brian.esler@millernash.com

Akiva M. Cohen, New York Bar No. 4328969
(Admitted *pro hac vice*)
KAMERMAN, UNCYK, SONIKER
& KLEIN, P.C.
1700 Broadway
New York, NY 10019
Telephone: (212) 400-4930
Email: acohen@kusklaw.com

Dylan M. Schmeyer, Colorado Bar No. 50573
(Admitted *pro hac vice*)
KAMERMAN, UNCYK, SONIKER
& KLEIN, P.C.
750 W. 148th Ave #4216
Westminster, CO 80023
Telephone: (719) 930-5942
Email: dschmeyer@kusklaw.com

*Attorneys for Plaintiff*

4876-4045-5499.1

MOTION FOR DEFAULT -39
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121