The Honorable Tana Lin

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

BUNGIE, INC.,

Plaintiff,

v.

ELITE BOSS TECH INCORPORATED, 11020781 CANADA INC., DANIEL FAGERBERG LARSEN, ROBERT JAMES DUTHIE NELSON, SEBASTIAAN JUAN THEODOOR CRUDEN A/K/A "LUZYPHER," JOHN DOE NO. 4 A/K/A "GOODMAN," YUNXUAN DENG A/K/A "YIMOSECAI," ANTHONY ROBINSON A/K/A "RULEZZGAME," EDDIE TRAN A/K/A "SENTIENT", CHENZHIJIE CHEN A/K/A "CHENZHIJIE402, DSOFT, CVR 37454303, MARTA MAGALHAES A/K/A MINDBENDER A/K/A BLUEGIRL, AND JOHN DOES NO. 9-20,

Defendants.

Case No. 2:21-cv-01112-TL

DECLARATION OF ROBERT NELSON IN SUPPORT OF MOTION FOR DEFAULT

1.      My name is Robert James Duthie Nelson. The facts stated herein are true and correct based on my personal knowledge, and I could and would testify competently thereto if required to do so.

DECLARATION OF ROBERT NELSON- 1
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

2.    I, along with "Badger" and Daniel Larsen, am one of the three partners in a cheat software business ("Wallhax"). Wallhax is a commercial enterprise that operates on a for-profit basis, selling licenses to cheat software directly through multiple websites – Wallhax.com, ArtificialSensei.com, and CheatAutomation.com – and indirectly through reseller partners. Wallhax's software (the "Software") is designed to enable its users to cheat at video games. , including popular multiplayer games.

3.    Badger is, to the best of my knowledge, a resident of Germany. Larsen is, to the best of my knowledge, a resident of Denmark. I am a resident of Canada.

4.    I am the sole owner of Elite Boss Tech, Inc., ("EBT") and 11020781 Canada ("1102 Canada") two corporations that we use in connection with the Wallhax business; EBT owns the CheatAutomation.com and ArtificialSensei.com domains, while 1102 Canada maintains payment processor accounts used in the Wallhax business. Larsen participated in the business both individually and through his Danish sole proprietorship DSoft. Badger participated individually. Wallhax is not itself a registered business entity.

5.    One of the games we developed cheat software for is Bungie's game Destiny 2 (the "Destiny 2 Software").

6.    Each of us made different contributions to the enterprise. I used my prior experience as an affiliate for the cheat software website DamnCheaters.com to provide business and marketing expertise, and I handled the financial aspects of the business, including sending the monthly distribution of proceeds to Badger and Larsen.

7.    Badger and Larsen provided software engineering and coding skills, and developed our Software. Larsen, in particular, developed the "Framework" code that Wallhax used as the base for any cheat Software we developed for individual games, and was the lead developer for the Destiny 2 Software.

8.    We viewed our contributions as being equally important to the success of Wallhax as a business enterprise. We made decisions together as to how to operate the business, including

DECLARATION OF ROBERT NELSON - 2
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   on which games to offer cheats for. We shared expenses, such as website hosting costs or access

2   to software needed to develop cheats equally., and we re-invested funds that we received from

3   our sales into the business, for example by gaining access to new video games to develop and

4   market new cheats. We shared the profits from Wallhax in even thirds.

5        9.     All three of us – myself, Badger, and Larsen – had a financial interest in Wallhax.

6   All three of us also had some control over Wallhax and how Wallhax did business.

7        10.    In order to run the business and carry out its activities, we communicated with

8   each other using email, voice chat, and text chat, including via telegram. As part of my

9   settlement in this case, I provided logs of the telegram chats between myself and Larsen to

10   Bungie.

11        11.    I also routinely engaged in communications with customers who were based in

12   the United States, generally using various means of internet-based communication.

13        12.    I have been involved in the business of selling cheat software since approximately

14   2010, when I began selling cheats as an affiliate of DamnCheaters.com. Because I was highly

15   successful in that role, Oliver Baumgart, the owner of DamnCheaters.com, offered me the

16   opportunity to go into business with him.

17        13.    I started the CheatAutomation website in 2012, in partnership with Badger and

18   Oliver Baumgart. Badger was a coder who had been involved in programming cheats for

19   DamnCheaters.com. Baumgart was part of CheatAutomation for a time, but left the enterprise at

20   some point prior to 2014.

21        14.    Though I do not recall the exact date, Daniel Larsen began working with me after

22   CheatAutomation opened in 2012 and before Wallhax started operating in 2014.

23   CheatAutomation initially only sold offerings on behalf of DamnCheaters.com, but soon started

24   providing support for those cheats and updating them, with Badger working to do the

25   programming needed to update the cheats that were offered.

26

DECLARATION OF ROBERT NELSON - 3
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1      15.     In 2014, the three of us, Badger, Larsen, and myself, began operating the Wallhax

2 site, and doing business as Wallhax.

3      16.     The Wallhax enterprise exists for the sole purpose of selling cheat Software, and

4 it does not engage in other business activities. Wallhax sells subscriptions that allow users to

5 access cheat Software for terms of various lengths, generally ranging from three days to three

6 months. Although Wallhax has ceased offering the Destiny 2 Software, Wallhax continues to

7 offer cheat Software for other games.

8      17.     In addition to selling the Destiny 2 Software on different websites, we also sold

9 the cheats in different formats. Specifically, we offered the Destiny 2 Software as a standalone

10 product, and the also offered the Destiny 2 Software as part of a package that included

11 subscriptions to Cheat Software for a wide range of games.

12      18.     Wallhax sells these subscriptions through multiple websites in order to capture a

13 larger portion of the market. The Wallhax.com domain is owned by Daniel Larsen, while EBT

14 owns. Cheatautomation.com and ArtificialSensei.com.

15      19.     We also used our affiliates – third party resellers, who would buy subscriptions

16 from us in bulk at wholesale prices and sell them to others at a markup – to further increase our

17 market share. The resellers also serve as a safety net, allowing us to continue sales if and when

18 payment processors limit or close our accounts, which is a risk in the cheat Software business.

19      20.     Wallhax accepted payment in multiple currencies from users by credit card,

20 working through a variety of payment processors, as well as accepting several forms of

21 cryptocurrency as payment.

22      21.     Our customers are located around the world. Many are based in the United States,

23 and send us payment from the United States.

24      22.     During the course of its business, Wallhax used many different payment

25 processors. In large part, this was because Wallhax had difficulty maintaining consistent access

26

DECLARATION OF ROBERT NELSON - 4
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   to payment processors. Payment processors dropped Wallhax as a customer – or refused to

2   accept us as a customer in the first instance – because of the nature of our business.

3       23.     Wallhax monitored the function of the cheat Software, including the Destiny 2

4   Cheats, and would update the software as needed to ensure that it remained functional. We also

5   provided ongoing customer support, including issuing refunds when users could not use our

6   Software. Larsen and I were particularly involved in this aspect of our business. As part of our

7   customer support, I would occasionally extend a user's subscription by a few days as a reward

8   for them leaving us a good review as a thank you.

9       24.     We advertised our Software, including the Destiny 2 Software, in many ways,

10  including by making and posting videos to YouTube. We had to use multiple YouTube channels

11  to do this, because of the possibility that our channels might be suspended for copyright strikes

12  on the videos showing cheats for various games.

13      25.     The Destiny 2 Software we made available on our websites was a meaningful

14  portion of our income.

15      26.     Wallhax first sold access to the Destiny 2 Software in 2019, and continued to do

16  so until we learned that this action had been filed.

17      27.     Prior to the filing of this action, we were aware that Bungie was pursuing

18  litigation against other sellers of cheat software, and we took measures to attempt to make

19  ourselves less visible in the hope that we would be overlooked. We took down the specific page

20  on our site that referenced Destiny 2,  but we hoped that doing so would increase our chances of

21  being able to sell the Destiny 2 cheat in the long run, because we would be able to restore the

22  page to public view after Bungie's interest in pursuing cheaters waned.

23      28.     The Destiny 2 Software consists of several features that provide our users with in-

24  game advantages. One component, "ESP," allowed users to see through walls and identify other

25  opponents, including both characters controlled by other characters and characters controlled by

26  the game, that are not in their character's line of sight.

DECLARATION OF ROBERT NELSON - 5
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

29.     The Destiny 2 Software highlight these hidden characters, making them visible to our users. Without the cheats, the user would not be able to see the hidden characters and would not know where they are located. Knowing where opponents are provides a user of the Software with a considerable advantage in the game. This highlighting is not rendered on the player's screens by any instructions that the Destiny 2 software provides; it is created by our Destiny 2 Software.

30.     The Destiny 2 Software contain features that are user-configurable. For example, the user can select what colors are used to highlight different hidden entities.

31.     We frequently needed to update the Destiny 2 Software, because Bungie would often release updated versions of Destiny 2 that broke the Destiny 2 Software. We would then have to change our software to get around the measures in the new Destiny 2 version that prevented our Software from working.

32.     In addition to the Framework code, Larsen was the developer primarily responsible for creating the Destiny 2 Software and its required updates.

33.     The process of developing the Destiny 2 Software required a great deal of testing, which could only be undertaken by playing Destiny 2. Because Destiny 2 employed anti-cheat technologies, our accounts would often be caught during this process and banned. To continue testing, we created dozens of accounts, and would use these accounts until they were banned. Because Bungie employed many anti-cheat measures, these accounts would often be banned within four hours. In addition, Larsen had been hardware ID banned by Bungie, and had to take measures to evade that ban in order to play the game.

34.     Larsen was often involved in testing updates to the Destiny 2 Software, which required the use of additional accounts.

35.     I first became aware of this litigation the day the case was filed. Larsen, Badger and I obtained and circulated a copy of the complaint shortly thereafter, before I was formally served, and we began to seek legal counsel to represent us in this case.

DECLARATION OF ROBERT NELSON - 6
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   36.   We discussed the case extensively amongst ourselves from the start. We believed,

2   for a variety of reasons, that I had the greatest legal exposure, and we made plans on that basis,

3   including for how to share in the legal expenses.

4   37.   Larsen was an active participant in these discussions. He commented on the

5   overall litigation and on various settlement proposals. He objected to any proposal that would

6   require turning over the source code for any of the Software, including the Destiny 2 Software, to

7   Bungie directly or to Bungie through me, to ensure that the code could not be turned over

8   without his permission. Eventually he agreed that I could turn over the Destiny 2-specific code as

9   part of my settlement with Bungie, but he absolutely refused to allow me to turn over the

10  Framework code, which I never possessed and which I understand he holds the copyright on.

11

12      I declare under penalty of perjury under the laws of the United States that the foregoing is

13  true and correct.

14

15      DATED this  11   day of January, 2023 at Montreal, Quebec.

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF ROBERT NELSON - 7
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121