# Attachment A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable Tana Lin

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BUNGIE, INC.,

Plaintiff,

v.

ELITE BOSS TECH INCORPORATED,
11020781 CANADA INC., DANIEL
FAGERBERG LARSEN, ROBERT JAMES
DUTHIE NELSON, SEBASTIAAN JUAN
THEODOOR CRUDEN A/K/A
"LUZYPHER," JOHN DOE NO. 4 A/K/A
"GOODMAN," YUNXUAN DENG A/K/A
"YIMOSECAI," ANTHONY ROBINSON
A/K/A "RULEZZGAME," EDDIE TRAN
A/K/A "SENTIENT", CHENZHIJIE CHEN
A/K/A "CHENZHIJIE402, DSOFT, CVR
37454303, MARTA MAGALHAES A/K/A
MINDBENDER A/K/A BLUEGIRL, AND
JOHN DOES NO. 9-20,

Defendants.

Case No. 2:21-cv-01112-TL

MOTION FOR DEFAULT

**NOTE ON MOTION CALENDAR:
January 17, 2023**

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

MOTION FOR DEFAULT
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

# TABLE OF CONTENTS

2

I. INTRODUCTION ........................................................................................................ 1

II. FACTUAL BACKGROUND ...................................................................................... 2

   A.  BUNGIE AND THE LSLA ................................................................................. 2

   B.  LARSEN & THE WALLHAX ENTERPRISE ................................................... 3

III. ARGUMENT ............................................................................................................. 7

   A.  The Court Has Personal Jurisdiction Over Larsen and Subject Matter Jurisdiction Over the Dispute ................................................................................................................... 8

   B.  The First, Sixth, and Seventh *Eitel* Factors Favor Default Judgment Because Larsen Has Consciously Decided Not to Appear................................................................................ 9

   C.  The Second and Third *Eitel* Factors Favor Bungie Because Bungie's Well-Pled Complaint and Supporting Evidence Establish Larsen's Liability. ............................................... 10

      1.  Copyright Infringement.............................................................................. 10

      2.  Civil RICO under 18 U.S.C. § 1962(a), (b), & (c)....................................... 15

      3.  Circumvention of Technological Measures under 17 U.S.C. § 1201(a) ....... 21

      4.  Violation of the Computer Fraud and Abuse Act ....................................... 23

      5.  Breach of Contract and Interference with Contractual Relations ................ 26

      6.  Violation of the Washington Consumer Protection Act............................... 27

      7.  Civil Conspiracy........................................................................................ 28

   D.  The Fourth *Eitel* Factor Weighs in Bungie's Favor Because Larsen's Conduct Warrants the Damages Bungie seeks...................................................................................................... 29

   E.  The Fifth *Eitel* Factor Favors Bungie Because the Facts are Undisputed. ........................ 29

   F.  The Court Should Award Bungie $3,400,154.71 in Compensatory Damages, $13,530,000.00 in Statutory Damages, and $348,151.02 in Attorney Fees and Costs, Plus Fees Incurred After Submission of this Motion .................................................................. 30

      1.  On Bungie's Anti-Circumvention Claim, the Court Should Award Bungie $13,530,000.00 in Statutory Damages.................................................................. 30

      2.  On Bungie's Copyright Claim, the Court Should Award Bungie $1,400,156.71 in Damages, Plus Costs and Attorneys' Fees...................................................... 32

      3.  Plaintiff is Entitled to Compensation for Its Significant Mitigation Expenses............. 35

      4.  Plaintiff is Entitled to Recover its Attorney's Fees and Costs ...................... 35

   G.  Plaintiff is Entitled to Permanent Injunctive Relief. .......................................... 36

      1.  Plaintiff Suffered Irreparable Harm ............................................................ 37

      2.  Monetary Damages Alone Are Inadequate ................................................. 37

      3.  The Balance of Equities Favors a Permanent Injunction .............................. 38

      4.  The Public Interest Would Be Served by a Permanent Injunction................... 38

IV. Conclusion ................................................................................................................ 39

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

# Table of Authorities

**Page(s)**

**Cases**

*Allwaste, Inc. v. Hecht*, 65 F.3d 1523 (9th Cir. 1995) .................................................. 19

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633 (9th Cir. 2013) ........................ 38

*Amazon Content Servs. LLC v. Kiss Libr.*, No. C20-1048 MJP, 2021 WL 5998412
 (W.D. Wash. Dec. 17, 2021) ................................................................................. 9

*Apulent, Ltd. v. Jewel Hosp., Inc.*, C14-637RSL, 2015 WL 630953
 (W.D. Wash. Feb. 12, 2015) ................................................................................. 34

*Bangkok Broad. & T.V. Co., Ltd. v. IPTV Corp.*, 549 Fed. Appx. 647 (9th Cir. 2013) ............... 30

*Blizzard Entm't, Inc. v. Bossland GmbH*, 16-cv-1236-DOC, 2017 WL 7806600
 (C.D. Cal. Mar. 31, 2017) .............................................................................. 11, 12

*Blue Nile, Inc. v Ideal Diamond Solutions, Inc.*, No. C10-380Z, 2011 WL 3360664
 (W.D. Wash. Aug 3, 2011) ................................................................................... 11

*Boyle v. U.S.*, 556 U.S. 938 (2009) ................................................................................ 15

*Cisco Sys. Inc. v. Arista Networks, Inc.*, 14-CV-05344-BLF, 2016 WL 11752975
 (N.D. Cal. Nov. 16, 2016) ................................................................................... 33

*Crim. Prods., Inc. v. Evans*, No. 16-CV-1647RAJ, 2018 WL 2397439
 (W.D. Wash. Apr. 4, 2018) .................................................................................. 14

*Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 1200, 1211 (W.D. Wash. 2014) ..................... 10

*CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051 (E.D. Cal. 2009),
 *aff'd*, 348 F. App'x 288 (9th Cir. 2009) ................................................................... 37

*DeFelice v. State, Emp't Sec. Dep't*, 187 Wash. App. 779, 351 P.3d 1971 (2015) .................... 11

*Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696  (9th Cir. 2008) ............................ 14

*Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017) .............................. 10, 38

*eBay, Inc. v. Bidder's Edge*, 100 F. Supp. 2d 1058 (N.D. Cal. 2000) ................................... 37

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ..................................................... 37

*Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 538 F. Supp. 3d 1132
 (D. Or. 2021) ...................................................................................................... 38

*Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986) ............................................................... 7

*Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918 (E.D. Va. 2017) ............... 24

*Facebook, Inc. v. ILikeAd Media Int'l Co. Ltd.*, 19-CV-07971-SK, 2022 WL 2289064
 (N.D. Cal. Feb. 1, 2022), *report and recommendation adopted as modified*,
 19-CV-07971-JST, 2022 WL 2289058 (N.D. Cal. Mar. 15, 2022) ...................................... 8

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) ................................ 25

*Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002) ............................................. 7

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

*Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016 (9th Cir. 2001) .................................... 20

*Getty Images I v. Virtual Clinic*s, No. C13-0626JLR, 2014 WL 1116775
(W.D. Wash. Mar. 20, 2014) ...................................................................................... 37, 39

*Gossen v. JPMorgan Chase Bank*, 819 F. Supp. 2d 1162 (W.D. Wash. 2011)........................... 29

*Griffo v. Oculus VR, Inc.*, SACV151228DOCMRWX, 2018 WL 6265067
(C.D. Cal. Sept. 18, 2018)................................................................................................. 33

*Hangman Ridge*, 105 Wash.2d 778 719 P.2d 531 .............................................................. 28

*Hill v. Lynn*, No. 17 C 06318, 2018 WL 2933636 (N.D. Ill. June 12, 2018) ................... 24, 26

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) ...................................... 25

*Holland Am. Line Inc. v. Wartsila N. Am. Inc.*, 485 F.3d 450 (9th Cir. 2007) ............................... 8

*In re Tuli,* 172 F.3d 707 (9th Cir. 1999) ........................................................................... 7

*Internet Specialties W., Inc. v. Milon- DiGiorgio Enters., Inc.*, 559 F.3d 985
(9th Cir. 2009)................................................................................................................. 39

*Inteum Co., LLC v. Natl. U. of Singapore*, C17-1252-JCC, 2018 WL 2317606
(W.D. Wash. May 22, 2018)............................................................................................. 28

*Jackson v. Sturkie*, 255 F. Supp. 2d 1096 (N.D. Cal 2003) ............................................... 38

*Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979 (2016)............................................. 36

*Klem v. Wash. Mut. Bank,* 176 Wn.2d 771 295 P.3d 1179 (2013) .................................... 27

*Landstar Ranger, Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 2d 916 (C.D. Cal. 2010) .......... 29

*Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 930 P.2d 288 (1997)............ 26, 27

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F. 2d 965 (9ᵗʰ Cir. 1992) ................ 13

*Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353 (9th Cir. 2005) .............. 15

*Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002)................................................................. 32

*MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993)................................ 24, 36

*Malnar v. Carlson*, 128 Wash. 2d 521, 910 P.2d 455 (1996).............................................. 11

*Maplebear Inc. v. Doe*, No. 121CV474AJTIDD, 2021 WL 2767296,
(E.D. Va. May 10, 2021) ............................................................................................... 25

*MDY Industries LLC v. Blizzard Entertainment Inc.*, 629 F. 3d 928 (9th Cir. 2010)................... 22

*Neurovision Medical Products, Inc. v. NuVasive, Inc.*, 2014 WL 12554861
(C.D. Cal. Aug. 5, 2014)................................................................................................. 38

*Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007 (9th Cir. 1994)................................ 30

*Nugget Hydroelectric, L.P. v. P. Gas and Elec. Co.*, 981 F.2d 429 (9th Cir. 1992).................... 21

*Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 899 P.2d 6 (1995)........ 26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

*On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001) ............................................................ 33

*Padded Spaces LLC v. Weiss*, C21-0751JLR, 2022 WL 2905887
(W.D. Wash. July 22, 2022) .......................................................................................... 7, 9, 10

*Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 204 P.3d 885 (2009 ........................... 27

*PepsiCo Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172 (C.D. Cal. 2002) ............................... 10, 29

*Philips N. Am. LLC v. Glob. Med. Imaging, LLC*, No. 21-CV-3615, 2022 WL 3106971
(N.D. Ill. Aug. 4, 2022) ....................................................................................................... 26

*Philips N. Am. LLC v. KPI Healthcare, Inc.*, SACV191765JVSJDEX,
2021 WL 6103527 (C.D. Cal. Sept. 1, 2021) ...................................................................... 31

*Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004),
*as amended on denial of reh'g and reh'g en banc* (Oct. 25, 2004), *opinion amended
on denial of reh'g*, 03-35188, 2004 WL 2376507 (9th Cir. Oct. 25, 2004) ...................... 33

*Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531
(N.D. Tex. 2003) .................................................................................................................. 13

*Principal Life Ins. Co. v. Hill*, C21-1716 MJP, 2022 WL 2718087
(W.D. Wash. July 13, 2022) .................................................................................................. 7

*Rearden LLC v. Walt Disney Co.*, 17-CV-04006-JST, 2021 WL 4099622
(N.D. Cal. Aug. 17, 2021) .................................................................................................... 32

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) ...................................................................... 16

*Rimini St., Inc. v. Oracle Int'l Corp.*, 473 F. Supp. 3d 1158 (D. Nev. 2020) ...................... 14

*Seattle Pac. Indus., Inc. v. S3 Holding LLC*, 831 Fed. Appx. 814 (9th Cir. 2020)............... 30

*Shute v. Carnival Cruise Lines*, 783 P.2d 78 (Wash. 1989) .................................................... 8

*Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068 (N.D. Cal. 2005) ......... 31

*State v. Reader's Digest Ass'n*, 81 Wash.2d 259, 501 P.2d 290.......................................... 28

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ................. 37

*Take-Two Interactive Software, Inc. v. Zipperer*, 18 CIV. 2608 (LLS),
2018 WL 4347796 (S.D.N.Y. Aug. 16, 2018) ................................................................... 12

*Theofel v. Farey-Jones*, 359 F.3d 1066 (9th Cir. 2004)........................................................ 25

*TracFone Wireless, Inc. v. SND Cellular, Inc.*, 715 F. Supp. 2d 1246 (S.D. Fla. 2010)............. 32

*Tu v. TAD Sys. Tech. Inc.*, 2009 WL 2905780, (E.D.N.Y. 2009)........................................... 39

*U.S. v. Middleton*, 231 F.3d 1207 (9th Cir. 2000) ................................................................ 35

*Unicolors, Inc. v. Urb. Outfitters, Inc.,* 853 F.3d 980 (9th Cir. 2017)................................... 14

*United States v. Liu*, 731 F.3d 982 (9th Cir. 2013)................................................................ 15

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) ........................................................ 17

MOTION FOR DEFAULT -iv
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

*United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) .................................................. 24

*United States v. Shipsey*, 363 F.3d 962 (9th Cir. 2004) ............................................... 17

*Urban Accessories, Inc. v. Iron Age Design & Imp., LLC,* C14-1529JLR,
2015 WL 1510027 (W.D. Wash. Apr. 1, 2015) ....................................................... 11

*Van Buren v. United States*, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021) ...................... 25

*Warner Bros. Home Entm't Inc. v. Jimenez*, 2013 WL 3397672 (C.D. Cal. 2013) ...... 38

*Wecosign, Inc. v. IFG Holdings, Inc.*, 845 (C.D. Cal. 2012) ....................................... 38

*Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995 n.12 (Fed. Cir. 1986) .................. 38

*Woody v. Stapp*, 146 Wn. App. 16 (Wash. Ct. App. 2008) ......................................... 28

**Statutes**
17 U.S. Code § 504 ....................................................................................................... 35

17 U.S.C. § 1201 ........................................................................................ 8, 21, 22, 23

17 U.S.C. § 502(a) ....................................................................................................... 36

17 U.S.C. § 504(b) ....................................................................................................... 32

17 U.S.C. § 506(a) ....................................................................................................... 18

18 U.S.C. 1030 ...................................................................................... 8, 23, 24, 36

18 U.S.C. § 1343 .......................................................................................................... 17

18 U.S.C. § 1956 ............................................................................................ 17, 18, 19

18 U.S.C. § 1957 ................................................................................................. 17, 19

18 U.S.C. § 1961 ............................................................................................ 15, 17, 19

18 U.S.C. § 1962 ........................................................................................ 8, 15, 16, 21

18 U.S.C. § 1962 *et seq.* .............................................................................................. 15

18 U.S.C. § 1964 ............................................................................................ 32, 35, 36

28 U.S.C. § 1331 ............................................................................................................ 8

28 U.S.C. § 1367 ............................................................................................................ 8

RCW 19.138.280 .......................................................................................................... 35

RCW 19.86.090 ...................................................................................................... 32, 35

RCW 19.86.920 ............................................................................................................ 27

**Rules**
Fed. R. Civ. P. 55 ........................................................................................................... 7

Fed. R. Civ. P. 41 ........................................................................................................... 8

LCR 55 ............................................................................................................................ 7

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# I. <u>INTRODUCTION</u>

As alleged in the Complaint – and as Defendants Elite Boss Tech Incorporated ("EBT"), 11020781 Canada Inc. ("1102 Canada"), and Robert James Duthie Nelson ("Nelson") conceded in their stipulated judgment – the Wallhax enterprise develops cheat software that violates both federal law and the rights of Plaintiff Bungie, Inc. ("Bungie") in its successful live-service game, *Destiny 2*. Defaulting Defendant Daniel Fagerberg Larsen ("Larsen") played a critical role in those violations, designing the cheat software ("Cheats") and helping to coordinate the Wallhax enterprise. As shown herein, the evidence establishes Larsen's personal liability on each of Bungie's claims in this action: for (1) copyright infringement, (2) civil RICO, (3) circumvention of technological protection measures, (4) violations of the Computer Fraud and Abuse Act, (5) breach of contract, (6) intentional interference with contractual relations, (7) violations of the Washington Consumer Protection Act, and (8) civil conspiracy. Given Larsen's default, Bungie is thus entitled to a default judgment on its claims.

As further shown herein, that judgment should issue in the amount of $17,278,305.73. Bungie is entitled to an award of statutory damages in the amount of $13,530,000.00, consisting of $2,000 per circumvention device. It is entitled to an award of its actual damages under the copyright act and the CFAA, which, after a trebling of their damages under the Racketeering Influence and Corrupt Organizations Act, is $3,400,154.71. And Bungie is entitled to an award of attorneys' fees and costs of $348,151.02. All told, Bungie's damages total $17,278,305.73.

Finally, the Court should issue a permanent injunction barring Larsen from continuing to develop, sell, distribute, or otherwise profit from Cheats targeting *Destiny 2* or other Bungie games. Cheat software allows unskilled, unethical, and antisocial players to gain an unfair advantage against other players in Bungie's shared-world, massively multiplayer online games, in which millions of users across the globe play with and compete against each other for fun,

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    bragging rights, in-game loot, and accolades. Cheats destroy the appeal of Destiny 2's

2    competitive PvP activities, attract the parasitic activities of black-market "boosting" services,

3    and devalue the in-game and real-world rewards that Bungie offers for exceptional end-game

4    achievement. Cheats thus negatively impact the gaming experience of Bungie's large community

5    of honest players who enjoy playing and winning fairly through skill and practice rather than

6    shortcuts, and thereby negatively affect Bungie's business. That, in turn, threatens Bungie in

7    ways that cannot be reduced to a damages number. As the provider of a continuing live-service

8    game, Bungie is uniquely vulnerable to attacks on the long-tail engagement of its community of

9    players. When Bungie's player community is dissatisfied, Bungie loses players and the

10   opportunity for continued growth, and therefore revenue (Bungie's revenue from *Destiny 2* is

11   derived entirely from players' in-game cosmetic purchases, optional purchases of additional

12   game content ("DLCs"), and memorabilia – all of which suffer when players are less attached to

13   the game). Larsen's Cheat activity thus irreparably harms Bungie, and should be enjoined.

## II. <u>FACTUAL BACKGROUND</u>

### A.  BUNGIE AND THE LSLA

16         Bungie, Inc. is the developer and publisher of the critically acclaimed video game

17   *Destiny 2*, a shared world massively multiplayer online shooter. Declaration of James Barker

18   ("Barker Dec"), ¶ 2. *Destiny 2* operates on a free-to-play model; the base game and experience is

19   completely free, and any console or PC owner with the hardware and the inclination can

20   download and play. *Id.*, ¶ 7. The player can then elect to become a customer: Bungie offers for

21   sale various expansions and packs of content that add story missions and campaigns, new

22   weapons and items, and any manner of cosmetic and aesthetic enhancements that can be

23   obtained using an in-game currency, Silver, that a player may purchase. *Id.* As such, Bungie's

24   business depends entirely upon community good will and the high quality of their player

25   experience. *Id.*, ¶ 8.  The better the game is, and the more fun it is to play, the more players

26   become paying customers. *Id.*

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    The bet Bungie made on itself and its game is substantial. Bungie expends significant

2    resources on the development of new content, both free and commercial. Barker Dec, ¶ 9.

3    Bungie released a massive new expansion, *The Witch Queen*, in early 2022, and will release

4    another, *Lightfall*, in February 2023. *Id.* As such, it is vital that Bungie protect the quality of the

5    *Destiny 2* experience, and it therefore spares no expense in doing so. In order to play *Destiny 2*,

6    players must first agree to the Limited Software License Agreement (the "LSLA"); it is

7    impossible to play the game without agreeing to the LSLA's terms. *Id.*, ¶ 17. The LSLA contains

8    provisions against hacking and modifying the game, protects Bungie's intellectual property

9    rights, and forbids cheating. *Id.*, Ex. 3.

10    Cheat software imperils Bungie's live-service business model, which is especially

11    vulnerable because the base game is free to play. Barker Dec, ¶¶ 13-14. When the game is unfair,

12    and when its competitive modes are so saturated with cheaters as to become broken, players stop

13    having fun. *Id.* Between major expansions, Bungie maintains a rigorous publishing schedule of

14    seasonal content and in-game events, which expand the game in substantial ways on a quarterly

15    basis and drive a central story with narrative content week-by-week. When players stop having

16    fun, they stop spending money, stop participating in the game's community, stop promoting the

17    game in their own capacity and fans, influencers, and creators, and sometimes, stop playing

18    altogether. *Id.* Additionally, the perception of cheating leads to bad press and scorn from the

19    wider industry. *Id.*, ¶ 14 and Ex. 2. As such, Bungie devotes considerable resources to anti-cheat

20    mitigation measures, and to identifying and banning offenders. Barker Dec, ¶¶ 16-23.  The more

21    complex and novel the cheat, the more expensive it is to combat, both in money and man hours.

22    *Id.*, ¶ 25. Larsen's cheat has demanded substantial investments of time, resources, effort, and

23    legal expenses to combat. *Id.*, ¶ 26. *See also* Declaration of Steven Guris ("Guris Dec"), ¶ 5.

24    **B.  LARSEN & THE WALLHAX ENTERPRISE**

25    Daniel Fagerberg Larsen ("Larsen") is a cheater who makes a living developing and

26    selling illegal cheat software, and a resident of Denmark.  Declaration of Robert James Duthie

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

Nelson ("Nelson Dec"), ¶ 3; Declaration of Patrick Schaufuss ("Schaufuss Dec"), ¶¶ 1-2, 13, 17. Larsen and his partners worked together to develop and sell Cheats.  Schaufuss Dec, ¶ 5; Nelson Dec, ¶¶ 2-11.  Larsen and his co-Defendants, Nelson and Patrick Schaufuss (a/k/a "Badger") were partners in the cheat software business, and developed and sold subscriptions to cheat software to multiple games, including *Destiny 2*, from the Wallhax.com website and other websites. Schaufuss Dec, ¶¶ 1, 3; Nelson Dec, ¶¶ 16-21. Wallhax sold subscriptions to cheat software on terms of various lengths, usually between three days and three months. Nelson Dec, ¶ 16; Declaration of Akiva M. Cohen ("Cohen Dec") Ex. 1. Users paid for these subscriptions via crypto or credit card, Nelson Dec, ¶ 20; if a user left a positive review, Nelson would extend their subscription by a few days as a thank you. Cohen Dec Ex. 2. After a customer subscribed to their software, Wallhax continued to update the cheat as needed to ensure that it remained functional and undetectable, and provided customer service and support. Nelson Dec, ¶¶ 23, 31. In addition to selling the cheats at their own websites at Wallhax.com, Cheatautomation.com, and ArtificialSensei.com, Wallhax also operated a reseller program. Nelson Dec, ¶ 19. Resellers would purchase the cheat in bulk at a discount and resell it, both on the Wallhax sites and their own, enabling them to provide additional payment processing options while sharing in the Wallhax profits. *Id.* Nelson, Larsen, Badger, their relevant corporate entities, and the Wallhax resellers are collectively referred to herein as the "Wallhax Enterprise."

Nelson brought several years of experience in the cheat business to the table, having previously been a successful affiliate marketer for DamnCheaters.com. Nelson Dec, ¶ 12. Badger and Larsen were the technical team, with Larsen responsible for the design of the Wallhax client software, also known as the "cheat loader." Schaufuss Dec, ¶ 5. Larsen was also the architect and developer ██████████████████████████████████████████ ██████████████████████████████████ *Id.*, ¶¶ 5-6. *See also* Cohen Dec Ex. 3. ████ ██████████████████████████████████████████ Schaufuss Dec, ¶ 6. ████████████████

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████ *Id.*;

3 Guris Dec, ¶¶ 22-25. ████████████████████████████████████

4 ██████████████████████████████████████████████████████████

5 ████████████████████████████ Schaufuss Dec, ¶ 6. ███████████

6 ██████████████████████████████████████████████████████████

7 ██████████████████████████ Schaufuss Dec, ¶ 6, as well as the development of game-

8 specific cheats for various games, including *Destiny 2*. Cohen Dec Ex. 4[1] at 295-297; Schaufuss

9 Dec, ¶ 6. Larsen, Nelson, and Badger split profits from the Wallhax Enterprise amongst

10 themselves in equal thirds. Cohen Dec Ex. 6; Nelson Dec, ¶ 8; Schaufuss Dec, ¶ 5. Nelson

11 participated in the enterprise through his corporate entities, EBT and 1102 Canada Inc., which

12 collected the payments for Wallhax's cheat software, Cohen Dec Ex. 4 at 2146-49, and Ex. 3;

13 Nelson Dec, ¶ 4; Schaufuss Dec, ¶ 5, while Larsen participated through his own Danish business

14 entity, DSoft, CVR 37454303.[2] Cohen Dec Ex.7; Nelson Dec., ¶ 4.

15   Nelson, Larsen, and Badger operated the Wallhax Enterprise as a general partnership,

16 with Larsen and his fellow defendants equally sharing its profits and expenses. Nelson Dec, ¶8.,

17 Cohen Dec Ex. 6**.** The Wallhax Enterprise invested considerable time and effort in attempting to

18 evade the measures Bungie uses to combat cheaters. Schaufuss Dec, ¶ 9; Guris Dec, ¶ 6. Indeed,

19 the Wallhax Enterprise exists for the sole purpose of developing and selling cheats. Nelson Dec,

20 ¶ 16; Schaufuss Dec, ¶ 3. In order to effectively develop and test cheats, Larsen and his partners

21 played *Destiny 2* extensively, going through dozens of accounts as each one in turn got banned

22 for cheating. Nelson Dec, ¶¶ 33-34; Cohen Dec Ex. 4 at 1428-1430.

23

24

_____

25 [1] Nelson's affidavit authenticating the documents produced by Wallhax is submitted concurrently herewith as Exhibit 5 to the Cohen Dec.

26 [2] Danish companies are registered by CVR number assigned by Denmark's Central Business Register.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   At a high level, the Wallhax Cheat's components primarily work in three different ways.

2   First, some components – such as the ESP hack that shows cheaters targets that would otherwise

3   be hidden, the "teamcheck" that provides color-coded highlighting to identify targets as friendly,

4   neutral, or enemies, and a warning feature that tells players when they are being targeted –

5   primarily obtain game information not normally available to players and make that game

6   information visible. Schaufuss Dec, ¶¶ 6-7. That information can be displayed to the cheater

7   either via a user-configurable Cheat-provided overlay or as a secondary display on a different

8   screen. *Id.*, ¶ 7. Second, other components – such as the aimbot and triggerbot - █████

9   ██████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████████

11  ████████████████████████████  Schaufuss Dec, ¶¶ 8; Cohen Dec Ex. 4 at 1476-79.

12  And third, some components – such as the hardware ID spoofer – primarily work to avoid

13  detection by Bungie's technology protective measures (its anti-cheat systems) by ███████

14  ████████████████████████████████[3] Schaufuss Dec, ¶ 9. *C.f.*

15  Barker Dec, ¶¶ 20-23. When Bungie introduced measures to defend against cheat software, the

16  Wallhax Enterprise reverse-engineered their mitigation efforts to prevent Bungie from blocking

17  the Wallhax Cheat and rendering it useless. Cohen Dec Ex. 4 at lines 1192-95, 1205-07. That

18  allowed them to continue to market and sell their cheat as effective. *Id.* at lines 74-77.

19  Larsen and his colleagues became aware that Bungie was beginning to take legal action

20  against other cheating enterprises like theirs. Cohen Dec Ex. 4 at lines 541-542. Eventually, they

21  learned that their enterprise had come to Bungie's attention, and that they were being sued. *Id.* at

22  line 1949. They did not cease their unlawful activities. Instead, they responded by taking

23

24

---

25  [3] Because most of Destiny 2's anticheat systems are proprietary, Wallhax does not name or advertise specific features that it circumvents, instead trumpeting that its cheats are or will be "undetected." However, Wallhax

26  prominently advertises technology to circumvent BattlEye, a commercial anticheat package that has been added to Bungie's protective measures after this lawsuit began.

MOTION FOR DEFAULT -6
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    additional measures to hide their tracks, including – with the knowledge that they were being

2    sued – measures to destroy evidence relevant to this litigation. *Id.* at lines 2162-2166 and 1994.

3         At all relevant times, Larsen and the Wallhax Enterprise knew their actions were

4    wrongful, and continued them anyway. Schaufuss Dec, ¶ 13. In fact, Larsen sought and obtained

5    legal advice when Wallhax was threatened by Activision Blizzard with a lawsuit over similar

6    conduct, and that advice reassured him that as a resident of Denmark he could thumb his nose at

7    any judgment an American court might issue, even if his conduct put his partners, Nelson and

8    Badger, at risk. Schaufuss Dec, ¶¶ 14, 16-17.

9                                    **III. <u>ARGUMENT</u>**

10        The Court unquestionably has the authority to enter a default judgment against Larsen,

11   based on the Court's Order of Default and the Federal and Local Rules. Fed. R. Civ. P. 55; LCR

12   55. Once the Clerk entered default, Larsen's liability was established, and the well-pled factual

13   allegations of the Complaint accepted as true. *See Principal Life Ins. Co. v. Hill*, C21-1716 MJP,

14   2022 WL 2718087, at *1 (W.D. Wash. July 13, 2022) (*quoting Fair Hous. of Marin v. Combs*,

15   285 F.3d 899, 906 (9th Cir. 2002). Prior to entering judgment, the Court must assure itself that it

16   has both personal and subject matter jurisdiction. *See Padded Spaces LLC v. Weiss,* C21-

17   0751JLR, 2022 WL 2905887, at *2 (W.D. Wash. July 22, 2022) (*citing In re Tuli,* 172 F.3d 707,

18   712 (9th Cir. 1999)). And in considering whether to enter a default judgment, the Court must

19   assess the seven *Eitel* factors: (1) the prejudice to Bungie from denial of a default judgment; (2)

20   the merits of Bungie's claims; (3) the sufficiency of the Complaint; (4) the amount at issue; (5)

21   the possibility of a factual dispute; (6) whether the default was due to excusable neglect; and (7)

22   the preference for decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir.

23   1986). As shown below, application of these rules requires grant of the motion. The Court has

24   subject matter jurisdiction over this dispute and personal jurisdiction over Larsen, and the *Eitel*

25   factors weigh heavily in favor of entering a default judgment. The motion should be granted.

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

## A.  THE COURT HAS PERSONAL JURISDICTION OVER LARSEN AND SUBJECT MATTER JURISDICTION OVER THE DISPUTE

The Court's subject matter jurisdiction over this action is straightforward; the Court has federal question jurisdiction over civil actions arising under the laws of the United States, 28 U.S.C. § 1331, and Bungie asserted claims against Larsen under 18 U.S.C. § 1962(a), (b), & (c), 17 U.S.C. § 1201(a), and 18 U.S.C. § 1030(a)(5)(B). Dkt. No. 1 at ¶¶ 157-265. And the Court therefore has pendant jurisdiction over Bungie's state law claims against Larsen, which arise out of the same operative nucleus of fact as Bungie's copyright, DMCA, and RICO claims. 28 U.S.C. § 1367(a). *See id.* at ¶¶ 266-306.

The Court also has personal jurisdiction over Larsen. Larsen agreed to the LSLA,[4] which contains a forum selection clause that provides that those who accept the agreement "agree to submit to the personal jurisdiction of any federal or state court in King County, Washington." Compl. at ¶ 40. That is sufficient to support personal jurisdiction. *See Facebook, Inc. v. ILikeAd Media Int'l Co. Ltd.*, 19-CV-07971-SK, 2022 WL 2289064, at *2 (N.D. Cal. Feb. 1, 2022), *report and recommendation adopted as modified*, 19-CV-07971-JST, 2022 WL 2289058 (N.D. Cal. Mar. 15, 2022) (citing *Holland Am. Line Inc. v. Wartsila N. Am. Inc.*, 485 F.3d 450, 458 (9th Cir. 2007). And, were it necessary, the Court would also have jurisdiction over Larsen under Washington's long arm statute. *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 80 (Wash. 1989).

As established by Plaintiff's affidavit of service, Dkt. No. 31, Larsen was properly served with the Complaint. Fed. R. Civ. P. 41(f)(1) (service under Hague Convention is sufficient). As such, Larsen is subject to the jurisdiction of the Court, and the Court may grant a default judgment against him so long as the *Eitel* factors warrant it. They do.

---

[4] The evidence establishes that Larsen himself played *Destiny* 2. Cohen Dec Ex. 4 at lines 1428-1430. As explained by Mr. Barker, he could only have done so after accepting the LSLA. Barker Dec, ¶ 17.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

**B.  THE FIRST, SIXTH, AND SEVENTH *EITEL* FACTORS FAVOR DEFAULT JUDGMENT BECAUSE LARSEN HAS CONSCIOUSLY DECIDED NOT TO APPEAR.**

The evidence submitted in connection with this motion makes clear that Larsen has been on actual notice of this litigation and has consciously chosen not to appear, and, as such, each of the first (prejudice from denial), sixth (excusable neglect), and seventh (preference for merits decisions) *Eitel* factors weigh heavily in Bungie's favor. As to the sixth factor, Larsen discussed the litigation extensively with Nelson over Telegram chat, beginning the day the litigation was filed. Cohen Dec. Ex. 4 at lines 1967-1968, 1985-1990, and 2000-2110. By August 20, 2021, Larsen had and was discussing a copy of the complaint. *Id.* at line 2172.  As settlement discussions between Bungie and Nelson progressed, Larsen offered opinions on settlement terms and opposed the release to Bungie of the full Wallhax software. *Id.* at lines 2202-05 and 2433-40**.** His refusal to appear before the Court is thus active and intentional, not excusable neglect.

Absent a default judgment, Bungie has no legal remedy against Larsen and no means to prevent him from inflicting further harm, and would therefore be prejudiced by denial of the motion. *See Amazon Content Servs. LLC v. Kiss Libr.,* No. C20-1048 MJP, 2021 WL 5998412, at *3 (W.D. Wash. Dec. 17, 2021) ("Defendants have failed to appear or participate in this litigation. Plaintiffs face prejudice by not being able to obtain complete relief on their claims…"). As to the preference for decisions on the merits, as discussed below, Bungie's submission here is no mere form request for default judgment – it is supported by expert testimony, the testimony of Larsen's partners and co-defendants, and documents obtained from Larsen's partners in discovery. *See* Cohen Dec Exs. 1-15; Nelson Dec; Schaufuss Dec; Guris Dec. Even were that not so, because there can be no decision on the merits after adversarial testing unless Larsen participates, and Larsen has refused to do so, the policy preference for contested litigation rather than default is irrelevant. *See Padded Spaces LLC v. Weiss,* C21-0751JLR, 2022 WL 2905887, at *5 (W.D. Wash. July 22, 2022) (Seventh *Eitel* factor favors default judgment when failure to answer precludes the possibility of resolution on the merits).

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   **C.  THE SECOND AND THIRD *EITEL* FACTORS FAVOR BUNGIE BECAUSE**
2       **BUNGIE'S WELL-PLED COMPLAINT AND SUPPORTING EVIDENCE**
        **ESTABLISH LARSEN'S LIABILITY.**

3           The second and third factors – "often analyzed together," *Padded Spaces LLC v. Weiss*,

4   C21-0751JLR, 2022 WL 2905887, at *3 (W.D. Wash. July 22, 2022), *quoting Curtis v.*

5   *Illumination Arts, Inc.,* 33 F. Supp. 3d 1200, 1211 (W.D. Wash. 2014) – likewise favor grant of

6   the motion. In assessing these factors, the Court must examine whether Bungie pled facts

7   sufficient to establish and succeed on the asserted claims. *Id.*; *PepsiCo Inc. v. Cal. Sec. Cans*,

8   238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002).

9           Here, in addition to the well-pled allegations in the Complaint, Bungie's motion for a

10  default judgment is supported by declarations from Bungie's investigator-expert Stephen Guris,

11  from Bungie's in-house counsel James Barker, and from other former defendants themselves,

12  alongside voluminous chat records and logs from the Defendants directly discussing the relevant

13  events. Taken together, the Complaint and other evidence strongly support grant of this motion.

14          **1.  Copyright Infringement**

15          Bungie has clearly established its "ownership of the allegedly infringed material" and

16  "that the alleged infringers violate at least one exclusive right granted to copyright holders."

17  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (cleaned up). Bungie

18  has copyright registrations for *Destiny 2* both as an audiovisual work and as software,

19  establishing its ownership. Barker Dec, ¶ 3 and Ex. 1.

20          Larsen's infringement of Bungie's rights in *Destiny 2* is equally clear. Larsen was the

21  lead developer of the Cheats and engaged in the infringing acts at issue in this case. Schaufuss

22  Dec, ¶¶ 5, 10-12. Larsen was also a partner in the Wallhax Enterprise, along with "Badger" and

23  Nelson (both individually and through his companies, EBT and 1102 Canada).[5] Nelson Dec, ¶¶

24  _____

[5] Under Washington law, "[T]he association of two or more persons to carry on as co-owners a business for profit
25  forms a partnership, whether or not the persons intend to form a partnership." RCW 25.05.055. "A partnership is
    formed by agreement to place money, effects, labor and skill ... in a lawful business and to divide the profits and
26  bear the losses in certain proportions." *DeFelice v. State, Emp't Sec. Dep't*, 187 Wash. App. 779, 789, 351 P.3d 197,

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  2-6. Larsen may be held individually liable for the infringements as personal participant in the

2  infringing activity; the corporate veil provides no protection. *See Urban Accessories, Inc. v. Iron*

3  *Age Design & Imp., LLC*, C14-1529JLR, 2015 WL 1510027, at *4 (W.D. Wash. Apr. 1, 2015)

4  *quoting Blue Nile, Inc. v Ideal Diamond Solutions, Inc.,* No. C10-380Z, 2011 WL 3360664, at *2

5  (W.D. Wash. Aug 3, 2011) ("copyright is a strict liability tort; therefore, there is no corporate

6  veil and all individuals who participate are jointly and severally liable").

7      The Wallhax Enterprise infringed Bungie's copyrights in several ways. During the

8  process of developing the cheat, Larsen repeatedly downloaded and played *Destiny 2* to enable

9  the development of the cheat, invalidating his license and rendering that usage unlicensed. *See*

10 *Blizzard Entm't, Inc. v. Bossland GmbH*, 16-cv-1236-DOC, 2017 WL 7806600, at *4 (C.D. Cal.

11 Mar. 31, 2017) (fraudulently obtaining access to software by falsely indicating agreement to a

12 license agreement renders the license void and the download unlicensed and infringing). Each

13 download and play was therefore an infringement. *Blizzard*, 2017 WL 7806600 at *4.

14     The cheat software also infringes by altering the underlying game software as it is

15 executed, creating an unauthorized derivative work. Nelson Dec, ¶¶ 28-30. The Cheats' code

16 contains instructions that actively modify the game displays seen by cheaters during gameplay,

17 Schaufuss Dec ¶ 7, creating an unauthorized derivative work by annotating Bungie's copyrighted

18 display. The various components of the Cheats provide cheaters with visuals that are not part of

19 the audiovisual work that Bungie presents to players. Player characters that are behind objects

20 and out of the view of honest players are "colorfully highlighted" for cheaters using Larsen's

21 products. Schaufuss Dec ¶ 7.[6] These colors not only show the cheater that there are other players

22 or enemies hidden from view; the precise color used informs the cheater at a glance whether a

23 
24 201 (2015). "Where, from all the competent evidence, it appears the parties have entered into a business relation combining their property, labor, skill and experience, or some of these elements on the one side and some on the other, for the purpose of joint profits, a partnership will be deemed established." *Malnar v. Carlson*, 128 Wash. 2d
25 521, 535, 910 P.2d 455, 461 (1996).

26 [6] Not only are the precise colors used not part of the game, the cheat software allows the cheater to customize the colors to their own preference. Schaufuss Dec, ¶ 7.

MOTION FOR DEFAULT -11
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  character is an enemy or an ally - a feature that is certainly not available to honest players or part

2  of the game's graphics. Nelson Dec, ¶¶ 29-30. The Cheats also produce text alerts that inform

3  cheaters if another player is aiming at them, even allowing the cheater to specify what color the

4  cheat should use when it generates warning text in the overlay. Schaufuss Dec, ¶ 7. And the

5  cheat will even draw lines of dots, or "bread crumbs," showing where another player has been,

6  allowing cheaters to effortlessly track their opponents through the game. *Id.* All these features

7  were drawn on the cheaters' screens as game overlays. However, the Cheats did not stop there.

8  They also contained a 'webdar' mode that presented all the key information needed by cheaters

9  on secondary devices including phones and tablets, allowing players to stream their gameplay

10  without revealing that they were cheating. Schaufuss Dec, ¶ 7.

11         These features create unauthorized and infringing derivative works. The creation of

12  dynamic screen overlays creates a new, unauthorized derivative work consisting of the

13  combination of Bungie's protected *Destiny 2* audiovisual work and the new display elements

14  added by the Cheats, which annotate it. See *Blizzard Entm't, Inc. v. Bossland GmbH*, 2017 WL

15  7806600, at *5 (C.D. Cal. Mar. 31, 2017) (holding that a dynamic screen overlay created as a

16  video game cheat constitutes a derivative work). *See also Take-Two Interactive Software, Inc. v.*

17  *Zipperer*, 18 CIV. 2608 (LLS), 2018 WL 4347796, at *8 (S.D.N.Y. Aug. 16, 2018) (cheat

18  software that created "alternative version" of video game "with added elements" sufficient for

19  likelihood of success on the merits of copyright claim on preliminary injunction). Exhibit B to

20  the Guris Declaration shows what that derivative work looks like:

21

22

23

24

25

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

2

3

4

5

6

7

8

9

10

11



12

13  (Note the red text indicating the presence of an enemy behind the wall).

14       The secondary display created by the Cheats' 'webdar' mode – a feature absolutely not

15  provided by the game software – is also a derivative work, for similar reasons, and, to the extent

16  that it incorporates the games' own graphics, an infringing reproduction. *See* 17 U.S.C. § 106.

17  All of these modifications to the game are created by instructions fixed within the cheat

18  software's code. Schaufuss Dec, ¶ 10. These visual changes are not produced in any way by the

19  *Destiny 2* software but are instead created by the Cheats. *C.f. Lewis Galoob Toys, Inc. v.*

20  *Nintendo of America, Inc.*, 964 F. 2d 965, 968 (9th Cir. 1992) (finding that a mechanical device

21  that sat between a game cartridge and a console did not create a derivative work where the

22  display came entirely from the original game).

23       But the infringement continued. Data structures are copyrightable, *see Positive Software*

24  *Sols., Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531, 535 (N.D. Tex. 2003), and

25  copying data structures from *Destiny 2* into the cheat software also infringes Bungie's copyright.

26  *See Bungie, Inc. v. Aimjunkies.com*, C21-811 TSZ, 2022 WL 2391705, at *2 (W.D. Wash. July

MOTION FOR DEFAULT -13
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1, 2022) (cheat software that "necessarily copied" code corresponding to data structures likely

infringed). Here, the cheats operate by copying *Destiny 2*'s data structures and data and then

████████████████████████████████████████. Schaufuss Dec, ¶ 6. And, because the

Cheats themselves exist in a concrete and permanent form that substantially incorporates

protected content without Bungie's consent, the Cheats were an unauthorized derivative work in

violation of Bungie's rights under 17 USC 106(2). *See Rimini St., Inc. v. Oracle Int'l Corp.*, 473

F. Supp. 3d 1158, 1210 (D. Nev. 2020).

Finally, Larsen's copying was willful, for purposes of both civil and criminal copyright

infringement. Bungie alleged willfulness, Dkt. No. 1 at ¶¶ 139-56, 177, and factual allegations of

willfulness are deemed admitted on default. *See*, *e.g.*, *Crim. Prods., Inc. v. Evans*, No. 16-CV-

1647RAJ, 2018 WL 2397439, at *1 (W.D. Wash. Apr. 4, 2018) (deeming allegation of

willfulness admitted on default*); FameFlynet, Inc. v. Feel the Piece, LLC*, No.

CV175406FMOGJSX, 2018 WL 4850383, at *3 (C.D. Cal. Feb. 21, 2018) ("court may infer

willfulness even where a defendant defaults"); *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528

F.3d 696, 702 (9th Cir. 2008) ("all factual allegations in the complaint are deemed true,

including the allegation of Poof's willful infringement"). And, were it necessary, the record is

replete with facts[7] from which Larsen's willfulness can be inferred under the Ninth Circuit

standard applicable to civil criminal infringement cases. *See Unicolors, Inc. v. Urb. Outfitters,*

*Inc.,* 853 F.3d 980, 991 (9th Cir. 2017) ("the plaintiff must show (1) that the defendant was

---

[7] The messages between the Wallhax Enterprise's principals reveal that Larsen and his co-conspirators were concerned when they learned of Bungie's suits against other cheat developers. Cohen Dec. Ex. 4 at 1220-1224. Despite this notice, they neither ceased their unlawful infringement nor acted as though they believed what they were doing was lawful; instead, they took measures intended to evade detection and continue profiting from the infringement. Defendants set the profanity filter on their forum to remove mentions of *Destiny 2* so that it would not come up in searches, Cohen Dec. Ex. 4 at 1856 hid the subforums dedicated to discussions of their *Destiny 2* cheat, *id.* at 2162-2166, and, once they had actual knowledge of this suit, they actively attempted to spoliate evidence by moving their communications to Keybase and setting the messages to disappear after three days**,** Schaufuss Dec, ¶ 16. Larsen went further and deleted all the posts he had made on CheatAutomation.com. Cohen Dec, ¶ 8. Larsen was the instigator of some of these efforts, and a participant in all of them. His knowledge of the unlawfulness of his actions is thus not only deemed admitted by default, but also clearly apparent from his actions.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    actually aware of the infringing activity, or (2) that the defendant's actions were the result of

2    reckless disregard for, or willful blindness to, the copyright holder's rights"); *United States v.*

3    *Liu*, 731 F.3d 982, 990 (9th Cir. 2013) ("willfully" as used in 17 U.S.C. § 506(a) connotes a

4    voluntary, intentional violation of a known legal duty") (cleaned up).

5    **2.   Civil RICO under 18 U.S.C. § 1962(a), (b), & (c)**

6         Bungie's well-pled complaint and supporting evidence establish Larsen's liability under

7    the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.* ("RICO").

8    RICO forbids "any person employed by or associated with any enterprise engaged in, or the

9    activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

10   indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or

11   collection of unlawful debt." 18 U.S.C. § 1962(c). To prevail on its RICO claim, Bungie must

12   show: 1) a violation of 18 U.S.C. § 1962; (2) injury to its business or property; and (3) causation

13   of the injury by the violation. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 451 (2006).

14   Bungie has established these elements.

15   **a.   Violation of 18 U.S.C. § 1962(c)**

16        To recover under § 1962(c), Bungie must prove (1) conduct, (2) of an enterprise, (3)

17   through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to

18   the plaintiff's "business or property" by the conduct constituting the violation. *Living Designs,*

19   *Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).

20        (1) The Wallhax Enterprise is a RICO enterprise

21        An "enterprise" "includes any individual, partnership, corporation, association, or other

22   legal entity, and any union or group of individuals associated in fact although not a legal entity."

23   18 U.S.C. § 1961(4). A RICO Enterprise must have a "structure" that has at least three features:

24   a purpose, relationships among the associates, and longevity sufficient to permit the associates to

25   pursue the enterprise's purpose. *Boyle v. U.S.*, 556 U.S. 938 (2009). "[A]n association-in-fact

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   enterprise is simply a continuing unit that functions with a common purpose." *Id*. There should

2   be no question that the Wallhax Enterprise satisfies this element of RICO.

3        The Wallhax Enterprise consisted of multiple distinct legal entities and individuals

4   working together over a period of years for a common illegal purpose: selling cheat software.

5   The Wallhax website was owned and operated by EBT. Cohen Dec Ex. 8. Payments were

6   funneled through 1102 Canada. *Id.*, Exs. 9, 10. Nelson, Schaufuss, and Larsen operated the

7   Wallhax business as partners, with Larsen contributing his technical skills via yet another legal

8   entity, DSoft. It began operations in 2012 and continues to operate, selling cheats for other video

9   games, to this day. Nelson Dec, ¶ 16. Were that not enough, Wallhax also employed a "reseller"

10  program, by which third parties could purchase the cheat at a bulk discount, sell it themselves,

11  and share in the profit with the Wallhax Enterprise while also providing a valuable safety net

12  against the inevitable if unpredictable loss of payment processors. Nelson Dec, ¶ 19, Cohen Dec

13  Ex. 4 at lines 1488-1490. And, as shown herein, its purpose was illegal: sale of cheat software

14  that violated copyright law, the DMCA's anticircumvention provisions, and the Computer Fraud

15  and Abuse Act. The Wallhax Enterprise thus more than satisfies the criteria for a RICO

16  enterprise: it had associates, a structure (in which Nelson, Larsen, and Schaufuss controlled the

17  business and shared the profits), longevity, and an illegal purpose.

18               (2) Larsen conducted the enterprise

19        Persons who "conduct[ed] or participate[d], directly or indirectly, in the conduct of such

20  enterprise's affairs," are liable for RICO. 18 U.S.C. § 1962(c). "RICO liability is not limited to

21  those with primary responsibility for the enterprise's affairs," but "some part in directing the

22  enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Larsen was

23  not an incidental participant in the Wallhax Enterprise's activities, merely taking direction and

24  being tertiarily useful. He was an active manager who directed the Wallhax Enterprise's affairs.

25  Cohen Dec Ex. 4 at lines 117-19, 129-30; Nelson Dec, ¶ 9. He developed the *Destiny 2* cheat

26  software the enterprise sold, shared in the profits, and had input on the response to this legal

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   action. Nelson Dec, ¶¶ 2-10, 35-37; Schaufuss Dec, ¶¶ 5, 16. He was an essential component of

2   the enterprise, and his conduct both steered and furthered its purpose.

3                  (3)  The Wallhax Enterprise engaged in a pattern of racketeering activity

4          Racketeering activity is "any act which is indictable" under specified provisions of Title

5   18. 18 U.S.C. § 1961(1)(B). Bungie pled the following predicate acts: 1) wire fraud (18 U.S.C. §

6   1343) in Defendants' use of the interstate wires to further their fraudulent cheat sales; 2) criminal

7   copyright infringement in the illegal and intentional sale of Bungie's copyrighted intellectual

8   property for profit; and 3) money laundering (18 U.S.C. § 1956 & 1957) in violation of 18

9   U.S.C. § 1956(a)(1) and 18 U.S.C. § 1957.

10                          (A)  Wire Fraud

11         The elements of wire fraud are (1) a scheme to defraud; (2) use of the wires in

12   furtherance of the scheme; and (3) a specific intent to deceive or defraud. *United States v.*

13   *Shipsey*, 363 F.3d 962, 971 (9th Cir. 2004). A scheme to defraud involves "the intent not only to

14   make false statements or utilize other forms of deception, but also to deprive a victim of money

15   or property by means of those deceptions." *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th

16   Cir. 2020). The record makes clear that the conduct of the Wallhax Enterprise satisfies each of

17   these elements.

18         First, developing the cheat software that was the Wallhax Enterprise's core product

19   required Defendants to use the interstate wires to obtain a copy of the *Destiny 2* software through

20   fraud. As discussed above, Larsen had to fraudulently indicate his intent to abide by the terms of

21   the LSLA – which prohibited the cheat development and sale that was his purpose in

22   downloading the game – in order to obtain and access the *Destiny 2* software. *Supra* at 6, 12.

23   Because the *Destiny 2* software is property, and it was downloaded over the internet through

24   fraud, the Wallhax Enterprise's initial download of the *Destiny 2* software is sufficient, in and of

25   itself, to violate the wire fraud statute.

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Second, Defendants' subsequent distribution of Cheats over the internet also involved the

2    use of the interstate wires as part of a scheme to obtain property from Bungie by means of false

3    or fraudulent pretenses. Bungie offers its players various rewards and items of value for certain

4    participation and accomplishment in the course of *Destiny 2* gameplay. Barker Dec, ¶ 11. For

5    instance, players who complete *Destiny 2*'s highest-level endgame content ("raids") within a

6    designated period of time from release qualify to purchase a "raid jacket." *Id.* Because players

7    who utilize Larsen's cheat software have all executed the LSLA and represented to Bungie that

8    they are gaming honestly, using cheat software to obtain such rewards is a fraud.

9    Moreover, Defendants routinely used interstate wires in connection with this scheme.

10   Larsen is located in Denmark, Badger in Germany, and Nelson in Canada. Nelson Dec, ¶¶ 3.

11   Each used email, telephone, and chat communications extensively to coordinate and operate the

12   Wallhax Enterprise. *See*, *e.g.*, Cohen Dec Ex. 4 at lines 350-364 and 2358-2364; Nelson Dec,

13   ¶¶10-11. These actions establish the predicate act of wire fraud.

14                              (B)   Criminal Copyright Infringement

15   The elements of criminal copyright infringement are (1) that a valid copyright; (2) was

16   infringed by the defendant; (3) willfully; and (4) for purposes of commercial advantage or

17   private financial gain. 17 U.S.C. § 506(a). As shown above, the Wallhax Enterprise infringes

18   Bungie's copyrights, and it does so specifically for commercial advantage and private financial

19   gain. *Supra*, at 11-15. And Larsen's willfulness must both be presumed given his default and has

20   been actively demonstrated on the evidence. *Supra*, at 14-15.

21                              (C)   Money Laundering

22   A defendant engages in money laundering under 18 U.S.C. § 1956(a)(1)(A)(i)[8] when

23   they (1) conduct (or attempt to conduct) (2) a financial transaction, (3) knowing that the property

24   involved in the financial transaction represents the proceeds of some unlawful activity, (4) with

25   _____

26   [8] Due to a typo, the Complaint mistakenly identified §1956(a)(1)(A)(***ii***) as the section applicable to money
laundering by use of proceeds to promote specified unlawful activity.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    the intent to promote the carrying on of specified unlawful activity, and (5) the property was in

2    fact be derived from a specified unlawful activity. 18 U.S.C. § 1956(a)(1). The proceeds of

3    Wallhax's cheat software sales are proceeds of criminal copyright infringement and wire fraud,

4    which is a specified unlawful activity under §1956(a)(1). The Wallhax principals were aware that

5    their activity was unlawful, *see* Nelson Dec, ¶ 24 (testifying to awareness that content had been

6    taken down as infringing), *id.*, ¶ 22 (payment processors would decline their business given its

7    nature); Schaufuss Dec, ¶ 13 (awareness that conduct violated the DMCA); Cohen Dec Ex. 4 at

8    lines 1219-24, 1863, 1868, & 1855-56. And Wallhax reinvested those proceeds in its business,

9    using them to pay staff, invest in tools and equipment, and promote the business. Schaufuss Dec

10   Ex. 1; Nelson Dec, ¶ 8. Each time it reinvested those proceeds, the Wallhax Enterprise

11   committed money laundering under 18 U.S.C. §1956(a)(1)(A)(i).

12        The Wallhax Enterprise also engaged in money laundering under 18 U.S.C. § 1957,

13   which prohibits engaging in transactions involving more than $10,000 of property derived from

14   specified unlawful activity. Cohen Dec Ex. 10 at pp. 9-15 (showing regular transfers in excess of

15   $10,000 from PayPro to 1102 Canada's WiseBusiness Ltd. account, among others). Thus, Larsen

16   engaged in money laundering under both § 1956(a) and § 1957.

17                        (D)   Pattern of Predicate Acts

18        Nor were these isolated predicate acts. To establish a pattern of racketeering activity,

19   Bungie need only show at least two acts of racketeering activity. 18 U.S.C. § 1961(5). "To

20   prevail under RICO, plaintiffs must establish that the predicate acts were continuous … by

21   pleading 'closed-ended continuity' or by pleading 'open-ended continuity.'" *Allwaste, Inc. v.*

22   *Hecht*, 65 F.3d 1523, 1526 (9th Cir. 1995) Closed-ended continuity is "a closed period of

23   repeated conduct … established by showing that the predicate acts occurred over a substantial

24   period of time." *Id.* Open-ended continuity, on the other hand, involves "past conduct that by its

25   nature indicates a threat of future criminal conduct. It is established by showing either that the

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   predicate acts specifically threaten repetition or that they were an ongoing entity's regular way of

2   doing business." *Id.*

3          Here, the Wallhax Enterprise has engaged in the conduct at issue over a period of ten

4   years, and began selling the *Destiny 2* cheat in 2019. Nelson Dec, ¶¶ 14, 26. Bungie is not the

5   only victim of the Wallhax Enterprise's conduct; it offers cheat software for more than 20 other

6   games, including DICE's *Star Wars Battlefront 2*, Valve's *Counter-Strike*, Studio Wildcard's

7   *ARK: Survival Evolved*, Rare's *Sea of Thieves*, and Electronic Arts' *Battlefield V*. Cohen Dec Ex.

8   11. Each of those games has a provision in its license agreement or terms of use that bars

9   hacking and cheating, Cohen Dec ¶ 11, meaning that the Wallhax Enterprise committed a similar

10  fraud when it first obtained access to those games to develop the Cheats. Each of those games is

11  the subject of copyright registrations, Cohen Dec Ex. 12 meaning that the Wallhax Enterprise

12  similarly committed criminal copyright infringement when it hacked them. The Wallhax

13  Enterprise routinely reinvested the proceeds of its cheat software into developing, marketing, and

14  distributing new and existing cheats, Nelson Dec, ¶ 8, and apparently continues to do so to this

15  day. That is more than sufficient to establish the necessary pattern.

16                       (4) <u>Injury to Bungie from the Predicate Acts</u>

17         To establish a RICO injury and causation, Bungie need only show that it suffered some

18  out-of-pocket loss as a result of the predicate acts. *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d

19  1016, 1021 (9th Cir. 2001). The evidence submitted herewith is more than sufficient to do so. As

20  detailed above, the Cheats caused significant injury to Bungie's business. Thousands of players

21  used Larsen's Cheats, Cohen Dec Ex. 13, contributing to the perception that *Destiny 2* had "a

22  cheating problem." Barker Dec, ¶ 14. Bungie has incurred significant expense in order to identify

23  and address Defendants' Cheats in particular, Cohen Dec Ex. 4 at lines 1925-28 (gloating that

24  the Wallhax Cheat impelled Bungie to obtain BattlEye), so that it could strengthen the

25  protections for its copyrighted work and ensure that players could not fraudulently obtain

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  rewards. Barker Dec, ¶ 16; Guris Dec, ¶ 51. Moreover, Wallhax users cost Bungie business and

2  drove existing players from their game. Barker Dec, ¶ 25.

3           b.  **Violation of 18 U.S.C. § 1962(a)**

4           18 U.S.C. § 1962(a) prohibits people who have received income derived from a pattern of

5  racketeering activity to use those funds to invest in any business or enterprise engaged in or

6  impacting interstate or foreign commerce. 18 U.S.C. § 1962(a).  As laid out above, the Wallhax

7  Enterprise has derived substantial income from their illegal activities, which funds were, in turn,

8  invested directly back into the marketing, development, and growth of the enterprise. Nelson

9  Dec, ¶ 8. This money expanded the reach and market of the *Destiny 2* cheats, contributing to and

10  magnifying the harm suffered by Bungie, an injury under 1962(a). But for the Wallhax

11  Enterprises' continuing investment in their activities, Bungie's damages would have been

12  significantly less over time. *Nugget Hydroelectric, L.P. v. P. Gas and Elec. Co.*, 981 F.2d 429,

13  437 (9th Cir. 1992).

14           c.  Violation of 18 U.S.C. § 1962(b)

15           Section 1962(b) prohibits people from acquiring or maintaining an interest in or control

16  of an enterprise through a pattern of racketeering activity, if that enterprise engages in or impacts

17  interstate or foreign commerce. 18 U.S.C. § 1962(b). As a partner in Wallhax and developer of

18  the Cheat, Larsen maintained both an interest in the activities of the Wallhax Enterprise and

19  control over the enterprise. Nelson Dec, ¶¶ 6-9. The Wallhax Enterprise engaged in both

20  interstate and foreign commerce, as demonstrated above. As such, Larsen violated 18 U.S.C. §

21  1962(b).

22           **3.  Circumvention of Technological Measures under 17 U.S.C. § 1201(a)**

23           The second and third *Eitel* factors also favor default judgment Bungie's Section 1201(a)

24  claim for two reasons. Larsen violated the statute when he trafficked in an anticircumvention

25  device in violation of 17 U.S.C. § 1201(a)(2). And Larsen's own circumvention of technical

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    protection measures in the course of developing the Cheats, including his evasion of bans,

2    violated 17 U.S.C. § 1201(a)(1).

3         Larsen infringed Bungie's rights under Section 1201 when he: "(1) traffic[ked] in (2) a

4    technology or part thereof (3) that is primarily designed, produced, or marketed for, or has

5    limited commercially significant use other than (4) circumventing a technological measure (5)

6    that effectively controls access (6) to a copyrighted work." *MDY Industries LLC v. Blizzard*

7    *Entertainment Inc.*, 629 F. 3d 928, 953 (9th Cir. 2010). As was the case in *MDY*, *id.* at 953-54,

8    those elements are easily met here. Larsen created and trafficked in the Cheats, Nelson Dec, ¶¶

9    16-23 ; Schaufuss Dec, ¶ 5, which, as software, are a technology, satisfying elements one and

10   two. *See MDY*, 629 F.3d at 953-954. The Cheats contain technology that is has no purpose other

11   than evading Bungie's anti-cheat measures, Schaufuss Dec, ¶ 9; Guris Dec, ¶ 52, meeting

12   elements three and four. *MDY*, 629 F.3d at 953-954. And the dynamic non-literal elements of the

13   *Destiny 2* game and its expansions are a copyright-protected work, thereby fulfilling element six.

14   *Id*.

15        Defendants breached measures that effectively controlled access to the work, and thereby

16   meet the fifth element, in two separate ways. First, the Cheats circumvent anti-cheat software

17   and tools used by Bungie. Schaufuss Dec, ¶ 9; Barker Dec, ¶¶ 19, 23. Second, the Cheats also

18   ████████████████████████████████████████████████████████████████

19   ██████████████████████████████. Schaufuss Dec, ¶¶ 8-9; Guris Dec, ¶¶ 34-35. As

20   with the anti-cheat software at issue in *MDY*, the Cheats violate Bungie's Section 1201 rights,

21   and, as discussed below, Bungie is entitled to recompense for its damages. *MDY*, 629 F.3d at

22   954. Larsen has engaged in the same trafficking in anticircumvention devices that his co-

23   conspirators have stipulated to, and should be held accountable alongside them. The evidence

24   shows that users downloaded Wallhax cheat software at least 6,765 times, and statutory damages

25   should be awarded accordingly. Dkt. No. 27 at ¶ 5.

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Larsen also separately breached 17 U.S.C. § 1201(a)(1) when he repeatedly used new

2    accounts to evade Bungie's bans. Larsen's initial efforts to help cheaters prosper at Bungie's

3    expense were hampered by a significant barrier: Bungie had caught Larsen attempting to cheat,

4    and banned him from gameplay – a fact Larsen was aware of. Nelson Dec, ¶¶ 33-34. Larsen

5    therefore created new accounts to avoid or bypass the measures that Bungie implemented to

6    prevent him from accessing the game. Nelson Dec, ¶¶ 33-34; Barker Dec, ¶ 21 (bans control

7    access to *Destiny 2*). In so doing, Larsen violated the DMCA. 17 U.S.C. § 1201(a)(3)(A)

8    (activities that "avoid" or "bypass" access controls constitute circumvention). Larsen did not

9    merely engage in this conduct once or twice; his accounts were being banned by Bungie as

10   quickly as they could be identified, often within hours. Nelson Dec, ¶ 33. Evidence suggests that

11   Larsen personally engaged in anticircumvention in excess of thirty times. Cohen Dec Ex. 4 at

12   lines 332-37, 563-75, 1287-1321, 1407-21, 1436-54, 1680-95.

13   And the Cheats Larsen created also violate § 1201(b)(1). As discussed above, and unlike

14   the software at issue in *MDY*, Larsen's Cheats create an infringing derivative work whenever

15   they are engaged during *Destiny 2* gameplay. Because Bungie's anti-cheating measures thus

16   effectively protect their derivative works right from violation during gameplay, Larsen is also

17   liable to Bungie under § 1201(b)(1).

18   ### 4.  Violation of the Computer Fraud and Abuse Act

19   Bungie's well-pled complaint and the supporting evidence similarly establishes Larsen's

20   liability under the Computer Fraud and Abuse act because Larsen intentionally accessed a

21   protected computer without authorization, damaging Bungie. 18 U.S.C. § 1030(a)(5)(B).

22   As pled in the complaint and admitted by Larsen's default, the *Destiny 2* servers (the

23   "Server"), the *Destiny 2* client software (the "Client"), and the proprietary, encrypted network

24   protocols which facilitate the transfer of information between them (together with the Server and

25   the Client, the "Protected Computer") collectively constitute a "protected computer." A

26   "protected computer" is any computer affected by or involved in interstate commerce, which

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   includes all computers with Internet access. *United States v. Nosal*, 844 F.3d 1024, 1050 (9th

2   Cir. 2016). The Computer Fraud and Abuse Act defines a "computer" broadly. 18 U.S.C. §

3   1030(e)(1). Cloud-based and internet-based services and information are "computers" under the

4   CFAA, *Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 926–27 (E.D. Va.

5   2017) (an account "connected to—and entirely contained within—the Internet" was a "protected

6   computer" under the CFAA), and the statute also "clearly includes" online data storage facilities

7   "operating in conjunction with what is ordinarily thought of as a computer." *Hill v. Lynn*, No. 17

8   C 06318, 2018 WL 2933636, at *3 (N.D. Ill. June 12, 2018).

9        *Destiny 2* consists of many elements, which all work together under Bungie's ownership

10  and control to create the massively multiplayer gameplay experience. Barker Dec, ¶ 5. The client

11  software is made available by Bungie for one purpose and one purpose only: to enable players to

12  play *Destiny 2. Id.* Bungie is the only party authorized to control the content and functionality of

13  the Client; the Client's sole functionality is to connect to the Server and allow players to play the

14  game. As described in paragraphs 242-251 of the Complaint, the Client is directly related to and

15  operates in conjunction with the Server, both in fact by its design and in law under the LSLA.

16       When a computer program is executed from disk and loads into RAM, it creates a legally

17  distinct copy. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993). This

18  memory-resident copy of the Client stores important data such as the character's position, health

19  level, and ammunition level. Barker Dec, ¶ 5. The Client also communicates those values to the

20  server so that the game can respond appropriately. *Id.* When copied into memory, the Client is a

21  data storage and communications facility directly related to and operating in conjunction with the

22  Server, and as a result is part of the *Destiny 2* "computer".

23       Larsen's access to this protected computer was concededly without authorization. Bungie

24  prevents exposure and manipulation of key game data via specific technological measures

25  designed to protect the integrity of the gameplay on the Protected Computer. Barker Dec, ¶ 6.

26  These measures cannot be overridden or disabled by other applications because Windows

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   categorically prevents applications from interfering with each other's operations in this way.

2   Guris Dec, ¶ 9. In order to circumvent these "generally applicable rules regarding access

3   permissions," *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022), Larsen

4   ████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   and copying them into the cheat software's source code. Schaufuss Dec, ¶11. The Destiny 2

7   cheat ████████████████████████████████████████████████████

8   ████████████████████████████ *Id.* ████████████████████████

9   ████████████████████████████████████████████████████████████

10  ██████████ *Id.* ████████████████████████████████████████,

11  Larsen's cheat software is then able to obtain and manipulate "information located in particular

12  areas of the computer … that are off limits to him." *Van Buren v. United States*, 141 S. Ct. 1648,

13  1662, 210 L. Ed. 2d 26 (2021).

14      The cheat software then either reveals that information to the cheater to yield an unfair

15  advantage, such as with the ESP hack, or manipulated through the Cloned System Instructions to

16  convince *Destiny 2* that the cheating player is accomplishing things that he is not skilled enough

17  to accomplish on his own, as with the Aimbot. The *Destiny 2* client sends the resulting cheat-

18  altered values back to the *Destiny 2* server almost instantly, having accepted them as valid. Guris

19  Dec, ¶ 35. Bungie alone has the right to authorize such access to the *Destiny 2* Protected

20  Computer. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016)

21  (permission from the user is insufficient to create authorization); *Theofel v. Farey-Jones*, 359

22  F.3d 1066, 1078 (9th Cir. 2004) (plaintiff is proximately harmed by unauthorized access via a

23  third-party computer). It has not done so.

24      Larsen's unauthorized access to Bungie's protected data and information clearly falls

25  within the conduct prohibited by the CFAA. *Maplebear Inc. v. Doe*, No. 121CV474AJTIDD,

26  2021 WL 2767296, at *1–2 (E.D. Va. May 10, 2021) (granting injunctive relief). *See also*

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  *Philips N. Am. LLC v. Glob. Med. Imaging, LLC*, No. 21-CV-3615, 2022 WL 3106971, at \*7

2  (N.D. Ill. Aug. 4, 2022) (allegations of hacking set out CFAA claim even where machines

3  themselves were owned by the defendant); *Villareal v. Saenz*, No. 520CV00571OLGRBF, 2021

4  WL 1986831, at \*7 (W.D. Tex. May 18, 2021)(unauthorized access to web-based account

5  violates the CFAA even if access is accomplished on a computer owned by the defendant); *Hill*

6  *v. Lynn*, No. 17 C 06318, 2018 WL 2933636, at \*3 (N.D. Ill. June 12, 2018) ("computer"

7  includes web-based accounts). And it has caused extensive damage to Bungie, which has had to

8  take a range of very costly measures to attempt to further block users from employing Larsen's

9  cheat software. Barker Dec, ¶¶ 16-23. Bungie has properly alleged a CFAA claim and default

10  judgment on this claim is warranted.

11       **5.  Breach of Contract and Interference with Contractual Relations**

12       Bungie's well-pled complaint establishes Larsen's liability for both his own breach of

13  contract and for his intentional interference with Bungie's contractual relations. The complaint

14  alleges the existence of the LSLA, the terms of which Larsen accepted when he first played

15  *Destiny 2*. Dkt. No. 1, ¶¶ 267-72; Cohen Dec Ex. 4 at line 987. The LSLA imposes a duty to,

16  inter alia, not reverse engineer, create derivative works of, or hack or modify *Destiny 2*. Dkt. No.

17  1, ¶¶ 276-77; Barker Dec Ex. 3. Larsen is thus plainly liable for breach of contract. *See Nw.*

18  *Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6, 9 (1995)

19  (setting forth elements of breach of contract claim).

20       Larsen also tortiously interfered with Bungie's contractual relations. Bungie's claim for

21  tortious interference only requires it to show that Larsen was aware of a contractual relationship

22  between Bungie and its players, that Larsen's intentional interference induced a breach of that

23  contract, that his interference was through improper means or with an improper purpose, and

24  damaged Bungie. *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d

25  288, 300 (1997). Each of those elements is satisfied: The LSLA is a valid contract between

26  Bungie and *Destiny 2* players, which Larsen, having repeatedly executed the LSLA himself, was

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  well aware of. He intentionally interfered with that relationship by supplying cheat software to

2  players. Cohen Dec Ex. 4 at line 2028 ("And maybe we encourage our users to break their

3  TOS"). As shown above, doing so violated both Federal law and Larsen's own agreement with

4  Bungie. And the breaches damaged Bungie by requiring it to incur costs defending against

5  Larsen's cheats, by costing Bungie continued revenue from players banned for using cheats, and

6  by harming Bungie's reputation and deterring honest players from playing *Destiny 2*. Barker

7  Dec, ¶¶ 13-15, 24-27. Larsen's liability is clear.

8      **6. Violation of the Washington Consumer Protection Act**

9      The second and third Eitel factors also favor default judgment for Bungie's claim under

10  the Washington Consumer Protection Act ("WCPA"). The WCPA must "be liberally construed

11  that its beneficial purposes may be served." RCW 19.86.920. For a plaintiff to prevail in a

12  private cause of action under the CPA, they must establish "(1) an unfair or deceptive act or

13  practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a

14  person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.,* 166

15  Wn.2d 27, 37, 204 P.3d 885 (2009) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title*

16  *Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986)). "[A] claim under the Washington CPA may

17  be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive

18  substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute

19  but in violation of public interest." *Klem v. Wash. Mut. Bank,* 176 Wn.2d 771, 787, 295 P.3d

20  1179 (2013).

21      Larsen's actions were unfair and deceptive. "A plaintiff need not show the act in question

22  was intended to deceive, only that it had the capacity to deceive a substantial portion of the

23  public." *Panag*, 166 Wn.2d at 47 (citing *Leingang*, 131 Wn.2d at 150). Wallhax did not disclose

24  that its cheats were logging and retaining its users' personally identifying information in

25  violation of many laws, including (in the European Union) the GDPR. The Wallhax Enterprise,

26  through its Cheats, assembled a database on its users' activity that included information as varied

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    and deeply personal as the contents of their browser tabs, revealing such minutiae as email

2    logins,  ninth-grade algebra classes, and COVID health information. Guris Dec, ¶¶ 39-50. It was

3    also a potential national security risk: a tool that, in at least some cases, compromised computers

4    used by members of the military or Department of Defense. *Id.*, ¶¶ 48-50.  Wallhax's

5    development and use of cheat software also deceived both Bungie and the public. Bungie expects

6    users to play the game honestly and comply with their agreements in the LSLA, Barker Dec, ¶

7    12, 16, while *Destiny 2*'s tens of millions of players expect an honest, fair experience. *Id.* And

8    even Wallhax's users were deceived – not only by the undisclosed logging software, but by

9    Wallhax's false reassurances that its cheats would evade detection, which led to Wallhax users

10   being banned. Cohen Dec Ex. 14; Barker Dec ¶ 21.

11        Offering the cheats for sale is a commercial act, RCW 19.86.010, and the public's interest

12   is implicated by the Wallhax Enterprise's misconduct. It injures Bungie in its business, damaging

13   customer satisfaction and impacting their player retention, and has the capacity to cause further

14   injury to future players, and thus to Bungie's reputation and community good will. Moreover, as

15   shown above Defendant's conduct is unlawful, and "[w]hat is illegal and against public policy is

16   per se an unfair trade practice*." Hangman Ridge*, 105 Wash.2d at 786, 719 P.2d 531 (alteration

17   in original, quoting *State v. Reader's Digest Ass'n*, 81 Wash.2d at 270, 501 P.2d 290). Bungie is

18   thus entitled to judgment on this claim as well.

19        **7.   Civil Conspiracy**

20        Larsen's liability for civil conspiracy is as clearly established as his liability for the other

21   causes of action on which it depends. To establish a claim for civil conspiracy, a plaintiff must

22   show "(1) two or more people combined to accomplish an unlawful purpose…; and (2) ... an

23   agreement to accomplish the conspiracy." *Inteum Co., LLC v. Natl. U. of Singapore*, C17-1252-

24   JCC, 2018 WL 2317606, at *1 (W.D. Wash. May 22, 2018), citing *Woody v. Stapp*, 146 Wn.

25   App. 16, 22 (Wash. Ct. App. 2008). A claim for civil conspiracy must be predicated on "a

26   cognizable and separate underlying claim." *Gossen v. JPMorgan Chase Bank*, 819 F. Supp. 2d

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1162, 1171 (W.D. Wash. 2011). Here, Larsen engaged in the relevant conduct in concert with

Nelson, Badger, and the other participants in the Wallhax Enterprise, and pursuant to his

agreement with his partners to do so. That is all that is required to support this claim.

## D. THE FOURTH *EITEL* FACTOR WEIGHS IN BUNGIE'S FAVOR BECAUSE LARSEN'S CONDUCT WARRANTS THE DAMAGES BUNGIE SEEKS.

The fourth factor favors a default judgment because the damages that Bungie seeks are

reasonable in light of Larsen's willful and extensive illegal conduct. Although courts are more

cautious when a large damages award is involved, "the court must consider the amount of money

at stake in relation to the seriousness of Defendant['s] conduct." *PepsiCo, Inc.,* 238 F. Supp. 2d

at 1176. As discussed in Section F, *infra*, Larsen's conduct entitles Bungie to the award it seeks.

## E. THE FIFTH *EITEL* FACTOR FAVORS BUNGIE BECAUSE THE FACTS ARE UNDISPUTED.

The fifth factor decidedly favors grant of a default judgment, as Larsen has consciously

declined to participate in this litigation. Larsen has thus admitted both the scope and the extent of

his participation in the illicit enterprise at the heart of this case. Because default has been entered,

"the court must take plaintiff's factual allegations as true." *Curtis v. Illumination Arts, Inc.*, 33 F.

Supp. 3d 1200, 1212 (W.D. Wash. 2014). In any event, there would be no dispute over the

material facts even had Larsen appeared. The evidence submitted for the second and third *Eitel*

factors is substantial, including direct testimony from Larsen's co-conspirators and admissions in

his Telegram chat logs, and the fifth factor thus favors default judgment. *See Landstar Ranger,*

*Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 2d 916, 922 (C.D. Cal. 2010) (no possibility of

factual dispute where plaintiff "supported its claims with ample evidence, and defendant has

made no attempt to challenge the accuracy of the allegations in the complaint"). Indeed, Larsen's

co-defendants and partners in the Wallhax Enterprise have already stipulated to those facts and

accepted their liability. This factor thus favors grant of the motion.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

**F. THE COURT SHOULD AWARD BUNGIE $3,400,154.71 IN COMPENSATORY DAMAGES, $13,530,000.00 IN STATUTORY DAMAGES, AND $348,151.02 IN ATTORNEY FEES AND COSTS, PLUS FEES INCURRED AFTER SUBMISSION OF THIS MOTION**

The award Bungie seeks in this case is large because the harm that Bungie has incurred is substantial. These damages stem from the multiple wrongful acts that Larsen committed over the course of his participation in the Wallhax Enterprise, and the different harms those acts caused Bungie. As the Ninth Circuit has repeatedly reaffirmed, one act by a defendant may create multiple legal harms, and when the statutes forbidding those harms are enacted for different purposes and provide for different types of damages, there is no concern for double recovery. *See Seattle Pac. Indus., Inc. v. S3 Holding LLC*, 831 Fed. Appx. 814, 818 (9th Cir. 2020); *Bangkok Broad. & T.V. Co., Ltd. v. IPTV Corp.*, 549 Fed. Appx. 647 (9th Cir. 2013); *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994). Here, Bungie seeks to recover damages for the following separate harms:

**1. On Bungie's Anti-Circumvention Claim, the Court Should Award Bungie $13,530,000.00 in Statutory Damages**

Bungie is entitled to an award of $13,530,000.00 in statutory damages for Larsen's anticircumvention violations. Although Bungie is unable to precisely calculate the damages it has sustained as a result of Larsen's Cheats, Bungie has been forced to expend considerable sums on cheat mitigation – sums which would not be necessary were it not for people like Larsen. Barker Dec, ¶¶ 24-25. Where a plaintiff proves that a defendant violated the DMCA's anticircumvention provisions, the plaintiff may elect to receive statutory damages, which the Court has discretion to award up to $2,500 per circumvention device or act of circumvention in violation of Section 1201. 17 U.S.C. 1203(c)(3). In this case, the settling defendants acknowledged that the Cheat were downloaded a total of 6,765 times, and agreed to a consent judgment of $13,530,000.00, representing statutory damages of $2000 per act of infringement. Bungie respectfully requests that Larsen be held jointly and severally liable for this amount.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    This figure, which is less than the maximum statutory damages that are available, is

2    warranted under the circumstances of this case.  To determine where in the statutory range

3    damages should fall for a particular defendant, Courts consider factors including "profits reaped

4    by defendant in connection with the infringement; revenues lost to the plaintiff; and the

5    willfulness of the infringement.... The Court can also consider the goal of discouraging wrongful

6    conduct." *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1075 (N.D. Cal.

7    2005).

8    Here, the $2,000-per-unique-download damage figure Bungie seeks is appropriate. As the

9    Central District of California held just over a year ago, statutory damages of $2,000 per

10   anticircumvention device is appropriate where "the acts of circumvention are severe." *Philips N.*

11   *Am. LLC v. KPI Healthcare, Inc.*, SACV191765JVSJDEX, 2021 WL 6103527, at *8 (C.D. Cal.

12   Sept. 1, 2021). There is no question that Larsen's violations of the DMCA were severe. He was

13   fully aware at all times that what he was doing was illegal, yet he continued his conduct based on

14   advice of counsel that, as a citizen of Denmark, he could simply ignore the judgment of any

15   American court. Schaufuss Dec, ¶ 17. Defendants, including Larsen, made substantial profits

16   from their enterprise while making substantial efforts to avoid detection by Bungie in an attempt

17   to avoid suit. Nelson Dec, ¶ 27; Schaufuss Dec, ¶ 16. Moreover, the number of unique

18   downloads *undercounts* Larsen's violations of the DMCA: not only does it ignore his own

19   repeated circumventions of account bans and his own repeated uses of the Cheat software – each

20   of which was an independent act of circumvention – but he (and Wallhax) participated in each

21   act of circumvention conducted by the Cheat's users each and every one of the countless times

22   the Cheat was loaded and used to play *Destiny 2*, validating the user's license to the Cheat and

23   allowing access to the software. Schaufuss Dec, ¶ 5. Under these circumstances, it is appropriate

24   for the Court to award Bungie damages on the high end of the statutory range, particularly where

25   *not* doing so would leave Larsen in a more favorable position than his partners as a result of his

26   refusal to participate in this litigation. Indeed, if *this* conduct and *these* circumstances do not

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    justify an award of $2,000 per trafficked anticircumvention device, it is difficult to imagine what

2    circumstances ever could. *Cf. TracFone Wireless, Inc. v. SND Cellular, Inc.*, 715 F. Supp. 2d

3    1246, 1262 (S.D. Fla. 2010) (awarding $2,500 per circumvention device where defendant

4    "caused damage and substantial irreparable harm" through willful actions). The Court should

5    award Bungie $13,530,000 in statutory damages on its § 1201 claim.

6       **2.  On Bungie's Copyright Claim, the Court Should Award Bungie $1,400,156.71 in**
7          **Damages, Plus Costs and Attorneys' Fees**

8           Bungie is entitled to recover "any profits of the infringer that are attributable to the

9    infringement." 17 U.S.C. §504 (b). To recover the infringer's profits, Bungie "is required to

10   present proof only of the infringer's gross revenue, and the infringer is required to prove his or

11   her deductible expenses and the elements of profit attributable to factors other than the

12   copyrighted work. Bungie requests that this court award it $466,718.90 in actual damages under

13   17 U.S.C. §504, representing an award of $406,649.55 in Wallhax's direct profits and an

14   additional $60,069.35 in indirect profits.[9] Those baseline damages should trebled under RICO,

15   18 U.S.C. § 1964(c), and, subject to the statutory cap, under the WCPA. RCW 19.86.090, for a

16   total of $1,400,156.71.

17           In awarding the victim of infringement the infringer's profits, courts distinguish between

18   direct and indirect profits. Direct profits are "generated by selling an infringing product," *Mackie*

19   *v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). Indirect profits, which include those generated by

20   the use of infringing content in advertising, have "a more attenuated nexus to the infringement."

21   *Ibid.* To establish an entitlement to either direct or indirect profits, the copyright owner must

22   show a casual nexus between the profits and the infringement. *See Rearden LLC v. Walt Disney*

23   *Co.*, 17-CV-04006-JST, 2021 WL 4099622, at *3 (N.D. Cal. Aug. 17, 2021), on reconsideration

24   ---
     [9] Although Bungie is also entitled to recover its actual damages, 17 U.S.C § 504, it is unable to calculate such
25   damages in this case. It is not possible to fully quantify the income lost as a result of players who have ceased
     purchasing game items from Bungie. In addition, because of the nature of the harm caused by cheating, there is
26   literally no price at which Bungie would license cheating software. Bungie is therefore requesting only
     disgorgement of profits or, in the alternative, statutory damages.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    in part, 17-CV-04006-JST, 2022 WL 2064976 (N.D. Cal. June 8, 2022). To establish an

2    entitlement to indirect profits, the plaintiff must show that "the infringement at least partially

3    caused the profits that the infringer generated," and not simply that income is "remotely or

4    speculatively attributable to the infringement." *Griffo v. Oculus VR, Inc.*,

5    SACV151228DOCMRWX, 2018 WL 6265067, at \*9 (C.D. Cal. Sept. 18, 2018).

6        The requirement that requirement applies to both direct and indirect infringement, and

7    determines what is appropriately considered gross revenue under §504; a plaintiff cannot simply

8    point to all of a publisher's gross profits from all its sales as the gross revenue attributable to the

9    infringing inclusion of a poem in an anthology. *See Cisco Sys. Inc. v. Arista Networks, Inc.*, 14-

10   CV-05344-BLF, 2016 WL 11752975, at \*9 (N.D. Cal. Nov. 16, 2016) (*quoting On Davis v. The*

11   *Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001). Once the plaintiff has shown the causal nexus, the

12   burden shifts to the infringer to apportion any profits that were not the result of infringement.

13   *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004), *as amended on denial*

14   *of reh'g and reh'g en banc* (Oct. 25, 2004), *opinion amended on denial of reh'g*, 03-35188, 2004

15   WL 2376507 (9th Cir. Oct. 25, 2004).

16       As a result of information acquired from Settling Defendants, Bungie was able to

17   differentiate Defendants' relevant gross revenues into two pools. The first is the $406,649.55 of

18   revenue that was derived from the sale of the infringing cheat, both as a standalone product and

19   from the sale of subscriptions to Defendants' cheat services, which included but was not limited

20   to the *Destiny 2* cheat. The cheat subscriptions are, in effect, an anthology of video game cheats;

21   the *Destiny 2* cheats are a component of that anthology. This pool of revenue includes direct

22   profits attributable to the sale of the infringing product, and it is Defendants' burden to apportion

23   any profits that are not attributable to the inclusion of the Cheats. *See On Davis v. The Gap, Inc.*,

24   246 F.3d 152, 160 (2d Cir. 2001). Larsen's refusal to participate in this litigation does not shift

25   that burden back to Bungie.

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Second, there is a pool of gross revenue that consists of Defendants' convoyed sale of

2    other, non-*Destiny 2* cheats during the period of time that it offered the infringing Cheats.

3    Having cheats for high-popularity games in general and *Destiny 2* in particular was important to

4    Defendants' business not merely because of the direct revenues yielded by that product, but also

5    because having popular games allowed them to sell more cheats in total, including some that

6    would not otherwise have sold. *See* Schaufuss Dec, ¶ 3. Indeed, Defendants' business records

7    show substantial drops both in their overall revenue and in their overall cheat utilization when

8    they ceased providing the *Destiny 2* cheats. Cohen Dec, Ex. 15. This is non-speculative evidence

9    that the *Destiny 2* "infringement 'at least partially' contributed to profits." *Apulent, Ltd. v. Jewel*

10   *Hosp., Inc.*, C14-637RSL, 2015 WL 630953, at *5 (W.D. Wash. Feb. 12, 2015) (cleaned up).

11   Applying the percentage by which Defendants' non-*Destiny 2* cheat usage dropped after the

12   *Destiny 2* cheat was no longer available yields $60,069.35 in Wallhax revenue attributable to the

13   availability of *Destiny 2*. To the extent that there is any question about this calculation, here, too,

14   the burden shifts to Defendants to apportion profits attributable to sources other than the

15   infringement, and Larsen has not done so.

16       Placing this burden on Larsen is more than reasonable. Given Larsen's refusal to appear

17   in this case, Bungie is not in possession of the information needed to perfectly apportion those

18   sales that were specifically attributable to the *Destiny 2* cheats, nor can Bungie calculate the

19   portion of this income that represents whatever Larsen might wish to claim as expenses. Neither

20   Bungie nor this Court should engage in speculation as to those amounts; the uncertainty is purely

21   the result of Larsen's failure to appear. Thus, Bungie is entitled to an award of $466,718.90,

22   trebled to a total of $1,400,156.71.

23       In the alternative, and should the court find that Bungie has not adequately demonstrated

24   the link between Larsen's infringement and Larsen's revenues, Bungie respectfully requests that

25   the court award the maximum available statutory damages. Larsen's conduct, as demonstrated

26   above, provides more than ample proof of his willful infringement of Bungie's copyright

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   protected works. As such, Bungie is entitled, at its election, to recover either actual copyright

2   damages, or statutory damages of up to $150,000 per infringed work. 17 U.S. Code § 504. In this

3   case, Bungie has shown that two registered works were infringed, entitling it to receive up to

4   $300,000.

5        **3.   Plaintiff is Entitled to Compensation for Its Significant Mitigation Expenses**

6        Bungie is entitled to recover not only its cost of third-party anti-cheat software, but the

7   salaries it had to pay employees to work on its cheat mitigation efforts. *See U.S. v. Middleton*,

8   231 F.3d 1207 (9th Cir. 2000) (in criminal case, court could compute damages based on hours

9   worked and salaries paid to employees tasked with fixing CFAA problems). Bungie has

10  expended more than $2,000,000.00 on cheat mitigation, including game security staffing and

11  software, since the launch of Wallhax's *Destiny 2* Cheat in 2019. Barker Dec, ¶ 25. During the

12  time that the Wallhax Enterprise offered a *Destiny 2* Cheat, the Cheat market for *Destiny 2* was

13  comprised of three different cheat products: the Wallhax Cheat, the Ring -1 cheat, and the

14  AimJunkies cheat, each of which attempt to hack *Destiny 2* in different ways. Barker Dec, ¶ 26.

15  As a coarse estimate, the Court should fing that roughly one-third of Bungie's cheat mitigation

16  costs are attributable to the Wallhax Cheat, and should therefore award Bungie $666,666.00 as

17  baseline actual damages on its breach of contract, RICO, WCPA, and CFAA claims.  Those

18  baseline damages should trebled under RICO, 18 U.S.C. § 1964(c), and, subject to the statutory

19  cap, under the WCPA. RCW 19.86.090, for a total of $1,999,998.00.

20       **4.   Plaintiff is Entitled to Recover its Attorney's Fees and Costs**

21       Bungie is permitted under multiple statutes to recover its attorney's fees and costs of

22  court. Section 1964(c) expressly allows a party that has been injured by a RICO violation to

23  recover reasonable attorney's fees in a civil RICO case. The Washington Consumer Protection

24  Act states that "a person who is injured by a violation of this chapter may bring an action for

25  recovery of actual damages, including court costs and attorneys' fees." RCW 19.138.280.

26  Additionally, Section 505 of the Copyright Act "grants courts wide latitude to award attorney's

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  fees based on the totality of circumstances in a case." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136

2  S. Ct. 1979, 1985 (2016). Bungie has incurred $267,887.10 in attorney's fees to date. Cohen

3  Dec, ¶ 17;[10] Declaration of Brian Esler, ¶ 3. Bungie's attorney's fees were all reasonably

4  incurred in the process of litigating this action, and they are entitled to recover them by the RICO

5  Act, the Washington Consumer Protection Act, and the Copyright Act. In addition, Bungie has

6  incurred $80,263.92 in costs relating to this action, including expert fees. Barker Dec, ¶ 28.

7  Bungie is entitled to an award of those fees and costs.

8  **G.  PLAINTIFF IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF.**

9        In addition to statutory damages, the Court should permanently enjoin Larsen from

10  further infringing Plaintiff's rights and attacking their business by simply recreating the scheme

11  under a different name or developing new cheat software to sell with a different enterprise. "As a

12  general rule, a permanent injunction will be granted when liability has been established and there

13  is a threat of continuing violations." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520

14  (9th Cir. 1993). The Copyright Act specifically provides that a court may "grant temporary and

15  final injunctions on such terms at it may deem reasonable to prevent or restrain infringement of a

16  copyright." 17 U.S.C. § 502(a). Additionally, Larsen's liability for violations of the CFAA and

17  the Racketeer Influenced and Corrupt Organizations Act provide this Court ample reason to

18  grant permanent injunctive relief. 18 U.S.C. § 1964(a); 18 U.S.C. § 1030(g).

19        A plaintiff seeking permanent injunctive relief must demonstrate: "(1) that it has suffered

20  an irreparable injury; (2) that remedies available at law, such as monetary damages, are

21  inadequate to compensate for that injury; (3) that, considering the balance of hardships between

22  the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

23  would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, LLC*, 547 U.S.

24

25

26  [10] The Court's order on this motion should allow Bungie to submit any final billings it received relating to this action or this motion after submission of this brief.

MOTION FOR DEFAULT -36
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   388, 391 (2006). Because all four factors are met, the Court should issue a permanent injunction,

2   as set forth in the accompanying proposed order.

3         **1.   Plaintiff Suffered Irreparable Harm**

4         Bungie has suffered, and will continue to suffer, irreparable injury by virtue of Larsen's

5   willful infringements, violations, and criminal conduct. Loss of prospective customers and

6   goodwill is irreparable, because it cannot be easily calculated and compensated for by a money

7   judgment. *See, e.g., Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir.

8   2001); *eBay, Inc. v. Bidder's Edge*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm

9   resulting from lost profits and lost customer goodwill is irreparable because it is neither easily

10  calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief.");

11  *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) (copyright

12  infringement may specifically constitute irreparable harm "in the loss of control of a business's

13  reputation" and in the "loss of trade and … goodwill"), *aff'd,* 348 F. App'x 288 (9th Cir. 2009).

14        Here, as established by the well-plead complaint and supporting evidence, the illegal

15  activity of the Wallhax Enterprise has disrupted Bungie's business relationships, caused them to

16  lose current and prospective customers, and damaged their brand and reputation. Dkt No. 1, ¶¶ 5,

17  222, 287, 297; Barker Dec, ¶¶ 13-14, 25. Accordingly, the Court should find that Plaintiffs

18  suffered, and will continue to suffer, irreparable harm in the absence of permanent injunctive

19  relief. *See Getty Images I v. Virtual Clinic*s, No. C13-0626JLR, 2014 WL 1116775, at *6 (W.D.

20  Wash. Mar. 20, 2014) (finding irreparable harm because Getty faced potential loss of customers,

21  goodwill, and reputation from defendant's unlicensed use of Getty's images).

22        **2.   Monetary Damages Alone Are Inadequate**

23        "For the second factor, the plaintiff must show that 'remedies available at law, such as

24  monetary damages, are inadequate to compensate for the injury.'" *Getty Images II*, 2014 WL

25  1116775, at *6 (quoting *eBay*, 547 U.S. at 391). A defendant's failure to appear suggests their

26  "infringing activities will not cease absent judicial intervention." *Warner Bros. Home Entm't Inc.*

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  *v. Jimenez*, 2013 WL 3397672, at \*7 (C.D. Cal. 2013); *see also Jackson v. Sturkie*, 255 F. Supp.

2  2d 1096, 1103 (N.D. Cal 2003) ("[D]efendant's lack of participation in this litigation has given

3  the court no assurance that defendant's infringing activity will cease"). Here, monetary damages

4  are insufficient for the same reason that the harm is irreparable: because Bungie's lost business is

5  impossible to calculate, no award of compensatory damages can make it whole. "Loss of sales is

6  notoriously difficult to calculate, making money damages an inadequate remedy" *Edwards*

7  *Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 538 F. Supp. 3d 1132, 1146 (D. Or.

8  2021) (cleaned up), *quoting Neurovision Medical Products, Inc. v. NuVasive, Inc.*, 2014 WL

9  12554861, at \*1 (C.D. Cal. Aug. 5, 2014).

10  **3.   The Balance of Equities Favors a Permanent Injunction**

11  Larsen has no legitimate interest in continuing to profit from his exploitation and abuse of

12  Bungie's work. *Disney*, 869 F.3d at 866-67; *see Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534

13  F. App'x 633, 636 (9th Cir. 2013) (that injunction might drive defendant out of business was

14  irrelevant when defendant's business rests on infringing plaintiff's intellectual property);

15  *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects

16  to build a business on a product found to infringe cannot be heard to complain if an injunction

17  against continuing infringement destroys the business so elected."). And absent an injunction,

18  Bungie will continue to suffer further irreparable harm as a result of Defendants' willful

19  misconduct. Thus, the balance of harms weighs decidedly in Bungie's favor. *See, e.g., Wecosign,*

20  *Inc. v. IFG Holdings, Inc.*, 845 (C.D. Cal. 2012) ("[W]ithout an injunction, Plaintiff will lose

21  profits and goodwill, while an injunction will only proscribe Defendants' infringing activities.").

22  As Larsen has no right to continue his wanton and damaging misconduct, a permanent injunction

23  against these activities is necessary and prudent.

24  **4.   The Public Interest Would Be Served by a Permanent Injunction**

25  Courts routinely find that 'the public interest is served when the rights of copyright

26  holders are protected against acts likely constituting infringement,'" *Getty Images II*, 2014 WL

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1116775, at \*7 (citation omitted), as the public has a strong interest in not being taken in by fraudulent and infringing conduct. *see Internet Specialties W., Inc. v. Milon- DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 n.5 (9th Cir. 2009). The Wallhax Enterprise has damaged consumer confidence in Bungie's product and "sneer[ed] in the face of copyright owners and copyright laws." *See Tu v. TAD Sys. Tech. Inc.*, 2009 WL 2905780, at \*3 (E.D.N.Y. 2009) (citation & internal quotation marks omitted). Even without considering the myriad other laws Larsen's conduct breaks, it is manifestly in the public's interest that he be permanently enjoined from continuing his illegal and tortious conduct.

## IV. CONCLUSION

For the foregoing reasons, Bungie respectfully requests the Court enter a default judgment against Daniel Fagerberg Larsen for $17,278,305.73 and enter the requested injunctive relief.

DATED this 19th day of January, 2023.

By: s/ *Brian W. Esler*
Brian W. Esler, WSBA No. 22168
MILLER NASH LLP
Pier 70
2801 Alaskan Way, Suite 300
Seattle, WA 98121
Telephone: (206) 624-8300
Fax: (206) 340-9599
Email: brian.esler@millernash.com

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Akiva M. Cohen, New York Bar No. 4328969
(Admitted *pro hac vice*)
KAMERMAN, UNCYK, SONIKER
& KLEIN, P.C.
1700 Broadway
New York, NY 10019
Telephone: (212) 400-4930
Email: acohen@kusklaw.com

Dylan M. Schmeyer, Colorado Bar No. 50573
(Admitted *pro hac vice*)
KAMERMAN, UNCYK, SONIKER
& KLEIN, P.C.
750 W. 148th Ave #4216
Westminster, CO 80023
Telephone: (719) 930-5942
Email: dschmeyer@kusklaw.com

Attorneys for Plaintiff

4876-4045-5499.1

MOTION FOR DEFAULT -40
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121