# Attachment B

The Honorable Tana Lin

1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

BUNGIE, INC.,

11

Plaintiff,

Case No. 2:21-cv-01112-TL

12

v.

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT

13

ELITE BOSS TECH INCORPORATED,
11020781 CANADA INC., DANIEL
FAGERBERG LARSEN, ROBERT JAMES
DUTHIE NELSON, SEBASTIAAN JUAN
THEODOOR CRUDEN A/K/A
"LUZYPHER," JOHN DOE NO. 4 A/K/A
"GOODMAN," YUNXUAN DENG A/K/A
"YIMOSECAI," ANTHONY ROBINSON
A/K/A "RULEZZGAME," EDDIE TRAN
A/K/A "SENTIENT", CHENZHIJIE CHEN
A/K/A "CHENZHIJIE402, DSOFT, CVR
37454303, MARTA MAGALHAES A/K/A
MINDBENDER A/K/A BLUEGIRL, AND
JOHN DOES NO. 9-20,

14

15

16

17

18

19

20

**[PROPOSED]**

Defendants.

21

22     This matter having come before the Court upon Plaintiff Bungie, Inc.'s Motion for

23     Default Judgment against Daniel Fagerberg Larsen, and the Court having considered the Motion,

24     the declarations in support, and the pleadings and filings herein, and good cause having been

25     shown, the Court hereby GRANTS the Motion, ORDERS as follows, and directs the Clerk to

26     enter Judgment in conformity with this Order, including entering a monetary judgment in the

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   amount of **$17,278,305.73** against Defendant Larsen, a permanent injunction, and such other

2   relief as explained below:

3

4                                   **FINDINGS OF FACT**

5          Plaintiff Bungie is the developer and publisher of the critically acclaimed video game

6   *Destiny 2*, a shared world massively multiplayer online shooter. *Destiny 2* operates on a free-to-

7   play model; the base game and experience is completely free, and any console or PC owner with

8   the hardware and the inclination can download and play. The player can then elect to become a

9   customer: Bungie offers for sale various expansions and packs of content that add story missions

10  and campaigns, new weapons and items, and any manner of cosmetic and aesthetic

11  enhancements that can be obtained using an in-game currency, Silver, that a player may

12  purchase. As such, Bungie's business depends entirely upon community good will and the high

13  quality of their player experience. The better the game is, and the more fun it is to play, the more

14  players become paying customers.

15         As such, it is vital that Bungie protect the quality of the *Destiny 2* experience, and it

16  therefore spares no expense in doing so. In order to play *Destiny 2*, players must first agree to the

17  Limited Software License Agreement (the "LSLA"); it is impossible to play the game without

18  agreeing to the LSLA's terms. The LSLA contains provisions against hacking and modifying the

19  game, protects Bungie's intellectual property rights, and forbids cheating.

20         Defendant Daniel Fagerberg Larsen ("Larsen") makes a living developing and selling

21  illegal cheat software, and is a resident of Denmark.  Larsen conspired with other named

22  defendants, including those defendants who have already stipulated to judgments and injunctions

23  against them (*see* Dkt. Nos. 27 – 29),[1] to develop and sell subscriptions to cheat software to

24  multiple games, including *Destiny 2*, from the Wallhax.com website and other websites

25

26  _____

    [1] The Court takes judicial notice of the facts and relief stipulated to by other defendants in those previous orders.

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 2
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   (collectively, the "Wallhax Enterprise").[2]  The Wallhax Enterprise sold subscriptions to cheat

2   software on terms of various lengths, usually between three days and three months.  After a

3   customer subscribed to their software, Wallhax continued to update the cheat as needed to ensure

4   that it remained functional and undetectable, and provided customer service and support. In

5   addition to selling the cheats at their own websites at Wallhax.com, Cheatautomation.com, and

6   ArtificialSensei.com, Wallhax also operated a reseller program. Resellers would purchase the

7   cheat in bulk at a discount and resell it, both on the Wallhax sites and their own, enabling them

8   to provide additional payment processing options while sharing in the Wallhax profits.  Larsen

9   himself profited from the Wallhax Enterprise, in which he was a general partner.

10           In order to effectively develop and test cheats, Larsen and his partners played *Destiny 2*

11   extensively, going through dozens of accounts as each one in turn got banned for cheating.  Each

12   time, Larsen agreed to LSLA.  When Bungie introduced measures to defend against cheat

13   software, the Wallhax Enterprise reverse-engineered their mitigation efforts to prevent Bungie

14   from blocking the Wallhax Cheat and rendering it useless.  That allowed them to continue to

15   market and sell their cheat as effective.

16           Larsen and his colleagues became aware that Bungie was beginning to take legal action

17   against other cheating enterprises like theirs. Eventually, they learned that their enterprise had

18   come to Bungie's attention, and that they were being sued. They did not cease their unlawful

19   activities. Instead, they responded by taking additional measures to hide their tracks, including –

20   with the knowledge that they were being sued – measures to destroy evidence relevant to this

21   litigation.

22           At all relevant times, Larsen and the Wallhax Enterprise knew their actions were

23   wrongful and illegal, and continued them anyway. In fact, Larsen sought and obtained legal

24   advice when Wallhax was threatened by Activision Blizzard with a lawsuit over similar conduct,

25   _____

26   [2] This Order refers to the Wallhax Enterprise and defendant Larsen interchangeably, as Larsen controlled the
Wallhax Enterprise and is individually liable for all of its actions.

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 3
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   and that advice reassured him that as a resident of Denmark he could thumb his nose at any
2   judgment an American court might issue, even if his conduct put his partners at risk.  Larsen was
3   wrong in that conclusion.

**CONCLUSIONS OF LAW**

6   The Court's subject matter jurisdiction over this action is straightforward; the Court has
7   federal question jurisdiction over civil actions arising under the laws of the United States, 28
8   U.S.C. § 1331, and Bungie asserted claims against Larsen under 18 U.S.C. § 1962(a), (b), & (c),
9   17 U.S.C. § 1201(a), and 18 U.S.C. § 1030(a)(5)(B). Dkt. No. 1 at ¶¶ 157-265. And the Court
10  therefore has pendant jurisdiction over Bungie's state law claims against Larsen, which arise out
11  of the same operative nucleus of fact as Bungie's copyright, DMCA, and RICO claims. 28
12  U.S.C. § 1367(a). *See id.* at ¶¶ 266-306.

13  The Court also has personal jurisdiction over Larsen. Larsen agreed to the LSLA,[3] which
14  contains a forum selection clause that provides that those who accept the agreement "agree to
15  submit to the personal jurisdiction of any federal or state court in King County, Washington."
16  Compl. at ¶ 40. That is sufficient to support personal jurisdiction. *See Facebook, Inc. v. ILikeAd*
17  *Media Int'l Co. Ltd.*, 19-CV-07971-SK, 2022 WL 2289064, at *2 (N.D. Cal. Feb. 1, 2022),
18  *report and recommendation adopted as modified*, 19-CV-07971-JST, 2022 WL 2289058 (N.D.
19  Cal. Mar. 15, 2022) (citing *Holland Am. Line Inc. v. Wartsila N. Am. Inc.*, 485 F.3d 450, 458 (9th
20  Cir. 2007). And, were it necessary, the Court would also have jurisdiction over Larsen under
21  Washington's long arm statute. *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 80 (Wash. 1989).

22  As established by Plaintiff's affidavit of service, Dkt. No. 31, Larsen was properly served
23  with the Complaint. Fed. R. Civ. P. 41(f)(1) (service under Hague Convention is sufficient). As
24  such, Larsen is subject to the jurisdiction of the Court.  The Court has already entered an order of

25
26  [3] The evidence establishes that Larsen himself played *Destiny* 2. As explained by Mr. Barker, he could only have
done so after accepting the LSLA. Barker Dec, ¶ 17.

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 4
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   default against Larsen.  Dkt. No. 35.  In considering whether to enter a default judgment, the

2   Court must assess the seven *Eitel* factors: (1) the prejudice to Bungie from denial of a default

3   judgment; (2) the merits of Bungie's claims; (3) the sufficiency of the Complaint; (4) the amount

4   at issue; (5) the possibility of a factual dispute; (6) whether the default was due to excusable

5   neglect; and (7) the preference for decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470,

6   1471-72 (9th Cir. 1986). The Court may grant a default judgment against him so long as the *Eitel*

7   factors warrant it. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). They do.

8   **A.  THE FIRST, SIXTH, AND SEVENTH *EITEL* FACTORS FAVOR DEFAULT**
      **JUDGMENT BECAUSE LARSEN HAS CONSCIOUSLY DECIDED NOT TO**
9     **APPEAR.**

10         The first, sixth, and seventh *Eitel* factors all favor default because the evidence shows

11  that Larsen was properly served and consciously decided not to appear.  As to the sixth factor,

12  Larsen discussed the litigation extensively with defendant Nelson over Telegram chat, beginning

13  the day the litigation was filed. By August 20, 2021, Larsen had and was discussing a copy of the

14  complaint. As settlement discussions between Bungie and Nelson progressed, Larsen offered

15  opinions on settlement terms and opposed the release to Bungie of the full Wallhax software. His

16  refusal to appear before the Court is thus active and intentional, not excusable neglect.

17         Absent a default judgment, Bungie has no legal remedy against Larsen and no means to

18  prevent him from inflicting further harm, and would therefore be prejudiced by denial of the

19  motion. *See Amazon Content Servs. LLC v. Kiss Libr.,* No. C20-1048 MJP, 2021 WL 5998412,

20  at *3 (W.D. Wash. Dec. 17, 2021) ("Defendants have failed to appear or participate in this

21  litigation. Plaintiffs face prejudice by not being able to obtain complete relief on their

22  claims…"). As to the preference for decisions on the merits, as discussed below, Bungie's

23  submission here is no mere form request for default judgment – it is supported by expert

24  testimony, the testimony of Larsen's partners and co-defendants, and documents obtained from

25  Larsen's partners in discovery.  Because Larsen consciously decided to ignore the summons and

26  not participate or defend, he has precluded any adversarial resolution on the merits.  *See Padded*

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 5
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   *Spaces LLC v. Weiss*, C21-0751JLR, 2022 WL 2905887, at *5 (W.D. Wash. July 22, 2022)

2   (Seventh *Eitel* factor favors default judgment when failure to answer precludes the possibility of

3   resolution on the merits).

4   　　　The second and third factors – "often analyzed together," *Padded Spaces LLC v. Weiss*,

5   C21-0751JLR, 2022 WL 2905887, at *3 (W.D. Wash. July 22, 2022), *quoting Curtis v.*

6   *Illumination Arts, Inc.,* 33 F. Supp. 3d 1200, 1211 (W.D. Wash. 2014) – likewise favor grant of

7   the motion.  Here, in addition to the well-pled allegations in the Complaint, Bungie's motion for

8   a default judgment is supported by declarations from Bungie's investigator-expert Stephen Guris,

9   from Bungie's in-house counsel James Barker, and from other former defendants themselves,

10  alongside voluminous chat records and logs from the Defendants directly discussing the relevant

11  events. Taken together, the Complaint and other evidence strongly support grant of this motion.

12  **Copyright Infringement**

13  　　　Bungie has copyright registrations for *Destiny 2* both as an audiovisual work and as

14  software, establishing its ownership.  Larsen's infringement of Bungie's rights in *Destiny 2* is

15  equally clear. Larsen was the lead developer of the Cheats and engaged in the infringing acts at

16  issue in this case. Larsen was also a partner in the Wallhax Enterprise.  Larsen may be held

17  individually liable for the infringements as personal participant in the infringing activity; the

18  corporate veil provides no protection. *See Urban Accessories, Inc. v. Iron Age Design & Imp.,*

19  *LLC,* C14-1529JLR, 2015 WL 1510027, at *4 (W.D. Wash. Apr. 1, 2015).

20  　　　The Wallhax Enterprise infringed Bungie's copyrights in several ways. During the

21  process of developing the cheat, Larsen repeatedly downloaded and played *Destiny 2* to enable

22  the development of the cheat, invalidating his license and rendering that usage unlicensed. *See*

23  *Blizzard Entm't, Inc. v. Bossland GmbH*, 16-cv-1236-DOC, 2017 WL 7806600, at *4 (C.D. Cal.

24  Mar. 31, 2017) (fraudulently obtaining access to software by falsely indicating agreement to a

25  license agreement renders the license void and the download unlicensed and infringing). Each

26  download and play was therefore an infringement. *Blizzard*, 2017 WL 7806600 at *4.

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 6
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    The cheat software also infringes by altering the underlying game software as it is

2    executed, creating an unauthorized derivative work.  The Cheat's creation of dynamic screen

3    overlays creates a new, unauthorized derivative work consisting of the combination of Bungie's

4    protected *Destiny 2* audiovisual work and the new display elements added by the Cheats, which

5    annotate it. See *Blizzard Entm't, Inc. v. Bossland GmbH*, 2017 WL 7806600, at *5 (C.D. Cal.

6    Mar. 31, 2017) (holding that a dynamic screen overlay created as a video game cheat constitutes

7    a derivative work).  And, because the Cheats themselves exist in a concrete and permanent form

8    that substantially incorporates protected content without Bungie's consent, the Cheats were an

9    unauthorized derivative work in violation of Bungie's rights under 17 USC 106(2). *See Rimini*

10   *St., Inc. v. Oracle Int'l Corp.*, 473 F. Supp. 3d 1158, 1210 (D. Nev. 2020).

11    Finally, Larsen's copying was willful, for purposes of both civil and criminal copyright

12   infringement. Bungie alleged willfulness, Dkt. No. 1 at ¶¶ 139-56, 177, and factual allegations of

13   willfulness are deemed admitted on default. *See*, *e.g.*, *Crim. Prods., Inc. v. Evans*, No. 16-CV-

14   1647RAJ, 2018 WL 2397439, at *1 (W.D. Wash. Apr. 4, 2018) (deeming allegation of

15   willfulness admitted on default).  The record is replete with facts[4] from which Larsen's

16   willfulness can be inferred under the Ninth Circuit standard applicable to infringement cases. *See*

17   *Unicolors, Inc. v. Urb. Outfitters, Inc.,* 853 F.3d 980, 991 (9th Cir. 2017).

18   **Civil RICO under 18 U.S.C. § 1962(a), (b), & (c)**

19    Bungie's well-pled complaint and supporting evidence establish Larsen's liability under

20   the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.* ("RICO").

21   RICO forbids "any person employed by or associated with any enterprise engaged in, or the

22

23   [4] The messages between the Wallhax Enterprise's principals reveal that Larsen and his co-conspirators were
24   concerned when they learned of Bungie's suits against other cheat developers. Cohen Dec. Ex. 4 at 1220-1224.
     Despite this notice, they neither ceased their unlawful infringement nor acted as though they believed what they
25   were doing was lawful; instead, they took measures intended to evade detection and continue profiting from the
     infringement. Larsen was the instigator of some of these efforts, and a participant in all of them. His knowledge of
26   the unlawfulness of his actions is thus not only deemed admitted by default, but also clearly apparent from his
     actions.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

2   indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or

3   collection of unlawful debt." 18 U.S.C. § 1962(c). To prevail on its RICO claim, Bungie must

4   show: 1) a violation of 18 U.S.C. § 1962; (2) injury to its business or property; and (3) causation

5   of the injury by the violation. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 451 (2006).

6   Bungie has established these elements.

7         An "enterprise" "includes any individual, partnership, corporation, association, or other

8   legal entity, and any union or group of individuals associated in fact although not a legal entity."

9   18 U.S.C. § 1961(4). A RICO enterprise must have a "structure" that has at least three features: a

10  purpose, relationships among the associates, and longevity sufficient to permit the associates to

11  pursue the enterprise's purpose. *Boyle v. U.S.*, 556 U.S. 938 (2009). "[A]n association-in-fact

12  enterprise is simply a continuing unit that functions with a common purpose." *Id*. The Wallhax

13  Enterprise consisted of multiple distinct legal entities and individuals working together over a

14  period of years for a common illegal purpose: selling cheat software. Its purpose was illegal: sale

15  of cheat software that violated copyright law, the DMCA's anticircumvention provisions, and the

16  Computer Fraud and Abuse Act. The Wallhax Enterprise satisfies this element of RICO.

17        Persons who "conduct[ed] or participate[d], directly or indirectly, in the conduct of such

18  enterprise's affairs," are liable for RICO. 18 U.S.C. § 1962(c). "RICO liability is not limited to

19  those with primary responsibility for the enterprise's affairs," but "some part in directing the

20  enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Larsen was

21  not an incidental participant in the Wallhax Enterprise's activities, merely taking direction and

22  being tertiarily useful. He was an active manager who directed the Wallhax Enterprise's affairs.

23  He developed the *Destiny 2* cheat software the enterprise sold, shared in the profits, and had

24  input on the response to this legal action. He was an essential component of the enterprise, and

25  his conduct both steered and furthered its purpose.

26

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 8
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1      Racketeering activity is "any act which is indictable" under specified provisions of Title

2  18. 18 U.S.C. § 1961(1)(B). Bungie pled the following predicate acts: 1) wire fraud (18 U.S.C. §

3  1343) in Defendants' use of the interstate wires to further their fraudulent cheat sales; 2) criminal

4  copyright infringement in the illegal and intentional sale of Bungie's copyrighted intellectual

5  property for profit; and 3) money laundering (18 U.S.C. § 1956 & 1957) in violation of 18

6  U.S.C. § 1956(a)(1) and 18 U.S.C. § 1957.

7      First, developing the cheat software that was the Wallhax Enterprise's core product

8  required Defendants to use the interstate wires to obtain a copy of the *Destiny 2* software through

9  fraud. As discussed above, Larsen had to fraudulently indicate his intent to abide by the terms of

10  the LSLA – which prohibited the cheat development and sale that was his purpose in

11  downloading the game – in order to obtain and access the *Destiny 2* software. Because the

12  *Destiny 2* software is property, and it was downloaded over the internet through fraud, the

13  Wallhax Enterprise's initial download of the *Destiny 2* software is sufficient, in and of itself, to

14  violate the wire fraud statute.

15      Second, Defendants' subsequent distribution of Cheats over the internet also involved the

16  use of the interstate wires as part of a scheme to obtain property from Bungie by means of false

17  or fraudulent pretenses. Bungie offers its players various rewards and items of value for certain

18  participation and accomplishment in the course of *Destiny 2* gameplay. Because players who

19  utilize Larsen's cheat software have all executed the LSLA and represented to Bungie that they

20  are gaming honestly, using cheat software to obtain such rewards is a fraud.

21      Moreover, Defendants routinely used interstate wires in connection with this scheme.

22  Larsen is located in Denmark, and his partners were located in Canada and Germany. Each used

23  email, telephone, and chat communications extensively to coordinate and operate the Wallhax

24  Enterprise. These actions establish the predicate act of wire fraud.

25      The elements of criminal copyright infringement are (1) that a valid copyright; (2) was

26  infringed by the defendant; (3) willfully; and (4) for purposes of commercial advantage or

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 9
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   private financial gain. 17 U.S.C. § 506(a). As shown above, the Wallhax Enterprise infringes

2   Bungie's copyrights, and it does so specifically for commercial advantage and private financial

3   gain. And Larsen's willfulness must both be presumed given his default and has been actively

4   demonstrated on the evidence.

5          A defendant engages in money laundering under 18 U.S.C. § 1956(a)(1)(A)(i)[5] when

6   they (1) conduct (or attempt to conduct) (2) a financial transaction, (3) knowing that the property

7   involved in the financial transaction represents the proceeds of some unlawful activity, (4) with

8   the intent to promote the carrying on of specified unlawful activity, and (5) the property was in

9   fact be derived from a specified unlawful activity. 18 U.S.C. § 1956(a)(1). The proceeds of

10  Wallhax's cheat software sales are proceeds of criminal copyright infringement and wire fraud,

11  which is a specified unlawful activity under §1956(a)(1). The Wallhax principals were aware that

12  their activity was unlawful. And Wallhax reinvested those proceeds in its business, using them to

13  pay staff, invest in tools and equipment, and promote the business.  Each time it reinvested those

14  proceeds, the Wallhax Enterprise committed money laundering under 18 U.S.C.

15  §1956(a)(1)(A)(i).

16         The Wallhax Enterprise also engaged in money laundering under 18 U.S.C. § 1957,

17  which prohibits engaging in transactions involving more than $10,000 of property derived from

18  specified unlawful activity. Cohen Dec Ex. 10 at pp. 9-15 (showing regular transfers in excess of

19  $10,000 from PayPro to 1102 Canada's WiseBusiness Ltd. account, among others). Thus, Larsen

20  engaged in money laundering under both § 1956(a) and § 1957.

21         Nor were these isolated predicate acts. To establish a pattern of racketeering activity,

22  Bungie need only show at least two acts of racketeering activity. 18 U.S.C. § 1961(5). Here, the

23  Wallhax Enterprise has engaged in the conduct at issue over a period of ten years, and began

24  selling the *Destiny 2* cheat in 2019. Nelson Dec, ¶¶ 14, 26. Bungie is not the only victim of the

25  _____

26  [5] Due to a typo, the Complaint mistakenly identified §1956(a)(1)(A)(***ii***) as the section applicable to money
    laundering by use of proceeds to promote specified unlawful activity.

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 10
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Wallhax Enterprise's conduct; it offers cheat software for more than 20 other games, including

2    DICE's *Star Wars Battlefront 2*, Valve's *Counter-Strike*, Studio Wildcard's *ARK: Survival*

3    *Evolved*, Rare's *Sea of Thieves*, and Electronic Arts' *Battlefield V*.  Each of those games has a

4    provision in its license agreement or terms of use that bars hacking and cheating, meaning that

5    the Wallhax Enterprise committed a similar fraud and willful copyright infringement when it

6    first obtained access to those games to develop the Cheats.  That is more than sufficient to

7    establish the necessary pattern.

8           To establish a RICO injury and causation, Bungie need only show that it suffered some

9    out-of-pocket loss as a result of the predicate acts. *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d

10   1016, 1021 (9th Cir. 2001). The evidence submitted herewith is more than sufficient to do so. As

11   detailed above, the Cheats caused significant injury to Bungie's business. Thousands of players

12   used Larsen's Cheats, contributing to the perception that *Destiny 2* had "a cheating problem."

13   Bungie has incurred significant expense in order to identify and address Defendants' Cheats in

14   particular, so that it could strengthen the protections for its copyrighted work and ensure that

15   players could not fraudulently obtain rewards. Moreover, Wallhax users cost Bungie business

16   and drove existing players from their game.

17          18 U.S.C. § 1962(a) prohibits people who have received income derived from a pattern of

18   racketeering activity to use those funds to invest in any business or enterprise engaged in or

19   impacting interstate or foreign commerce. 18 U.S.C. § 1962(a).  As laid out above, the Wallhax

20   Enterprise has derived substantial income from their illegal activities, which funds were, in turn,

21   invested directly back into the marketing, development, and growth of the enterprise. This

22   money expanded the reach and market of the *Destiny 2* cheats, contributing to and magnifying

23   the harm suffered by Bungie, an injury under 1962(a). But for the Wallhax Enterprises'

24   continuing investment in their activities, Bungie's damages would have been significantly less

25   over time. *Nugget Hydroelectric, L.P. v. P. Gas and Elec. Co.*, 981 F.2d 429, 437 (9th Cir.

26   1992).

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 11
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    Section 1962(b) prohibits people from acquiring or maintaining an interest in or control

2    of an enterprise through a pattern of racketeering activity, if that enterprise engages in or impacts

3    interstate or foreign commerce. 18 U.S.C. § 1962(b). As a partner in Wallhax and developer of

4    the Cheat, Larsen maintained both an interest in the activities of the Wallhax Enterprise and

5    control over the enterprise. The Wallhax Enterprise engaged in both interstate and foreign

6    commerce, as demonstrated above. As such, Larsen violated 18 U.S.C. § 1962(b).

7         **Circumvention of Technological Measures under 17 U.S.C. § 1201(a)**

8         The second and third *Eitel* factors also favor default judgment Bungie's Section 1201(a)

9    claim for two reasons. Larsen violated the statute when he trafficked in an anticircumvention

10   device in violation of 17 U.S.C. § 1201(a)(2). And Larsen's own circumvention of technical

11   protection measures in the course of developing the Cheats, including his evasion of bans,

12   violated 17 U.S.C. § 1201(a)(1).

13        Larsen infringed Bungie's rights under Section 1201 when he: "(1) traffic[ked] in (2) a

14   technology or part thereof (3) that is primarily designed, produced, or marketed for, or has

15   limited commercially significant use other than (4) circumventing a technological measure (5)

16   that effectively controls access (6) to a copyrighted work." *MDY Industries LLC v. Blizzard

17   Entertainment Inc.*, 629 F. 3d 928, 953 (9th Cir. 2010). As was the case in *MDY*, *id.* at 953-54,

18   those elements are easily met here. Larsen created and trafficked in the Cheats, which, as

19   software, are a technology, satisfying elements one and two. *See MDY*, 629 F.3d at 953-954. The

20   Cheats contain technology that is has no purpose other than evading Bungie's anti-cheat

21   measures, meeting elements three and four. *MDY*, 629 F.3d at 953-954. And the dynamic non-

22   literal elements of the *Destiny 2* game and its expansions are a copyright-protected work, thereby

23   fulfilling element six. *Id*.

24        Defendants breached measures that effectively controlled access to the work, and thereby

25   meet the fifth element. As with the anti-cheat software at issue in *MDY*, the Cheats violate

26   Bungie's Section 1201 rights, and, as discussed below, Bungie is entitled to recompense for its

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   damages. *MDY*, 629 F.3d at 954. Larsen has engaged in the same trafficking in

2   anticircumvention devices that his co-conspirators have stipulated to, and should be held

3   accountable alongside them. The evidence shows that users downloaded Wallhax cheat software

4   at least 6,765 times, and statutory damages should be awarded accordingly. Dkt. No. 27 at ¶ 5.

5        Larsen also separately breached 17 U.S.C. § 1201(a)(1) when he repeatedly used new

6   accounts to evade Bungie's bans. Larsen's initial efforts to help cheaters prosper at Bungie's

7   expense were hampered by a significant barrier: Bungie had caught Larsen attempting to cheat,

8   and banned him from gameplay – a fact Larsen was aware of. Larsen therefore created new

9   accounts to avoid or bypass the measures that Bungie implemented to prevent him from

10   accessing the game. Larsen did not merely engage in this conduct once or twice; his accounts

11   were being banned by Bungie as quickly as they could be identified, often within hours.

12   Evidence suggests that Larsen personally engaged in anticircumvention in excess of thirty times.

13        And the Cheats Larsen created also violate § 1201(b)(1). As discussed above, and unlike

14   the software at issue in *MDY*, Larsen's Cheats create an infringing derivative work whenever

15   they are engaged during *Destiny 2* gameplay. Because Bungie's anti-cheating measures thus

16   effectively protect their derivative works right from violation during gameplay, Larsen is also

17   liable to Bungie under § 1201(b)(1).

18        **Violation of the Computer Fraud and Abuse Act**

19        Bungie's well-pled complaint and the supporting evidence similarly establishes Larsen's

20   liability under the Computer Fraud and Abuse act because Larsen intentionally accessed a

21   protected computer without authorization, damaging Bungie. 18 U.S.C. § 1030(a)(5)(B).

22        As pled in the complaint and admitted by Larsen's default, the *Destiny 2* servers (the

23   "Server"), the *Destiny 2* client software (the "Client"), and the proprietary, encrypted network

24   protocols which facilitate the transfer of information between them (together with the Server and

25   the Client, the "Protected Computer") collectively constitute a "protected computer." A

26   "protected computer" is any computer affected by or involved in interstate commerce, which

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 13
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   includes all computers with Internet access. *United States v. Nosal*, 844 F.3d 1024, 1050 (9th

2   Cir. 2016). The Computer Fraud and Abuse Act defines a "computer" broadly. 18 U.S.C. §

3   1030(e)(1). Cloud-based and internet-based services and information are "computers" under the

4   CFAA, *Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 926–27 (E.D. Va.

5   2017) (an account "connected to—and entirely contained within—the Internet" was a "protected

6   computer" under the CFAA), and the statute also "clearly includes" online data storage facilities

7   "operating in conjunction with what is ordinarily thought of as a computer." *Hill v. Lynn*, No. 17

8   C 06318, 2018 WL 2933636, at *3 (N.D. Ill. June 12, 2018).

9       *Destiny 2* consists of many elements, which all work together under Bungie's ownership

10   and control to create the massively multiplayer gameplay experience. The client software is

11   made available by Bungie for one purpose and one purpose only: to enable players to play

12   *Destiny 2.* Bungie is the only party authorized to control the content and functionality of the

13   Client; the Client's sole functionality is to connect to the Server and allow players to play the

14   game. As described in paragraphs 242-251 of the Complaint, the Client is directly related to and

15   operates in conjunction with the Server, both in fact by its design and in law under the LSLA.

16       When a computer program is executed from disk and loads into RAM, it creates a legally

17   distinct copy. *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993). This

18   memory-resident copy of the Client stores important data such as the character's position, health

19   level, and ammunition level. The Client also communicates those values to the server so that the

20   game can respond appropriately. When copied into memory, the Client is a data storage and

21   communications facility directly related to and operating in conjunction with the Server, and as a

22   result is part of the *Destiny 2* "computer".

23       Larsen's access to this protected computer was concededly without authorization. Bungie

24   prevents exposure and manipulation of key game data via specific technological measures

25   designed to protect the integrity of the gameplay on the Protected Computer. In order to

26   circumvent these "generally applicable rules regarding access permissions," *hiQ Labs, Inc. v.*

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 14
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   *LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022), Larsen engaged in reverse-engineering.

2   Larsen's cheat software is then able to obtain and manipulate "information located in particular

3   areas of the computer … that are off limits to him." *Van Buren v. United States*, 141 S. Ct. 1648,

4   1662, 210 L. Ed. 2d 26 (2021).

5   Bungie alone has the right to authorize such access to the *Destiny 2* Protected Computer.

6   *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016) (permission from

7   the user is insufficient to create authorization); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th

8   Cir. 2004) (plaintiff is proximately harmed by unauthorized access via a third-party computer).

9   Larsen's unauthorized access to Bungie's protected data and information clearly falls within the

10  conduct prohibited by the CFAA. *Maplebear Inc. v. Doe*, No. 121CV474AJTIDD, 2021 WL

11  2767296, at *1–2 (E.D. Va. May 10, 2021) (granting injunctive relief). *See also Philips N. Am.*

12  *LLC v. Glob. Med. Imaging, LLC*, No. 21-CV-3615, 2022 WL 3106971, at *7 (N.D. Ill. Aug. 4,

13  2022) (allegations of hacking set out CFAA claim even where machines themselves were owned

14  by the defendant); *Villareal v. Saenz*, No. 520CV00571OLGRBF, 2021 WL 1986831, at *7

15  (W.D. Tex. May 18, 2021)(unauthorized access to web-based account violates the CFAA even if

16  access is accomplished on a computer owned by the defendant); *Hill v. Lynn*, No. 17 C 06318,

17  2018 WL 2933636, at *3 (N.D. Ill. June 12, 2018) ("computer" includes web-based accounts).

18  And it has caused extensive damage to Bungie, which has had to take a range of very costly

19  measures to attempt to further block users from employing Larsen's cheat software. Bungie has

20  properly alleged a CFAA claim and default judgment on this claim is warranted.

21

22

23  **Breach of Contract and Interference with Contractual Relations**

24  Bungie's well-pled complaint establishes Larsen's liability for both his own breach of

25  contract and for his intentional interference with Bungie's contractual relations. The complaint

26  alleges the existence of the LSLA, the terms of which Larsen accepted when he first played

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 15
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  *Destiny 2*. Dkt. No. 1, ¶¶ 267-72. The LSLA imposes a duty to, inter alia, not reverse engineer,

2  create derivative works of, or hack or modify *Destiny 2*. Dkt. No. 1, ¶¶ 276-77. Larsen is thus

3  plainly liable for breach of contract. *See Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78

4  Wn. App. 707, 712, 899 P.2d 6, 9 (1995) (setting forth elements of breach of contract claim).

5        Larsen also tortiously interfered with Bungie's contractual relations. Bungie's claim for

6  tortious interference only requires it to show that Larsen was aware of a contractual relationship

7  between Bungie and its players, that Larsen's intentional interference induced a breach of that

8  contract, that his interference was through improper means or with an improper purpose, and

9  damaged Bungie. *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d

10  288, 300 (1997). Each of those elements is satisfied: The LSLA is a valid contract between

11  Bungie and *Destiny 2* players, which Larsen, having repeatedly executed the LSLA himself, was

12  well aware of. He intentionally interfered with that relationship by supplying cheat software to

13  players. As shown above, doing so violated both Federal law and Larsen's own agreement with

14  Bungie. And the breaches damaged Bungie by requiring it to incur costs defending against

15  Larsen's cheats, by costing Bungie continued revenue from players banned for using cheats, and

16  by harming Bungie's reputation and deterring honest players from playing *Destiny 2*. Larsen's

17  liability is clear.

18        **Violation of the Washington Consumer Protection Act**

19        The second and third *Eitel* factors also favor default judgment for Bungie's claim under

20  the Washington Consumer Protection Act ("WCPA"). The WCPA must "be liberally construed

21  that its beneficial purposes may be served." RCW 19.86.920. For a plaintiff to prevail in a

22  private cause of action under the CPA, they must establish "(1) an unfair or deceptive act or

23  practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a

24  person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166

25  Wn.2d 27, 37, 204 P.3d 885 (2009) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title*

26  *Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986)). "[A] claim under the Washington CPA may

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 16
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive

2    substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute

3    but in violation of public interest." *Klem v. Wash. Mut. Bank,* 176 Wn.2d 771, 787, 295 P.3d

4    1179 (2013).

5          Larsen's actions were unfair and deceptive. "A plaintiff need not show the act in question

6    was intended to deceive, only that it had the capacity to deceive a substantial portion of the

7    public." *Panag*, 166 Wn.2d at 47 (citing *Leingang*, 131 Wn.2d at 150). Wallhax did not disclose

8    that its cheats were logging and retaining its users' personally identifying information in

9    violation of many laws, including (in the European Union) the GDPR. The Wallhax Enterprise,

10   through its Cheats, assembled a database on its users' activity that included information as varied

11   and deeply personal as the contents of their browser tabs, revealing such minutiae as email

12   logins,  ninth-grade algebra classes, and COVID health information. It was also a potential

13   national security risk: a tool that, in at least some cases, compromised computers used by

14   members of the military or Department of Defense. Wallhax's development and use of cheat

15   software also deceived both Bungie and the public. Bungie expects users to play the game

16   honestly and comply with their agreements in the LSLA, while *Destiny 2*'s tens of millions of

17   players expect an honest, fair experience. And even Wallhax's users were deceived – not only by

18   the undisclosed logging software, but by Wallhax's false reassurances that its cheats would

19   evade detection, which led to Wallhax users being banned.

20         Offering the cheats for sale is a commercial act, RCW 19.86.010, and the public's interest

21   is implicated by the Wallhax Enterprise's misconduct. It injures Bungie in its business, damaging

22   customer satisfaction and impacting their player retention, and has the capacity to cause further

23   injury to future players, and thus to Bungie's reputation and community good will. Moreover, as

24   shown above Defendant's conduct is unlawful, and "[w]hat is illegal and against public policy is

25   *per se* an unfair trade practice*." Hangman Ridge*, 105 Wash.2d at 786, 719 P.2d 531 (alteration

26

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 17
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  in original, quoting *State v. Reader's Digest Ass'n*, 81 Wash.2d at 270, 501 P.2d 290). Bungie is

2  thus entitled to judgment on this claim as well.

3       **Civil Conspiracy**

4       Larsen's liability for civil conspiracy is as clearly established as his liability for the other

5  causes of action on which it depends. To establish a claim for civil conspiracy, a plaintiff must

6  show "(1) two or more people combined to accomplish an unlawful purpose…; and (2) ... an

7  agreement to accomplish the conspiracy." *Inteum Co., LLC v. Natl. U. of Singapore*, C17-1252-

8  JCC, 2018 WL 2317606, at *1 (W.D. Wash. May 22, 2018), citing *Woody v. Stapp*, 146 Wn.

9  App. 16, 22 (Wash. Ct. App. 2008). A claim for civil conspiracy must be predicated on "a

10  cognizable and separate underlying claim." *Gossen v. JPMorgan Chase Bank*, 819 F. Supp. 2d

11  1162, 1171 (W.D. Wash. 2011). Here, Larsen engaged in the relevant conduct in concert with

12  Nelson, Badger, and the other participants in the Wallhax Enterprise, and pursuant to his

13  agreement with his partners to do so. That is all that is required to support this claim.

14  **B.  THE FOURTH *EITEL* FACTOR WEIGHS IN BUNGIE'S FAVOR BECAUSE**

15  **LARSEN'S CONDUCT WARRANTS THE DAMAGES BUNGIE SEEKS.**

16       The fourth factor favors a default judgment because the damages that Bungie seeks are

17  reasonable in light of Larsen's willful and extensive illegal conduct. Although courts are more

18  cautious when a large damages award is involved, "the court must consider the amount of money

19  at stake in relation to the seriousness of Defendant['s] conduct." *PepsiCo, Inc.*, 238 F. Supp. 2d

20  at 1176. Larsen's conduct entitles Bungie to the award it seeks.

21  **C.  THE FIFTH *EITEL* FACTOR FAVORS BUNGIE BECAUSE THE FACTS ARE**
  **UNDISPUTED.**

22       The fifth factor decidedly favors grant of a default judgment, as Larsen has consciously

23  declined to participate in this litigation. Larsen has thus admitted both the scope and the extent of

24  his participation in the illicit enterprise at the heart of this case. Because default has been entered,

25  "the court must take plaintiff's factual allegations as true." *Curtis v. Illumination Arts, Inc.*, 33 F.

26  Supp. 3d 1200, 1212 (W.D. Wash. 2014). In any event, there would be no dispute over the

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 18
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

material facts even had Larsen appeared. The evidence submitted for the second and third *Eitel*

factors is substantial, including direct testimony from Larsen's co-conspirators and admissions in

his Telegram chat logs, and the fifth factor thus favors default judgment. *See Landstar Ranger,*

*Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 2d 916, 922 (C.D. Cal. 2010) (no possibility of

factual dispute where plaintiff "supported its claims with ample evidence, and defendant has

made no attempt to challenge the accuracy of the allegations in the complaint"). Indeed, Larsen's

co-defendants and partners in the Wallhax Enterprise have already stipulated to those facts and

accepted their liability. This factor thus favors grant of the motion.

**D.  THE COURT AWARDS BUNGIE $3,400,154.71 IN COMPENSATORY DAMAGES, $13,530,000.00 IN STATUTORY DAMAGES, AND $348,151.02 IN ATTORNEY FEES AND COSTS, PLUS FEES INCURRED AFTER SUBMISSION OF THIS MOTION.**

The award Bungie seeks in this case is large because the harm that Bungie has incurred is

substantial. These damages stem from the multiple wrongful acts that Larsen committed over the

course of his participation in the Wallhax Enterprise, and the different harms those acts caused

Bungie. As the Ninth Circuit has repeatedly reaffirmed, one act by a defendant may create

multiple legal harms, and when the statutes forbidding those harms are enacted for different

purposes and provide for different types of damages, there is no concern for double recovery. *See*

*Seattle Pac. Indus., Inc. v. S3 Holding LLC*, 831 Fed. Appx. 814, 818 (9th Cir. 2020); *Bangkok*

*Broad. & T.V. Co., Ltd. v. IPTV Corp.*, 549 Fed. Appx. 647 (9th Cir. 2013); *Nintendo of Am.,*

*Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994). Here, Bungie is entitled to recover

damages for the following separate harms:

    i.  **On Bungie's Anti-Circumvention Claim, the Court Awards Bungie $13,530,000.00 in Statutory Damages**

Bungie is entitled to an award of $13,530,000.00 in statutory damages for Larsen's

anticircumvention violations. Although Bungie is unable to precisely calculate the damages it

has sustained as a result of Larsen's Cheats, Bungie has been forced to expend considerable sums

on cheat mitigation – sums which would not be necessary were it not for people like Larsen.

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 19
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   Where a plaintiff proves that a defendant violated the DMCA's anticircumvention provisions, the

2   plaintiff may elect to receive statutory damages, which the Court has discretion to award up to

3   $2,500 per circumvention device or act of circumvention in violation of Section 1201. 17 U.S.C.

4   1203(c)(3). In this case, the settling defendants acknowledged that the Cheat were downloaded a

5   total of 6,765 times, and agreed to a consent judgment of 13,530,000.00, representing statutory

6   damages of $2000 per act of infringement.

7       This figure, which is less than the maximum statutory damages that are available, is

8   warranted under the circumstances of this case.  To determine where in the statutory range

9   damages should fall for a particular defendant, Courts consider factors including "profits reaped

10  by defendant in connection with the infringement; revenues lost to the plaintiff; and the

11  willfulness of the infringement.... The Court can also consider the goal of discouraging wrongful

12  conduct." *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1075 (N.D. Cal.

13  2005).

14      Here, the $2,000-per-unique-download damage figure Bungie seeks is appropriate. As the

15  Central District of California held just over a year ago, statutory damages of $2,000 per

16  anticircumvention device is appropriate where "the acts of circumvention are severe." *Philips N.*

17  *Am. LLC v. KPI Healthcare, Inc.*, SACV191765JVSJDEX, 2021 WL 6103527, at *8 (C.D. Cal.

18  Sept. 1, 2021). There is no question that Larsen's violations of the DMCA were severe.

19  Moreover, the number of unique downloads *undercounts* Larsen's violations of the DMCA: not

20  only does it ignore Larsen's own repeated circumventions of account bans and his own repeated

21  uses of the Cheat software – each of which was an independent act of circumvention – but he

22  (and Wallhax) participated in each act of circumvention conducted by the Cheat's users each and

23  every one of the countless times the Cheat was loaded and used to play *Destiny 2*, validating the

24  user's license to the Cheat and allowing access to the software. Under these circumstances, it is

25  appropriate for the Court to award Bungie damages on the high end of the statutory range,

26  particularly where *not* doing so would leave Larsen in a more favorable position than his partners

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 20
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  as a result of his refusal to participate in this litigation. The Court awards Bungie $13,530,000 in

2  statutory damages on its § 1201 claim.

3    ii.   **On Bungie's Copyright Claim, the Court Awards Bungie $1,400,156.71 in**
          **Damages, Plus Costs and Attorneys' Fees**

4

5       Bungie is entitled to recover "any profits of the infringer that are attributable to the

6  infringement." 17 U.S.C. §504 (b). To recover the infringer's profits, Bungie "is required to

7  present proof only of the infringer's gross revenue, and the infringer is required to prove his or

8  her deductible expenses and the elements of profit attributable to factors other than the

9  copyrighted work. Bungie requests that this court award it $466,718.90 in actual damages under

10  17 U.S.C. §504, representing an award of $406,649.55 in Wallhax's direct profits and an

11  additional $60,069.35 in indirect profits.[6] Those baseline damages should trebled under RICO,

12  18 U.S.C. § 1964(c), and, subject to the statutory cap, under the WCPA. RCW 19.86.090, for a

13  total of $1,400,156.71.

14       In awarding the victim of infringement the infringer's profits, courts distinguish between

15  direct and indirect profits. Direct profits are "generated by selling an infringing product," *Mackie*

16  *v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). Indirect profits, which include those generated by

17  the use of infringing content in advertising, have "a more attenuated nexus to the infringement."

18  *Ibid.* To establish an entitlement to either direct or indirect profits, the copyright owner must

19  show a casual nexus between the profits and the infringement. *See Rearden LLC v. Walt Disney*

20  *Co.*, 17-CV-04006-JST, 2021 WL 4099622, at *3 (N.D. Cal. Aug. 17, 2021), on reconsideration

21  in part, 17-CV-04006-JST, 2022 WL 2064976 (N.D. Cal. June 8, 2022). To establish an

22  entitlement to indirect profits, the plaintiff must show that "the infringement at least partially

23  caused the profits that the infringer generated," and not simply that income is "remotely or

---

24  [6] Although Bungie is also entitled to recover its actual damages, 17 U.S.C § 504, it is unable to calculate such
25  damages in this case. It is not possible to fully quantify the income lost as a result of players who have ceased
    purchasing game items from Bungie. In addition, because of the nature of the harm caused by cheating, there is
26  literally no price at which Bungie would license cheating software. Bungie is therefore requesting only
    disgorgement of profits or, in the alternative, statutory damages.

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 21
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    speculatively attributable to the infringement." *Griffo v. Oculus VR, Inc.*,

2    SACV151228DOCMRWX, 2018 WL 6265067, at \*9 (C.D. Cal. Sept. 18, 2018).

3        That requirement applies to both direct and indirect infringement, and determines what is

4    appropriately considered gross revenue under §504; a plaintiff cannot simply point to all of a

5    publisher's gross profits from all its sales as the gross revenue attributable to the infringing

6    inclusion of a poem in an anthology. *See Cisco Sys. Inc. v. Arista Networks, Inc.*, 14-CV-05344-

7    BLF, 2016 WL 11752975, at \*9 (N.D. Cal. Nov. 16, 2016) (*quoting On Davis v. The Gap, Inc.*,

8    246 F.3d 152 (2d Cir. 2001). Once the plaintiff has shown the causal nexus, the burden shifts to

9    the infringer to apportion any profits that were not the result of infringement. *Polar Bear Prods.,*

10   *Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004), *as amended on denial of reh'g and reh'g*

11   *en banc* (Oct. 25, 2004), *opinion amended on denial of reh'g*, 03-35188, 2004 WL 2376507 (9th

12   Cir. Oct. 25, 2004).

13       As a result of information acquired from Settling Defendants, Bungie was able to

14   differentiate Defendants' relevant gross revenues into two pools. The first is the $406,649.55 of

15   revenue that was derived from the sale of the infringing cheat, both as a standalone product and

16   from the sale of subscriptions to Defendants' cheat services, which included but was not limited

17   to the *Destiny 2* cheat. The cheat subscriptions are, in effect, an anthology of video game cheats;

18   the *Destiny 2* cheats are a component of that anthology. This pool of revenue includes direct

19   profits attributable to the sale of the infringing product, and it is Defendants' burden to apportion

20   any profits that are not attributable to the inclusion of the Cheats. *See On Davis v. The Gap, Inc.*,

21   246 F.3d 152, 160 (2d Cir. 2001). Larsen's refusal to participate in this litigation does not shift

22   that burden back to Bungie.

23       Second, there is a pool of gross revenue that consists of Defendants' convoyed sale of

24   other, non-*Destiny 2* cheats during the period of time that it offered the infringing Cheats.

25   Having cheats for high-popularity games in general and *Destiny 2* in particular was important to

26   Defendants' business not merely because of the direct revenues yielded by that product, but also

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 22
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  because having popular games allowed them to sell more cheats in total, including some that

2  would not otherwise have sold. Indeed, Defendants' business records show substantial drops

3  both in their overall revenue and in their overall cheat utilization when they ceased providing the

4  *Destiny 2* cheats. This is non-speculative evidence that the *Destiny 2* "infringement 'at least

5  partially' contributed to profits." *Apulent, Ltd. v. Jewel Hosp., Inc.*, C14-637RSL, 2015 WL

6  630953, at *5 (W.D. Wash. Feb. 12, 2015) (cleaned up). Applying the percentage by which

7  Defendants' non-*Destiny 2* cheat usage dropped after the *Destiny 2* cheat was no longer available

8  yields $60,069.35 in Wallhax revenue attributable to the availability of *Destiny 2*.  Thus, Bungie

9  is entitled to an award of $466,718.90, trebled to a total of $1,400,156.71.

10     iii.     **Plaintiff is Entitled to Compensation for Its Significant Mitigation Expenses**

11         Bungie is entitled to recover not only its cost of third-party anti-cheat software, but the

12  salaries it had to pay employees to work on its cheat mitigation efforts. *See U.S. v. Middleton*,

13  231 F.3d 1207 (9th Cir. 2000) (in criminal case, court could compute damages based on hours

14  worked and salaries paid to employees tasked with fixing CFAA problems). Bungie has

15  expended more than $2,000,000.00 on cheat mitigation, including game security staffing and

16  software, since the launch of Wallhax's *Destiny 2* Cheat in 2019. During the time that the

17  Wallhax Enterprise offered a *Destiny 2* Cheat, the Cheat market for *Destiny 2* was comprised of

18  three different cheat products: the Wallhax Cheat, the Ring -1 cheat, and the AimJunkies cheat,

19  each of which attempt to hack *Destiny 2* in different ways. As a coarse estimate, the Court finds

20  that roughly one-third of Bungie's cheat mitigation costs are attributable to the Wallhax Cheat,

21  and therefore awards Bungie $666,666.00 as baseline actual damages on its breach of contract,

22  RICO, WCPA, and CFAA claims.  Those baseline damages are trebled under RICO, 18 U.S.C. §

23  1964(c), and, subject to the statutory cap, under the WCPA. RCW 19.86.090, for a total of

24  $1,999,998.00.

25

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    iv.    **Plaintiff is Entitled to Recover its Attorney's Fees and Costs**

2           Bungie is permitted under multiple statutes to recover its attorney's fees and costs of

3    court. Section 1964(c) expressly allows a party that has been injured by a RICO violation to

4    recover reasonable attorney's fees in a civil RICO case. The Washington Consumer Protection

5    Act states that "a person who is injured by a violation of this chapter may bring an action for

6    recovery of actual damages, including court costs and attorneys' fees." RCW 19.138.280.

7    Additionally, Section 505 of the Copyright Act "grants courts wide latitude to award attorney's

8    fees based on the totality of circumstances in a case." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136

9    S. Ct. 1979, 1985 (2016). Bungie has incurred $267,887.10 in attorney's fees to date. Cohen

10   Dec, ¶ 17;[7] Declaration of Brian Esler, ¶ 3. Bungie's attorney's fees were all reasonably incurred

11   in the process of litigating this action, and they are entitled to recover them by the RICO Act, the

12   Washington Consumer Protection Act, and the Copyright Act. In addition, Bungie has incurred

13   $80,263.92 in costs relating to this action, including expert fees. Barker Dec, ¶ 28. Bungie is

14   entitled to an award of those fees and costs.

15   **D.  PLAINTIFF IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF.**

16          In addition to statutory damages, the Court permanently enjoins Larsen from further

17   infringing Plaintiff's rights and attacking their business by simply recreating the scheme under a

18   different name or developing new cheat software to sell with a different enterprise. "As a general

19   rule, a permanent injunction will be granted when liability has been established and there is a

20   threat of continuing violations." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th

21   Cir. 1993). The Copyright Act specifically provides that a court may "grant temporary and final

22   injunctions on such terms at it may deem reasonable to prevent or restrain infringement of a

23   copyright." 17 U.S.C. § 502(a). Additionally, Larsen's liability for violations of the CFAA and

24

25   _____

26   [7] The Court will entertain a supplemental submission to capture any fees incurred too recently to be included in
     Bungie's submissions.

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 24
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1    the Racketeer Influenced and Corrupt Organizations Act provide this Court ample reason to

2    grant permanent injunctive relief. 18 U.S.C. § 1964(a); 18 U.S.C. § 1030(g).

3          A plaintiff seeking permanent injunctive relief must demonstrate: "(1) that it has suffered

4    an irreparable injury; (2) that remedies available at law, such as monetary damages, are

5    inadequate to compensate for that injury; (3) that, considering the balance of hardships between

6    the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

7    would not be disserved by a permanent injunction." *eBay, Inc. v. MercExchange, LLC*, 547 U.S.

8    388, 391 (2006). All four factors are met.

9         i.    **Plaintiff Suffered Irreparable Harm**

10         Bungie has suffered, and will continue to suffer, irreparable injury by virtue of Larsen's

11    willful infringements, violations, and criminal conduct. Loss of prospective customers and

12    goodwill is irreparable, because it cannot be easily calculated and compensated for by a money

13    judgment. *See, e.g., Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir.

14    2001); *eBay, Inc. v. Bidder's Edge*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm

15    resulting from lost profits and lost customer goodwill is irreparable because it is neither easily

16    calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief.");

17    *CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal. 2009) (copyright

18    infringement may specifically constitute irreparable harm "in the loss of control of a business's

19    reputation" and in the "loss of trade and … goodwill"), *aff'd,* 348 F. App'x 288 (9th Cir. 2009).

20         Here, as established by the well-plead complaint and supporting evidence, the illegal

21    activity of the Wallhax Enterprise has disrupted Bungie's business relationships, caused them to

22    lose current and prospective customers, and damaged their brand and reputation. Dkt No. 1, ¶¶ 5,

23    222, 287, 297; Barker Dec, ¶¶ 13-14, 25. Accordingly, the Court finds that Plaintiff suffered, and

24    will continue to suffer, irreparable harm in the absence of permanent injunctive relief. *See Getty*

25    *Images I v. Virtual Clini*cs, No. C13-0626JLR, 2014 WL 1116775, at *6 (W.D. Wash. Mar. 20,

26

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  2014) (finding irreparable harm because Getty faced potential loss of customers, goodwill, and

2  reputation from defendant's unlicensed use of Getty's images).

3  ii.    **Monetary Damages Alone Are Inadequate**

4  "For the second factor, the plaintiff must show that 'remedies available at law, such as

5  monetary damages, are inadequate to compensate for the injury.'" *Getty Images II*, 2014 WL

6  1116775, at *6 (quoting *eBay*, 547 U.S. at 391). A defendant's failure to appear suggests their

7  "infringing activities will not cease absent judicial intervention." *Warner Bros. Home Entm't Inc.*

8  *v. Jimenez*, 2013 WL 3397672, at *7 (C.D. Cal. 2013); *see also Jackson v. Sturkie*, 255 F. Supp.

9  2d 1096, 1103 (N.D. Cal 2003) ("[D]efendant's lack of participation in this litigation has given

10 the court no assurance that defendant's infringing activity will cease"). Here, monetary damages

11 are insufficient for the same reason that the harm is irreparable: because Bungie's lost business is

12 impossible to calculate, no award of compensatory damages can make it whole, and without an

13 injunction, Larsen's activities will continue. "Loss of sales is notoriously difficult to calculate,

14 making money damages an inadequate remedy" *Edwards Vacuum, LLC v. Hoffman*

15 *Instrumentation Supply, Inc.*, 538 F. Supp. 3d 1132, 1146 (D. Or. 2021) (cleaned up), *quoting*

16 *Neurovision Medical Products, Inc. v. NuVasive, Inc.*, 2014 WL 12554861, at *1 (C.D. Cal. Aug.

17 5, 2014).

18 iii.   **The Balance of Equities Favors a Permanent Injunction**

19 Larsen has no legitimate interest in continuing to profit from his exploitation and abuse of

20 Bungie's work. *Disney*, 869 F.3d at 866-67; *see Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534

21 F. App'x 633, 636 (9th Cir. 2013) (that injunction might drive defendant out of business was

22 irrelevant when defendant's business rests on infringing plaintiff's intellectual property);

23 *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects

24 to build a business on a product found to infringe cannot be heard to complain if an injunction

25 against continuing infringement destroys the business so elected."). And absent an injunction,

26 Bungie will continue to suffer further irreparable harm as a result of Defendants' willful

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 26
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  misconduct. Thus, the balance of harms weighs decidedly in Bungie's favor. *See, e.g., Wecosign,*

2  *Inc. v. IFG Holdings, Inc.*, 845 (C.D. Cal. 2012) ("[W]ithout an injunction, Plaintiff will lose

3  profits and goodwill, while an injunction will only proscribe Defendants' infringing activities.").

4  As Larsen has no right to continue his wanton and damaging misconduct, a permanent injunction

5  against these activities is necessary and prudent.

6       iv.    **The Public Interest Would Be Served by a Permanent Injunction**

7       Courts routinely find that 'the public interest is served when the rights of copyright

8  holders are protected against acts likely constituting infringement,'" *Getty Images II*, 2014 WL

9  1116775, at *7 (citation omitted), as the public has a strong interest in not being taken in by

10  fraudulent and infringing conduct. *see Internet Specialties W., Inc. v. Milon- DiGiorgio Enters.,*

11  *Inc.*, 559 F.3d 985, 993 n.5 (9th Cir. 2009). The Wallhax Enterprise has damaged consumer

12  confidence in Bungie's product and "sneer[ed] in the face of copyright owners and copyright

13  laws." *See Tu v. TAD Sys. Tech. Inc.*, 2009 WL 2905780, at *3 (E.D.N.Y. 2009) (citation &

14  internal quotation marks omitted). Even without considering the myriad other laws Larsen's

15  conduct breaks, it is manifestly in the public's interest that he be permanently enjoined from

16  continuing his illegal and tortious conduct.

17       THEREFORE, the Court enters judgment in the total amount of **$17,278,305.73** as

18  outlined above, and in addition, pursuant to 17 U.S.C. §§ 502, 504, 505, 506, and 1201, and this

19  Court's inherent equitable powers, the Court ORDERS as follows:

20       1.    Defendant, all persons acting under Defendant's direction or control (including

21  but not limited to Defendant's agents, representatives, and employees), and those persons or

22  companies in active concert or participation with Defendant who receive actual notice of this

23  Order by personal service or otherwise, must immediately and permanently cease and desist from

24  any of the following:

25       a.    Taking any steps on Defendant's own behalf or assisting others in creating,

26            distributing, advertising, marketing or otherwise making available; obtaining,

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   possessing, accessing or using; promoting, advertising, or encouraging or
2   inducing others to purchase or use (including via any social media account,
3   website, or video-sharing account); selling, reselling, or processing payments for;
4   assisting in any way with the development of; sharing, copying, transferring, or
5   distributing; publishing or distributing any source code or instructional material
6   for the creation of; or operating, assisting, promoting or linking to any website
7   designed to provide information to assist others in accessing, developing or
8   obtaining: (i) the Destiny 2 Software Module, either alone, or in conjunction with
9   the Defendant's Software; or (ii) any software whose use infringes Intellectual
10  Property owned or controlled by Plaintiff or its parents, subsidiaries, or affiliates
11  (collectively, "Plaintiff"), circumvents technological measures that effectively
12  control access to Plaintiff's games, violates Plaintiff's licensing agreements,
13  assists players of Plaintiff's games in violating Plaintiff's licensing agreements, or
14  is designed to exploit or enable the exploitation of any game owned, published,
15  distributed or operated by Plaintiff.

16  b.   Investing or holding any financial interest in any enterprise, product, or company
17       which Defendant knows or has reason to know is now, or intends in the future to
18       be, engaged in any of the foregoing activities prohibited by this Judgment and
19       Permanent Injunction.

20  c.   Reverse engineering, decompiling, packet editing, or otherwise manipulating
21       without authorization, any game owned, published, or operated by Plaintiff, or
22       providing any assistance to any person or entity engaged in such activities.

23  2.   The Court further enjoins Defendant and all third parties acting in concert and
24  participation with Defendant, including but not limited to any domain name registrars or
25  registries holding or listing any of Defendant's websites or storefronts, from supporting or
26  facilitating access to any and all domain names, URLs, and websites (including, but not limited

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 28
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1  to, insert sites), including any and all future and successor domain names, URLs, and websites,

2  through which Defendant traffic in circumvention devices that threaten Plaintiff's technological

3  protection measures or which infringe Plaintiff's Intellectual Property rights.

4        3.     Defendant is prohibited from using any social network, video sharing, or digital

5  messaging accounts under their control (including, but not limited to, Facebook, groups or chats

6  on Facebook, YouTube, Twitter, Tik Tok, Discord, GBATemp, Reddit, Telegram, Skype,

7  WeChat, WhatsApp, Signal, or their equivalent) to provide any content relating to the

8  distribution, marketing, offering for sale, or promotion of the Defendant's Cheat software or any

9  other software whose use infringes any of Plaintiff's Intellectual Property Rights, circumvents

10  Plaintiff's technological measures that effectively control access to Plaintiff's games, or violates

11  (or assists players of Plaintiff's games in violating) Plaintiff's license agreements, and must take

12  all necessary steps to remove any information on any non-dedicated (e.g., personal) social

13  network accounts under Defendants' control used to distribute or promote any of the foregoing.

14        4.     Defendant is further prohibited from engaging in any other violation of the Digital

15  Millennium Copyright Act or the Copyright Act, or any other federal or state law, with respect to

16  Plaintiff and its intellectual property.

17        5.     Defendant must destroy the Destiny 2 Software Module or any software that in

18  any way interacts with or pertains to Plaintiffs' Intellectual Property.

19        6.     This permanent injunction constitutes a binding court order, and any violations of

20  this order by Defendant will subject them to the full scope of this Court's contempt authority,

21  including punitive, coercive, and monetary sanctions.

22        7.     Any company or entity that any of Defendant controls in the future will also

23  comply with the provisions of this Judgment and Permanent Injunction.

24        8.     This permanent injunction is binding against Defendant worldwide, without

25  regard to the territorial scope of the specific intellectual property rights asserted in the Complaint

26

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 29
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1   and may be enforced in any court of competent jurisdiction wherever Defendants or their assets

2   may be found.

3         9.     Nothing contained in this Judgment and Permanent Injunction limits the right of

4   the Plaintiff to seek relief, including without limitation damages, for any infringements of any

5   Intellectual Property rights occurring after the date of this Judgment and Permanent Injunction.

6         10.    The Court finds there is no just reason for delay in entering this Judgment and

7   Permanent Injunction and, pursuant to Federal Rule of Civil Procedure 54, the Court directs

8   immediate entry of this Judgment and Permanent Injunction against Defendants.

9

10

11        DATED this _____ day of _____, 2023.

12

13                           _____

14                           Tana Lin
                               UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 30
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121

1

2

3    Presented by:

4    By: s/ *Brian W. Esler*
     Brian W. Esler, WSBA No. 22168
5    MILLER NASH LLP
     Pier 70
6    2801 Alaskan Way, Suite 300
     Seattle, WA 98121
7    Telephone: (206) 624-8300
     Fax: (206) 340-9599
8    Email: brian.esler@millernash.com

9    Akiva M. Cohen, New York Bar No.
     4328969 (Admitted *pro hac vice*)
10   KAMERMAN, UNCYK, SONIKER
     & KLEIN, P.C.
11   1700 Broadway
     New York, NY 10019
12   Telephone: (212) 400-4930
     Email: acohen@kusklaw.com
13
     Dylan M. Schmeyer, Colorado Bar No.
14   50573
     (Admitted *pro hac vice*)
15   KAMERMAN, UNCYK, SONIKER
     & KLEIN, P.C.
16   750 W. 148th Ave #4216
     Westminster, CO 80023
17   Telephone: (719) 930-5942
     Email: dschmeyer@kusklaw.com
18
           Attorneys for Plaintiff
19

20   4896-0963-8732.2

21

22

23

24

25

26

ORDER GRANTING MOTION FOR
DEFAULT JUDGMENT - 31
(Case No. 2:21-cv-01112-TL)

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, STE 300
SEATTLE, WASHINGTON 98121