1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10

11

BUNGIE, INC.,

12

Plaintiff,

v.

13

ELITE BOSS TECH INCORPORATED,
11020781 CANADA INC., DANIEL
FAGERBERG LARSEN, ROBERT
JAMES DUTHIE NELSON,
SEBASTIAAN JUAN THEODOOR
CRUDEN A/K/A "LUZYPHER," JOHN
DOE NO. 4 A/K/A "GOODMAN,"
YUNXUAN DENG A/K/A
"YIMOSECAI," ANTHONY
ROBINSON A/K/A "RULEZZGAME,"
EDDIE TRAN A/K/A "SENTIENT",
CHENZHIJIE CHEN A/K/A
"CHENZHIJIE402, DSOFT, CVR
37454303, MARTA MAGALHAES
A/K/A MINDBENDER A/K/A
BLUEGIRL, AND JOHN DOES NO. 9-
20,

Defendants.

14

15

16

17

18

19

20

21

22

CASE NO. 2:21-cv-01112-TL

ORDER GRANTING IN PART
PLAINTIFF'S MOTION FOR
DEFAULT JUDGMENT

23

24

This matter comes before the Court on Plaintiff Bungie, Inc.'s Motion for Default Judgment. Dkt. Nos. 75-1, 76-1 (sealed). Having reviewed the Motion and all supporting materials, the Court GRANTS in part the Motion, ENTERS default judgment against Defendant Daniel Fagerberg Larsen, and ENTERS a permanent injunction against Larsen on the terms set forth in this Order.

## I.   BACKGROUND

Operating out of Bellevue, Washington, Bungie develops, distributes, and owns the intellectual property rights to a video game called "Destiny 2", which is part of its "Destiny" franchise. Dkt. No. 43 ¶¶ 10, 50. Bungie alleges that Larsen, a resident of Denmark, and Defendant Robert Nelson and Patrick Schaufuss[1] developed, marketed, and sold "cheat" software for Destiny 2 through a website "Wallhax.com" that allowed users of Destiny 2 an unfair advantage when playing the game. *Id*. ¶ 1. The Court refers to the cheat as the "Wallhax cheat" and the business run by Larsen, Nelson, and Schaufuss as "Wallhax."

Bungie alleges and has provided evidence that Larsen helped develop the software code and framework of the Wallhax cheat. *See* Dkt. No. 63 ¶¶ 5–8; Dkt. No. 68 ¶¶ 4–5 (sealed). Larsen worked together with Nelson and Schaufuss to develop, market, and sell the Wallhax cheat to consumers around the world. *See* Dkt. No. 63 ¶¶ 2–11; Dkt. No. 68 ¶ 5 (sealed); Dkt. No. 64 ¶ 14; Dkt. No. 64-13. Through a consent judgment, Nelson agreed the Wallhax cheat has been downloaded 6,765 times. Dkt. No. 29 ¶ 5. Nelson also agreed that the Wallhax cheat willfully violated Bungie's two copyrights associated with Destiny 2—for its audiovisual work and software code. *Id*. ¶¶ 1–3. Nelson also agreed that the Wallhax cheat circumvented the technological measures Bungie employs to control and limit access to its Destiny 2 software,

---

[1] The Court notes that Schaufuss was named in the initial complaint as a defendant but was dropped as a defendant in the FAC.

1    such that each download of the Wallhax cheat constated a violation of the Digital Millennium

2    Copyright Act ("DMCA"), 17 U.S.C. § 1201(a) and (b). *Id.* ¶¶ 4–5. The Parties agreed that

3    judgment should be entered in the amount of $13,530,000, representing statutory damages of

4    $2,000 for each of the 6,765 downloads. *Id.* ¶ 6. Defendants consented to entry of a broad

5    permanent injunction concerning any further copyright infringement, and Bungie withdrew all

6    other claims. *Id.* ¶ 7.

7         Bungie asserts the following claims against Larsen: (1) copyright infringement;

8    (2) violations of the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

9    U.S.C. § 1962; (3) violations of the DMCA; (4) violations of the Computer Fraud and Abuse Act

10   ("CFAA"), 18 U.S.C. § 1030(a)(5)(B); (5) breach of contract; (6) intentional interference with

11   contractual relations; (7) violations of the Washington Consumer Protection Act ("CPA"); and

12   (8) civil conspiracy. Dkt. No. 43 ¶¶ 164–319. Bungie seeks entry of default judgment on all

13   claims, asking for judgment to be entered in the amount of $17,278,305.73. This total represents

14   the sum of: (1) $13,530,000 in statutory damages under the DMCA (Dkt. No. 76-1 at 36–38

15   (sealed)); (2) $466,718.90 as damages for its copyright claim, which Bungie asks to be trebled to

16   $1,400,156.71 (*id.* at 38–41 (sealed)); (3) $666,666.00 in actual damages for its breach of

17   contract, RICO, CFAA, and CPA claims, which Bungie asks to be trebled $1,999,998.00 (*id.* at

18   41–42 (sealed)); and (4) $267,887.10 in attorney fees and $80,263.92 in costs (Dkt. No. 64 ¶ 17;

19   Dkt. No. 65 ¶ 3; Dkt. No. 76-3 ¶ 28 (sealed)). Bungie also asks for entry of a permanent

20   injunction barring Larsen from engaging in future or further conduct that forms the basis of its

21   claims in this action.

22

23

24

## II.   ANALYSIS

### A.   Legal Standard

The Court has already found Larsen in default. Dkt. No. 35. After entry of default, the Court may enter a default judgment. Fed. R. Civ. P. 55(b). This determination is discretionary. *See Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988). "Factors which may be considered by courts in exercising discretion as to the entry of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986). In performing this analysis, "the general rule is that well-pled allegations in the complaint regarding liability are deemed true." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (quotation and citation omitted). And "[t]he district court is not required to make detailed findings of fact." *Id.*

### B.   Jurisdiction

Before entering default judgment, the Court must assure itself that it has subject matter jurisdiction and personal jurisdiction.

There is little doubt that the Court has subject matter jurisdiction over Bungie's claims. Bungie brings claims under various federal laws, which fall within the Court's original jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a). The Court has supplemental jurisdiction over Bungie's state-law claims pursuant to 28 U.S.C. § 1367(a).

The Court also finds that it has personal jurisdiction over Larsen. A valid contractual forum selection clause to which a defendant has consented may satisfy personal jurisdiction. *See*

1   *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007) (noting that a

2   forum selection clause may give rise to a waiver of objection provided the defendant agreed to be

3   bound). Bungie has provided evidence that Larsen agreed to the terms of Bungie's Limited

4   Software License Agreement ("LSLA"), which required Larsen to "agree to submit to the

5   personal jurisdiction of any federal or state court in King County, Washington." Dkt. No. 43 ¶

6   40. The Court accepts as true that Larsen agreed to these terms, given the well-pleaded

7   allegations in the Amended Complaint. And the additional evidence submitted strongly suggests

8   that Larsen had to have agreed to the LSLA in order to develop and refine the Wallhax cheat.

9   Dkt. No. 76-3 ¶ 17 (sealed); Dkt. No. 63 ¶¶ 33–34.

10  **C.      *Eitel* Factors Favor Default Judgment**

11         The Court reviews the *Eitel* factors to assess whether default judgment should be entered

12  and in what specific amounts. The seven *Eitel* factors weigh in favor of entry of default judgment

13  in Bungie's favor. But the Court finds that the judgment shall not be entered as to all claims or in

14  the full amount Bungie requests.

15         **1.      Factor One: Prejudice to Bungie**

16         Without entry of default judgment Bungie will be prejudiced. Bungie has attempted to

17  litigate this case and vindicate its rights under federal and state law against Larsen and the other

18  defendants. Indeed, Bungie was able to settle its claims with Nelson and the corporate entities he

19  owns, which led to entry of a consent judgment. But Larsen has failed to appear or participate in

20  this litigation despite being personally served. Bungie faces prejudice by not being able to obtain

21  complete relief on its claims against Larsen without entry of default judgment. This factor

22  weighs in favor of granting default judgment.

23

24

1

2   **2.      Factors Two and Three: Merits of Bungie's Claims and Sufficiency of Complaint**

3      Bungie has demonstrated the merit of its claims and the sufficiency of the amended

4   complaint as to all but the CPA claim. The Court reviews each claim.

5      **a.      *Copyright Infringement***

6      "To establish direct copyright infringement, the [plaintiff] must (1) show ownership of

7   the allegedly infringed material and (2) demonstrate that the alleged infringers violate at least

8   one exclusive right granted to copyright holders under 17 U.S.C. § 106." *Disney Enters., Inc. v.*

9   *VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citation and quotation omitted). "To prove

10  'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually

11  aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless

12  disregard' for, or 'willful blindness' to, the copyright holder's rights." *Louis Vuitton Malletier,*

13  *S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011) (citation and quotation omitted).

14     Bungie has sufficiently alleged a meritorious claim of willful copyright infringement.

15  Bungie has copyright registrations for Destiny 2 both as an audiovisual work and as software,

16  establishing its ownership. Dkt. No. 76-3 ¶ 3 (sealed); Dkt. No. 62-1. Bungie has alleged and

17  provided evidence that Larsen was a partner in Wallhax and helped develop the Wallhax cheat

18  which directly infringed on Bungie's copyrighted works in a variety of ways. Dkt. No. 43 ¶¶ 87–

19  106, 164–179; Dkt. No. 63 ¶¶ 2–9, 28–30, 31–34; Dkt. No. 68 ¶¶ 5, 7, 10–12 (sealed). And

20  Bungie has provided cogent allegations and additional evidence that Larsen's infringement was

21  willful. Dkt. No. 43 ¶¶ 146–163, 184; Dkt. No. 63 ¶¶ 2–9, 15–16, 23–27, 33–34; Dkt. No. 68 ¶¶

22  11–14 (sealed).

23     The Court finds that entry of default judgment on these claims is proper.

24

### b.    *Civil RICO*

Bungie's well-pled complaint and supporting evidence establish Larsen's liability under the civil RICO statute. To prevail on its RICO claim, Bungie must show: (1) a violation of 18 U.S.C. § 1962; (2) injury to its business or property; and (3) causation of the injury by the violation. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 451 (2006). The Court first examines the three alleged § 1962 violations and then the final two elements of the claim.

### (1)    Violations of § 1962(c)

To prove a violation under § 1962(c), Bungie must prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (citation and quotation omitted). Bungie has demonstrated sufficient allegations and evidence that Larsen, Schaufuss, and Nelson operated the Wallhax business as an ongoing organization that acted as a continuing unit to help them develop and sell the Wallhax cheat. *See Boyle v. United States*, 556 U.S. 938, 944–45 (noting that "an enterprise includes any union or group of individuals associated in fact" which can be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." (citation and quotation omitted)); Dkt. No. 43 ¶¶ 198–212; Dkt. No. 63 ¶¶ 15–16, 19. Bungie has provided evidence that Larsen conducted a key part of the enterprise, by developing and refining the Wallhax cheat. *See* Dkt. No. 63 ¶¶ 2–10, 35–37; Dkt. No. 68 ¶¶ 5, 16 (sealed).

Bungie has also shown that the Wallhax enterprise engaged in various predicate acts that injured Bungie's business. Specifically, Bungie has alleged and provided evidence that Larsen and the enterprise engaged in criminal copyright infringement and money laundering in violation of 18 U.S.C. §§ 1956 and 1957. As to criminal copyright infringement, Bungie must demonstrate

that Larsen willfully infringed on a valid copyright for purposes of commercial advantage or private financial gain. *See* 17 U.S.C. § 506(a). Here, the allegations and evidence suffice to show that Larsen willfully accessed and utilized Bungie's Destiny 2 software in order to develop the Wallhax cheat, which directly infringed on Bungie's two valid copyrights for Larsen's personal gain. Dkt. No. 43 ¶¶ 164–195, 222–23; Dkt. No. 63 ¶¶ 7, 27–34. The allegations and evidence are also sufficient to satisfy the predicate act of money laundering. A defendant engages in money laundering under 18 U.S.C. § 1956(a)(1)(A)(i) when they (1) conduct (or attempt to conduct) (2) a financial transaction, (3) knowing that the property involved in the financial transaction represents the proceeds of some unlawful activity, (4) with the intent to promote the carrying on of specified unlawful activity, and (5) the property was in fact be derived from a specified unlawful activity. 18 U.S.C. § 1956(a)(1). Bungie has shown that Larsen and the Wallhax enterprise obtained financial proceeds from the sale of the Wallhax cheat, which was the product of criminal copyright infringement. Dkt. No. 43 ¶¶ 164–195, 224–26; Dkt. No. 63 ¶¶ 15–27.

Bungie has shown a pattern of racketeering activity through the continuous operation of the Wallhax enterprise and over 6,000 downloads of the Wallhax cheat from at least 2019 through 2021. Dkt. No. 63 ¶¶ 14–15, 26, 35; *see Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1527 (9th Cir. 1995).

The Court does not reach Bungie's allegations that these acts constituted wire fraud, as doing so is unnecessary and the Court has doubt as to whether such a claim is adequately pleaded.

### (2)  Violation of § 1962(a) and (b)

The Court also finds that Bungie has demonstrated violations of 18 U.S.C. § 1962(a) and (b) by (1) Larsen receiving income from the Wallhax enterprise that was reinvested in the enterprise to develop as well as market new cheats; and (2) Larsen having an interest and control in the enterprise. *See* Dkt. No. 43 ¶¶ 196–212, 224–226; Dkt. No. 63 ¶¶ 6–9. The enterprise is

engaged in interstate or foreign commerce as it exists for the sole purpose of selling the Wallhax cheats. Dkt. No. 63 ¶ 16. This satisfies Bungie's burden as to the first element of the RICO claim.

### (3)   Remaining RICO elements

As to the final two elements of the RICO claim, Bungie has shown an injury to its business or property that was proximately caused by the Wallhax enterprise's conduct. To satisfy these elements, Bungie "must show that [it] has suffered a concrete financial loss by documenting the amount of damages to which he is entitled." *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1021 (9th Cir. 2001). Here, Bungie has provided evidence that it has expended a minimum of $2,000,000 on security staffing and software to address the fallout from the Wallhax cheat and two other software cheats impacting the Destiny 2 game. Dkt. No. 76-3 ¶¶ 25–26 (sealed).

\*     \*     \*

In sum, the Court is satisfied that Bungie has sufficiently alleged a violation of RICO. The Court finds that entry of default judgment on these claims is proper.

### c.   *The Digital Millennium Copyright Act*

The DMCA prohibits the circumvention of any technological measure that effectively controls access to a protected work and grants copyright owners the right to enforce that prohibition. 17 U.S.C. § 1201(a). Bungie may prove its claim under § 1201 by demonstrating that Larsen: "(1) traffic[ked] in (2) a technology or part thereof (3) that is primarily designed, produced, or marketed for, or has limited commercially significant use other than (4) circumventing a technological measure (5) that effectively controls access (6) to a copyrighted work." *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 953 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g*, No. C09-15932, 2011 WL 538748 (9th Cir. Feb. 17, 2011). Here, Bungie has provided allegations and evidence that Larsen developed and designed the Wallhax cheat to circumvent

Bungie's technological measures to protect its copyrighted works in violation of § 1201(a). Dkt. No. 43 ¶¶ 233–51; Dkt. No. 63 ¶¶ 16–23; Dkt. No. 68 ¶ 5, 9 (sealed); Dkt. No. 67 ¶ 52 (sealed). And Bungie has shown that the Wallhax cheat circumvented the controls and that Larson himself evaded those controls by opening new accounts after being banned. *See* Dkt. No. 68 ¶ 8–9 (sealed); Dkt. No. 67 ¶¶ 34–35 (sealed); Dkt. No. 76-3 ¶¶ 19, 21, 23 (sealed); Dkt. No. 63 ¶¶ 33–34. Additionally, Bungie has shown that Larsen violated § 1201(b)(1) by creating an infringing derivative work. The Court finds that entry of default judgment on these claims is proper.

### d.   *CFAA*

The CFAA states that "[w]hoever . . . intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer . . . shall be punished" by fine or imprisonment. 18 U.S.C. § 1030(a)(2)(C). "The term 'protected computer' refers to any computer 'used in or affecting interstate or foreign commerce or communication,' 18 U.S.C. § 1030(e)(2)(B)—effectively any computer connected to the Internet—including servers, computers that manage network resources and provide data to other computers." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1195 (9th Cir. 2022) (citation omitted).

Bungie has provided sufficient allegations and evidence that Larsen violated the CFAA when he intentionally accessed the Destiny 2 servers to obtain the Destiny 2 software to create the Wallhax cheat without authorization. Dkt. No. 43 ¶¶ 252–74. By doing so, Larsen violated that terms of the LSLA and manipulated key elements of the Destiny 2 software through the Wallhax cheat. *See* Dkt. No. 76-3 ¶ 6 (sealed); Dkt. No. 67 ¶¶ 9, 35 (sealed); Dkt. No. 68 ¶ 11 (sealed). Bungie has also provided evidence that Larsen's efforts have caused it damage by requiring increased security measures. *See* Dkt. No. 76-3 ¶¶ 16–23 (sealed). The Court finds that entry of default judgment on these claims is proper.

1

2

        e.      ***Breach of Contract and Intentional Interference with Contractual Relationship***

3

4

     To prove a breach of contract, Bungie must demonstrate that the "contract imposes a

duty, the duty is breached, and the breach proximately causes damage to" it. *See Nw. Indep.*

*Forest Mfrs. v. Dep't of Lab. & Indus.*, 78 Wn. App. 707, 712 (1995). "A claim for tortious

5

interference with a contractual relationship or business expectancy requires five elements: (1) the

6

existence of a valid contractual relationship or business expectancy; (2) that defendants had

7

knowledge of that relationship; (3) an intentional interference inducing or causing a breach or

8

termination of the relationship or expectancy; (4) that defendants interfered for an improper

9

purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce Cnty. Med.*

10

*Bureau, Inc.*, 131 Wn.2d 133, 157 (1997). "Intentional interference requires an improper objective

11

or the use of wrongful means that in fact cause injury to the person's contractual relationship." *Id.*

12

     Bungie has provided sufficient allegations and evidence that Larsen breached the terms of

13

the LSLA and tortiously interfered with Bungie's contractual relationship with other users of

14

Destiny 2. Bungie has shown that Larsen violated the terms of the LSLA by accessing Destiny 2

15

and the underlying software to create the Wallhax cheat and by creating multiple accounts after

16

being banned. *See* Dkt. No. 76-3 ¶ 6 (sealed); Dkt. No. 67 ¶¶ 9, 35 (sealed); Dkt. No. 68 ¶ 11

17

(sealed). And by selling the Wallhax cheat to other users of Destiny 2, Larsen induced other

18

users to violate the terms of the LSLA and interfere with Bungie's control of Destiny 2 and the

19

gaming environment through which it intended to generate revenue. *See* Dkt. No. 64-4 at

20

73:2028 (noting Defendants' acknowledgement that the cheat encouraged players to violate the

21

LSLA). And Bungie has shown that it suffered damages through this conduct by losing out on

22

in-game revenue and expending substantial sums to combat the Wallhax cheat. *See* Dkt. No. 76-

23

3 ¶¶ 13–15, 24–27 (sealed). The Court finds that entry of default judgment on these claims is proper.

24

### f.     *CPA*

To prevail on its CPA claim, Bungie must establish "(1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 37 (2009) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784 (1986)). "[A] claim under the Washington CPA may be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest." *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787 (2013).

The Court remains unconvinced that Bungie has alleged a valid CPA claim. Specifically, it has not provided evidence of an unfair or deceptive act that had the capacity to deceive a substantial portion of the public. The Wallhax cheat was developed and sold as an express means to allow players to cheat in the Destiny 2 game. There are no cogent allegations or evidence that individuals who purchased the Wallhax cheat were deceived or that they did not intend to purchase a cheat-enabling software. Bungie suggests that Wallhax deceived consumers by failing to disclose the fact that the software logged and retained personal identifying information. But Bungie overstates the nature of the information collected, which does not actually appear to reveal anything more than top-level browser information. *See* Dkt. No. 76-1 at 34 (sealed); Dkt. No. 67 ¶¶ 39–50 (sealed). Even if this conduct injured purchasers of the Wallhax cheat, Bungie has not shown how this conduct caused it to suffer any injury. The Court rejects Bungie's request for entry of default judgment on this claim.

### g.     *Civil Conspiracy*

To establish a claim for civil conspiracy, a plaintiff must show "(1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by

1    unlawful means; and (2) . . . an agreement to accomplish the conspiracy." *Woody v. Stapp*, 146

2    Wn. App. 16, 22 (Wash. Ct. App. 2008) (internal citation omitted). A claim for civil conspiracy

3    must be predicated on "a cognizable and separate underlying claim." *Gossen v. JPMorgan Chase*

4    *Bank*, 819 F. Supp. 2d 1162, 1171 (W.D. Wash. 2011).

5        The Court finds that Bungie has sufficiently alleged a claim of civil conspiracy. As

6    explained above in its analysis of Bungie's RICO claim, Bungie has shown that Larsen conspired

7    with Nelson and Schaufuss the unlawfully develop and sell the Wallhax cheat. This claim is

8    predicated on the other cognizable claims, as explained above. The Court finds that entry of

9    default judgment on these claims is proper.

10       **3.    Factor Four: Sum of Money at Stake**

11       Given the substantial sums that are at stake and the seriousness of the alleged

12   misconduct, the Court finds that this *Eitel* factor favors entry of default judgment

13       **4.    Factor Five: Possibility of Dispute of Material Facts**

14       The Court finds little possibility that the core, material facts are in dispute. Not only has

15   Larsen failed to appear in this action, but Bungie has provided detailed evidence in support of its

16   claims that is likely difficult to be rebutted. The Court also notes that Nelson consented to entry

17   of judgment in Bungie's favor on its Copyright Act and DMCA claims, which confirms many of

18   the key allegations concerning Larsen's liability. This factor favors entry of default judgment.

19       **5.    Factor Six: Whether Default is Due to Excusable Neglect**

20       There is no evidence that Larsen's failure to appear is due to excusable neglect. Nelson

21   also avers that Larsen was aware of this litigation, but believed he was beyond the reach of the

22   courts. *See* Dkt. No. 63 ¶¶ 35–37. This factor favors entry of default judgment.

23

24

1        **6.      Factor Seven: Strong Policy in Favor of Decision on the Merits**

2        The Court maintains a strong policy preference in favor of resolution of Bungie's claims

3  on the merits. But Larsen's decision not to appear in this case vitiates against this policy. This

4  factor weighs in favor of entry of default judgment.

5                                *      *      *

6        Having considered and balanced the *Eitel* factors, the Court finds that entry of default

7  judgment is proper on all but the CPA claim. On this basis, the Court GRANTS the Motion in part.

8  **D.      Amount of the Default Judgment**

9        Bungie asks the Court to award it: (1) $13,530,000 in statutory damages for Larsen's

10 violation of the DMCA; (2) $466,718.90 in damages for its copyright claim, which Bungie asks

11 to be trebled to $1,400,156.71; (3) $666,666.00 in actual damages for its breach of contract,

12 RICO, CFAA, and CPA claims, which Bungie asks to be trebled to $1,999,998.00; and

13 (4) $267,887.10 in attorney fees and $80,263.92 in costs. The Court agrees in part.

14       First, Bungie is entitled to statutory damages for Larsen's violations of the DMCA.

15 Under the Act, the Court may award statutory damages "in the sum of not less than $200 or more

16 than $2,500 per act of circumvention, device, product, component, offer, or performance of

17 service, as the court considers just." 17 U.S.C. § 1203(c)(3). Based on the allegations in the

18 complaint and the evidence provided, the Court is satisfied that Larsen's violations of the DMCA

19 were willful and that an award of up to $2,500 per download of the Wallhax cheat is "just." *See,*

20 *e.g.*, *Sony Computer Ent. Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1075 (N.D. Cal. 2005)

21 (finding that an award of $2,500 for the willful sale of copyright infringing devices). Bungie has

22 asked for only $2,000 per download and the Court finds that this amount is appropriate. The

23 Court will therefore enter default judgment in the amount of $13,530,000 for Larsen's violation

24 of the DMCA. This is also consistent with the amount of the consent judgment entered against Nelson.

1       Second, while Bungie is entitled to recovery of both actual damages and statutory

2   damages under the Copyright Act, it has shown only that it is entitled to statutory damages. *See*

3   17 U.S.C. § 504(a). Bungie seeks to recover what it claims to be Larsen's profits from the

4   copyright infringement as permitted by 17 U.S.C. § 504(b), admitting that it is otherwise "unable

5   to calculate such damages in this case." Dkt. No. 76-1 at 38 n.9 (sealed). Without citing any

6   specific evidence, Bungie asserts that Larsen's profits total $466,718.90. *Id*. at 37–40 (referring

7   to "information acquired from Settling Defendants" without any specificity.) The only evidence

8   as to profits that the Court can surmise can be found in emails from Nelson to Larsen and

9   Schaufuss concerning revenue in euros or Canadian dollars and two sets of banking statements

10  for one of Nelson's corporate entities in both U.S. and Canadian dollars. Dkt. No. 64 ¶¶ 6, 10–

11  11; Dkt. Nos. 64-6, 64-10, 64-11. These documents are submitted with a declaration of counsel

12  which does not explain the contents of the documents or provide any basis for the calculations

13  one might use to arrive at the sums requested, particularly since the records contain foreign

14  currencies. The Court finds that Bungie has failed to meet its burden to provide admissible

15  evidence of actual damages and the Court rejects the request to enter default judgment in the

16  amount requested. But Bungie has asked for $300,000, the maximum statutory award for

17  Larsen's willful infringement of its two copyrighted works. *See* 17 U.S.C. § 504(c)(2). The Court

18  finds this request reasonable, given the two alleged infringements and the willful nature of

19  Larsen's efforts to infringe on the copyrighted works. The Court directs entry of default

20  judgment to include $300,000 for violations of the Copyright Act.

21      Third, Bungie requests an award of "mitigation expenses" that it claims to have incurred

22  as a result of Larsen's breach of contract, RICO, and CFAA violations. Dkt. No. 76-1 at 41–42

23  (sealed). Bungie cites to a decision interpreting the CFAA, which concluded that the Act allows

24  for recovery of reasonable costs incurred to "resecure" a computer from further damage. *See*

1    *United States v. Middleton*, 231 F.3d 1207, 1213 (9th Cir. 2000) (considering the term in the

2    context of a criminal action). The Court also finds that the breach of contract would allow

3    Bungie to recover damages, such as the mitigation damages that Bungie incurred to remedy the

4    harms proximately caused by the breach. Here, Bungie has submitted evidence that it expended

5    roughly $2,000,000 to remedy the damage caused by the Wallhax cheat and two other cheat

6    products that targeted Destiny 2. Dkt. No. 76-3 ¶¶ 25–26 (sealed). Bungie asks for an award of

7    one third of these costs and that they be trebled under RICO, 18 U.S.C. § 1964(c). The Court

8    finds this to be appropriate. The Court directs entry of default judgement to include $1,999,998

9    for the RICO claim. The Court notes that Bungie does not ask for a separate award of $666,666

10   for the breach of contract or CFAA violation, and therefore will enter default judgment only in

11   the trebled figure.

12          Fourth, Bungie is entitled to reasonable attorney fees and costs. Reasonable attorney fees

13   and costs are recoverable under the Copyright Act. *See* 17 U.S.C. § 505. "In deciding whether to

14   award attorneys' fees, courts in this Circuit consider certain factors, including (1) the degree of

15   success obtained; [ (2) ] frivolousness; [ (3) ] motivation; [ (4) ] objective unreasonableness (both

16   in the factual and legal arguments in the case); and [ (5) ] the need in particular circumstances to

17   advance considerations of compensation and deterrence." *Halicki Films, LLC v. Sanderson Sales

18   & Mktg.*, 547 F.3d 1213, 1230 (9th Cir. 2008) (quotation and citation omitted). Here, the Court

19   finds that all five factors favor an award of attorney fees and costs. And it finds the requested

20   amounts to be reasonable. Here, the Court finds the requested amounts to be reasonable and finds

21   the award of $267,887.10 in attorney fees and $80,263.92 in costs to be proper.

22          In total, the Court directs entry of default judgment in the amount of $16,178,149.02.

23

24

1

**E.      Injunctive Relief**

2      The Court finds it appropriate to enter a permanent injunction against Larsen on the

3   majority of the terms Bungie requests. The Court notes that Bungie has requested an injunction

4   that extends to its software beyond Destiny 2 and includes broad language about its affiliates,

5   parents, and subsidiaries. The Court has limited the injunction to the Destiny 2 game, which is

6   the sole game at issue with regard to Bungie's copyright and DMCA claims. And the Court has

7   limited the injunction to Bungie rather than any subsidiaries, parents, and affiliates, given that

8   this action was brought solely by Bungie, Inc. and no other entities.

9      "As a general rule, a permanent injunction will be granted when liability has been

10   established and there is a threat of continuing violations." *MAI Sys. Corp. v. Peak Comput., Inc.*,

11   991 F.2d 511, 520 (9th Cir. 1993). And under the Copyright Act, the Court may "grant

12   temporary and final injunctions on such terms at it may deem reasonable to prevent or restrain

13   infringement of a copyright." 17 U.S.C. § 502(a). A plaintiff seeking permanent injunctive relief

14   must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at

15   law, such as monetary damages, are inadequate to compensate for that injury; (3) that,

16   considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

17   warranted; and (4) that the public interest would not be disserved by a permanent injunction."

18   *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

19      The Court finds that all four *eBay* factors favor entry of a permanent injunction. First,

20   based on the admitted allegations in the amended complaint, Larsen's copyright infringement has

21   caused irreparable harm to Bungie's goodwill and reputation and has caused it to incur expenses

22   to prevent further damage from cheat software. Second, Bungie has shown that monetary

23   damages alone will not prevent Larsen from engaging in further abusive conduct. Given Larsen's

24   decision not to appear in this case, there can be no assurances that Larsen will no longer engage

in the conduct at issue in this case. This satisfies the Court that monetary damages alone are

insufficient. Third, the equities favor Bungie, which seeks to enjoin Larsen from engaging in

illegal conduct that benefits only Larsen. This favors Bungie and the requested injunction.

Fourth, an injunction prohibiting Larsen from engaging in further conduct that infringes on

Bungie's copyrights will serve the public interest. The Court GRANTS the Motion and ENTERS the

following permanent injunction against Larsen as follows:

1.      Larsen, all persons acting under Larsen's direction or control (including but not

limited to Larsen's agents, representatives, and employees), and those persons or companies in

active concert or participation with Larsen who receive actual notice of this Order by personal

service or otherwise, must immediately and permanently cease and desist from any of the

following:

a.      Taking any steps on Larsen's own behalf or assisting others in: (i)

creating, distributing, advertising, marketing or otherwise making

available; obtaining, possessing, accessing or using; promoting,

advertising, or encouraging or inducing others to purchase or use

(including via any social media account, website, or video-sharing

account); (ii) selling, reselling, or processing payments for; (iii) assisting

in any way with the development of; sharing, copying, transferring, or

distributing; (iv) publishing or distributing any source code or

instructional material for the creation of; (v) or operating, assisting,

promoting or linking to any website designed to provide information to

assist others in accessing, developing or obtaining: (A) the Destiny 2

Software Module, either alone, or in conjunction with the Defendant's

Software; or (B) any software whose use infringes Intellectual Property

owned or controlled by Bungie, circumvents technological measures that effectively control access to Destiny 2, violates Bungie's licensing agreements, assists players of Destiny 2 in violating Bungie's licensing agreements, or is designed to exploit or enable the exploitation of Destiny 2.

    b.    Investing or holding any financial interest in any enterprise, product, or company which Larsen knows or has reason to know is now, or intends in the future to be, engaged in any of the foregoing activities prohibited by this Default Judgment and Permanent Injunction.

    c.    Reverse engineering, decompiling, packet editing, or otherwise manipulating Destiny 2 without authorization, or providing any assistance to any person or entity engaged in such activities.

2.    The Court further enjoins Larsen and all third parties acting in concert and participation with Larsen, including but not limited to any domain name registrars or registries holding or listing any of Larsen's websites or storefronts, from supporting or facilitating access to any and all domain names, URLs, and websites (including, but not limited to, insert sites), including any and all future and successor domain names, URLs, and websites, through which Larsen traffics circumvention devices that threaten Bungie's technological protection measures or which infringe Bungie's Intellectual Property rights identified in this action.

3.    Larsen is prohibited from using any social network, video sharing, or digital messaging accounts under their control (including, but not limited to, Facebook, groups or chats on Facebook, YouTube, Twitter, TikTok, Discord, GBATemp, Reddit, Telegram, Skype, WeChat, WhatsApp, Signal, or their equivalent) to provide any content relating to the distribution, marketing, offering for sale, or promotion of the Wallhax cheat software or any other software whose use infringes any of Bungie's Intellectual Property rights specified in this

action, circumvents Bungie's technological measures that effectively control access to Destiny 2, or violates (or assists players of Destiny 2 in violating) Bungie's license agreements, and must take all necessary steps to remove any information on any non-dedicated (*e.g.*, personal) social network accounts under Larsen's control used to distribute or promote any of the foregoing.

4.      Larsen is further prohibited from engaging in any other violation of the Digital Millennium Copyright Act or the Copyright Act, or any other federal or state law, with respect to Bungie and its intellectual property at issue in this action.

5.      Larsen must destroy the Destiny 2 Software Module or any software that in any way interacts with or pertains to Bungie's Intellectual Property.

6.      This permanent injunction constitutes a binding court order, and any violations of this order by Larsen will subject them to the full scope of this Court's contempt authority, including punitive, coercive, and monetary sanctions.

7.      Any company or entity that Larsen controls in the future will also comply with the provisions of this Default Judgment and Permanent Injunction.

8.      This permanent injunction is binding against Larsen worldwide, without regard to the territorial scope of the specific intellectual property rights asserted in the Amended Complaint, and may be enforced in any court of competent jurisdiction wherever Larsen or his assets may be found.

9.      Nothing contained in this Default Judgment and Permanent Injunction limits the right of Bungie to seek relief, including without limitation damages, for any infringements of any Intellectual Property rights occurring after the date of this Judgment and Permanent Injunction.

10.      The Court finds there is no just reason for delay in entering this Default Judgment and Permanent Injunction and, pursuant to Federal Rule of Civil Procedure 54, the Court directs the entry of this Default Judgment and Permanent Injunction against Defendants.

### III.   CONCLUSION

The Court finds that default judgment is appropriately entered in Bungie's favor as to all but the CPA claim. The Court finds that the total damages award shall be entered in the amount of $16,178,149.02 and consists of:

1.   $13,530,000 for violations of the DMCA;

2.   $300,000 for violations of the Copyright Act;

3.   $1,999,998 for violations of RICO; and

4.   $267,887.10 in attorney fees and $80,263.92 in costs.

The Court further GRANTS Bungie's request to be allowed to submit any final billings received relating to this action or the motion for default judgment after submission of the motion. Any further request for reimbursement for final billings must be received **within thirty (30) days** of this Order.

The Court also finds that entry of a permanent injunction on the terms specified above is appropriate and necessary. On these grounds, the Court GRANTS in part the Motion, ENTERS default judgment, and permanently ENJOINS Larsen on the terms specified above.

Dated this 9th day of May 2023.

Tana Lin
United States District Judge